# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| Defense Distributed,<br>Second Amendment Foundation, Inc.,<br>Firearms Policy Coalition, Inc.,<br>Firearms Policy Foundation,<br>The Calguns Foundation,<br>California Association of Federal<br>Firearms Licensees, Inc., and<br>Brandon Combs,<br><br>         *Plaintiffs*,<br><br>      v.<br><br>Gurbir Grewal, Attorney General of the<br>State of New Jersey,<br><br>         *Defendant*. | Civil Action No. _____<br><br><br><br>Oral Argument Requested |

## Plaintiffs' Brief in Support of Plaintiffs' Motion for a Temporary Restraining Order and Preliminary Injunction

BECK REDDEN LLP
Chad Flores*
cflores@beckredden.com
Daniel Hammond*
dhammond@beckredden.com
Hannah Roblyer*
hroblyer@beckredden.com
1221 McKinney Street, Suite 4500
Houston, Texas 77010
(713) 951-3700

HARTMAN & WINNICKI, P.C.
/s Daniel L. Schmutter
Daniel L. Schmutter
dschmutter@hartmanwinnicki.com
74 Passaic Street
Ridgewood, New Jersey 07450
(201) 967-8040

*Pro hac vice* motions to be filed

Counsel for Plaintiffs

# TABLE OF CONTENTS

TABLE OF CONTENTS ....................................................................... i

TABLE OF AUTHORITIES .................................................................. ii

SUMMARY OF THE ARGUMENT ....................................................... 1

STATEMENT OF THE CASE ............................................................... 5

I.     The Plaintiffs publish digital firearms information. ...................... 5

II.    Attorney General Gurbir Grewal is censoring the Plaintiffs. ....... 12

    A.     Grewal's civil actions erect an informal system of prior restraints. .......................................................... 12

    B.     Grewal is targeting the Plaintiffs with the new speech crime. ........... 14

ARGUMENT ....................................................................................... 18

I.     The Court should enjoin Grewal's enforcement of the speech crime. ......... 19

    A.     Plaintiffs will likely succeed on the First Amendment claim. ........... 19

    B.     Plaintiffs will likely succeed on the Due Process Clause claim......... 27

    C.     Plaintiffs will likely succeed on the Commerce Clause claim. .......... 29

    D.     Plaintiffs will likely succeed on the Supremacy Clause claim. ......... 30

    E.     Plaintiffs will suffer irreparable harm in the absence of immediate relief. ................................................. 34

    F.     The balance of equities favors the Plaintiffs and a preliminary injunction will serve the public interest. ........... 36

II.    The Court should enjoin Grewal civil enforcement efforts. ......... 37

CONCLUSION ................................................................................... 39

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*Act Now to Stop War & End Racism Coal. &*
  *Muslim Am. Soc'y Freedom Found. v. D.C.,*
  846 F.3d 391 (D.C. Cir. 2017)...................................................... 28, 29

*Am. Booksellers Found. v. Dean,*
  342 F.3d 96 (2d Cir. 2003) ................................................................. 31

*Am. Libraries Ass'n v. Pataki,*
  969 F. Supp. 160 (S.D.N.Y. 1997) .................................................... 31

*Armstrong v. Exceptional Child Ctr., Inc.,*
  135 S. Ct. 1378 (2015)........................................................................ 35

*Ashcroft v. Am. Civil Liberties Union,*
  542 U.S. 656 (2004) ........................................................................... 37

*Ashcroft v. Free Speech Coal.,*
  535 U.S. 234 (2002) ................................................... 4, 21, 22, 24, 25

*Backpage.com, LLC v. Cooper,*
  939 F. Supp. 2d 805 (M.D. Tenn. 2013) .......................................... 34

*Backpage.com, LLC v. Dart,*
  807 F.3d 229 (7th Cir. 2015) ................................................. 28, 36, 39

*Backpage.com, LLC v. Hoffman,*
  No. 13-CV-03952 DMC JAD, 2013 WL
  4502097 (D.N.J. Aug. 20, 2013) ............................................... 30, 34

*Backpage.com, LLC v. McKenna,*
  881 F. Supp. 2d 1262 (W.D. Wash. 2012) ....................................... 34

*Bantam Books, Inc. v. Sullivan,*
  372 U.S. 58 (1963) ....................................................................... 4, 38

*Bartnicki v. Vopper,*
  532 U.S. 514 (2001) ............................................................. 19, 22, 25

*Bernard v. Gulf Oil Co.*,
  619 F.2d 459 (5th Cir. 1980) (en banc),
  *aff'd*, 452 U.S. 89 (1981) ................................................................ 39

*Bernstein v. U.S. Dep't of State*,
  922 F. Supp. 1426 (N.D. Cal. 1996) .................................................. 20

*Boos v. Barry*,
  485 U.S. 312 (1988) ................................................................. 21, 28

*Brandenburg v. Ohio*,
  395 U.S. 444 (1969) ......................................................................... 25

*Brown v. Entm't Merchs. Ass'n.*,
  564 U.S. 786 (2011) ......................................................................... 23

*City of Chicago v. Morales*,
  527 U.S. 41 (1999) ........................................................................... 29

*City of Ladue v. Gilleo*,
  512 U.S. 43 (1994) ........................................................................... 11

*Crosby v. Nat'l Foreign Trade Council*,
  530 U.S. 363 (2000) ......................................................................... 35

*Def. Distributed v. U.S. Dept. of State*,
  121 F. Supp. 3d 680 (W.D. Tex. 2015) ..................................... 9, 11, 20

*Def. Distributed v. United States Dep't of State*,
  838 F.3d 451 (5th Cir. 2016) ...................................................... 7, 20

*Defense Distributed v. United States Department of State*,
  No. 1:15-CV-372-RP (W.D. Tex.) ..................................................... 5

*Elrod v. Burns*,
  427 U.S. 347 (1976) ......................................................................... 37

*Globe Newspaper Co. v. Sup. Ct. for Norfolk County*,
  457 U.S. 596 (1982) ......................................................................... 23

*Google, Inc. v. Hood*,
  822 F.3d 212 (5th Cir. 2016) ........................................................... 31

*B.H. ex rel. Hawk v. Easton Area Sch. Dist.*,
  725 F.3d 293 (3d Cir. 2013) ............................................................ 18

*Healy v. Beer Inst.*,
  491 U.S. 324 (1989) ......................................................................... 31

*Helen of Troy, L.P. v. Zotos Corp.*,
  235 F.R.D. 634 (W.D. Tex. 2006) ....................................................... 5

*Hess v. Indiana*,
  414 U.S. 105 (1973) ......................................................................... 25

*Holder v. Humanitarian Law Project*,
  561 U.S. 1 (2010) ............................................................................ 27

*Johnson v. United States*,
  135 S. Ct. 2551 (2015) ..................................................................... 29

*Junger v. Daley*,
  209 F.3d 481 (6th Cir. 2000) ............................................................ 19

*Kitty Hawk Aircargo, Inc. v. Chao*,
  418 F.3d 453 (5th Cir. 2005) .............................................................. 5

*Nat'l Foreign Trade Council, Inc. v. Giannoulias*,
  523 F. Supp. 2d 731 (N.D. Ill. 2007) ................................................. 35

*Nat'l Inst. of Family & Life Advocates v. Becerra*,
  138 S. Ct. 2361 (2018) ..................................................................... 21

*New York v. Ferber*,
  458 U.S. 747 (1982) ......................................................................... 27

*O'Donnell v. Goodhart*,
  900 F.3d 220 (5th Cir. 2018) ............................................................ 37

*Okwedy v. Molinari*,
  333 F.3d 339 (2d Cir. 2003) ............................................................. 39

*Orabi v. Att'y Gen. of the U.S.*,
  738 F.3d 535 (3d Cir. 2014) .............................................................. 5

*Pike v. Bruce Church, Inc.*,
  397 U.S. 137 (1970) ......................................................................... 30

*Rattner v. Netburn*,
    930 F.2d 204 (2d Cir. 1991) ............................................................. 39

*Reed v. Town of Gilbert, Ariz.*,
    135 S. Ct. 2218 (2015) .............................................................. 21, 23

*Rice v. Paladin Enters., Inc.*,
    128 F.3d 233 (4th Cir. 1997) ............................................................ 28

*Rocky Mtn. Farmers Union v. Corey*,
    730 F.3d 1070 (9th Cir. 2013) .......................................................... 30

*Smith v. California*,
    361 U.S. 147 (1960) ...................................................................... 27

*Smith v. Goguen*,
    415 U.S. 566 (1974) ...................................................................... 29

*Sorrell v. IMS Health Inc.*,
    564 U.S. 552 (2011) ...................................................................... 19

*Staples v. United States*,
    511 U.S. 600 (1994) ...................................................................... 25

*State of Washington v. United States Department of State*,
    No. 2:18-cv-1115-RSL (W.D. Wash.) .......................................... 6, 9

*Stilp v. Contino*,
    613 F.3d 405 (3d Cir. 2010). ........................................................... 36

*Sypniewski v. Warren Hills Reg'l Bd. of Educ.*,
    307 F.3d 243 (3d Cir. 2002) ............................................................ 36

*Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly*,
    309 F.3d 144 (3d Cir. 2002) ............................................................ 36

*Test Masters Educ. Servs., Inc. v. Singh*,
    428 F.3d 559 (5th Cir. 2005) ........................................................... 38

*United States v. Aguilar*,
    515 U.S. 593 (1995) ...................................................................... 26

*United States v. Alabama*,
    691 F.3d 1269 (11th Cir. 2012) ....................................................... 37

*United States v. Arizona*,
   641 F.3d 339 (9th Cir. 2011) ............................................................ 34

*United States v. Flores*,
   730 F. App'x 216 (5th Cir. 2018) (unpublished) ................................ 5

*United States v. Playboy Entm't Grp., Inc.*,
   529 U.S. 803 (2000) ......................................................................... 23

*United States v. Stevens*,
   559 U.S. 460 (2010) ......................................................................... 25

*Universal City Studios, Inc. v. Corley*,
   273 F.3d 429 (2d Cir. 2001) ............................................................ 20

*Ward v. Rock Against Racism*,
   491 U.S. 781 (1989) ......................................................................... 21

*Whole Woman's Health v. Hellerstedt*,
   136 S. Ct. 2292 (2016) ..................................................................... 23

*Ex parte Young*,
   209 U.S. 123 (1908) .................................................................... 4, 18

## Statutes

18 U.S.C. § 922(a)(1)(a) .......................................................................... 28

22 U.S.C.
   § 2778(a)(1) ............................................................................. 34, 35
   § 2778(g)(6) ..................................................................................... 34
   § (e)(2)(A) ........................................................................................ 34

28 U.S.C. §§ 516, 519 ............................................................................. 34

42 U.S.C. § 1983 ..................................................... 4, 18, 19, 31, 38

47 U.S.C.
   § 230(c)(1) ................................................................................ 32, 33
   § 230(e)(3) ....................................................................................... 32
   § 230(f)(3) ........................................................................................ 32

22 U.S.C. ch. 39 ...................................................................................... 34

N.J. Stat.
  2C:43-3(b)(1) ........................................................................................ 17
  2C:43-6(a)(3) ........................................................................................ 17
  2C:43-7(a)(4) ........................................................................................ 17

## Rules

Fed. R. Civ. P. 10(c) ................................................................................ 5

Fed. R. Evid. 201 .................................................................................... 5

## Other Authorities

22 C.F.R.
  Parts 120-130 ...................................................................................... 34
  § 126.7(a) .............................................................................................. 34

Bureau of Alcohol, Tobacco, Firearms and Explosives
  (Nov. 6, 2017), https://www.atf.gov/firearms/qa/does-
  individual-need-license-make-firearm-personal-use ......................... 28

William J. Krouse, *Gun Control: 3D-Printed AR-15
  Lower Receivers*, Cong. Res. Serv. Insight, 2
  (Aug. 22, 2018), https://fas.org/sgp/crs/misc/IN10957.pdf ............... 28

## SUMMARY OF THE ARGUMENT

In November 2018, the State of New Jersey enacted Senate Bill 2465, a new criminal law.  Section 3(*l*)(2) of the law criminalizes constitutionally protected speech that the Plaintiffs would be engaging in right now were it not for the imminent threat of enforcement posed by Attorney General Gurbir Grewal.  The Plaintiffs have been censored—their exercise of constitutional rights has been chilled—because of Attorney General Gurbir Grewal's promise to jail them and anyone else that speaks in violation of the Section 3(*l*)(2) speech crime.

Section 3(*l*)(2) does not criminalize conduct.  It criminalizes speech: "digital instructions" that "may be used" to "produce a firearm" with a "three-dimensional printer."  Section 3(*l*)(2) makes it a crime to "distribute" that speech "to a person in New Jersey" (except for manufacturers and wholesalers).  The law provides a nearly limitless definition of "distribute": "to sell, or to manufacture, give, provide, lend, trade, mail, deliver, publish, circulate, disseminate, present, exhibit, display, share, advertise, offer, or make available via the Internet or by any other means, whether for pecuniary gain or not, and includes an agreement or attempt to distribute."

No medium escapes this new crime.  Section 3(*l*)(2) outlaws speech delivered "by any means," including the sharing of  information "via the Internet" and via standard postal "mail."  The crime also extends to rudimentary in-person interactions such as "display[ing]," "present[ing]," and "giv[ing]" information.

1

All kinds of digital firearms information are censored by this new speech crime.  The ban covers both "computer-aided design files" *and* "other code or instructions stored and displayed in electronic format as a digital model."  Moreover, information's actual use is irrelevant.  The crime occurs if information "*may be used*" by a third party in certain activities, regardless of the speaker's intent.

This law is unconstitutional.  It is an extreme act of content-based censorship that has no hope of satisfying strict scrutiny because it is overbroad, underinclusive, ineffective, and lacking a scienter element.  It punishes speakers worldwide not because their speech itself does any harm, but because of speculation that their speech may sometimes bear a contingent and indirect relationship to bad acts.

Attorney General Gurbir Grewal is expressly targeting Defense Distributed. He said that this law must be enacted because of "a Texan named Cody Wilson" (Defense Distributed's founder) and "his supporters."  Section 3(*l*)(2) was made "to stop them" and to "stop the next Cody Wilson."  With his new speech crime "tool" in hand, the Attorney General threatened Defense Distributed and everyone that they share information with: "we will come after you."  Now he is carrying out the threat.

The CodeIsFreeSpeech.com publishers received the latest salvo.  ***Three days ago***, their act of republishing some of Defense Distributed's CAD files was met with yet another of Attorney General Gurbir Grewal's Orwellian take-down orders: "delete all files described within 24 hours or we will be forced to press charges."

2

Irreparable harm of the highest constitutional order will occur if the Attorney General is allowed to enforce Section 3(*l*)(2) against Defense Distributed, against SAF's members, or against CodeIsFreeSpeech.com.  Saturday's take-down order makes the threat truly imminent.  And the harm is not just prospective.  It is current.

With every passing day, Section 3(*l*)(2) causes irreparable harm by chilling protected speech and triggering self-censorship.  Defense Distributed, SAF's members, and the CodeIsFreeSpeech.com publishers are not the only victims.  Anyone who dares speak to another citizen about computer-aided firearm designs is being injured.  When Grewal says that "we will come after you," he means everyone.

In this action, Plaintiffs are likely to succeed in having Section 3(*l*)(2) held unconstitutional and its enforcement permanently enjoined.  This is true both as to the First Amendment actions and as to those brought under the Due Process Clause, Commerce Clause, and Supremacy Clause.  Until then, the Court should preserve the status quo and prevent irreparable harm by temporarily restraining and preliminarily enjoining Grewal's enforcement of Section 3(*l*)(2) against the Plaintiffs.

In addition to its new *criminal* law, Attorney General Gurbir Grewal has for months been acting to censor the Plaintiffs under the color of state *civil* laws.  He issued a cease-and-desist letter to Defense Distributed, sued Defense Distributed in state and federal court, and threatened service providers of both Defense Distributed and CodeIsFreeSpeech.com in an effort to shut down the speech.

Through these civil legal actions, Grewal has attempted to impose a prior restraint that is just as violative of the First Amendment as is Section 3(*l*)(2)'s new speech crime. His civil enforcement actions are also bound to be held unconstitutional in this case. They too should be restrained and enjoined until the Court issues a final judgment stopping this censorship for good.

"The right to think is the beginning of freedom, and speech must be protected from the government because speech is the beginning of thought." *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 253 (2002). Hence, a "law imposing criminal penalties on protected speech is a stark example of speech suppression." *Id.* at 244. The Constitution is no less offended by suppressive actions that take the form of "informal sanctions." *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67 (1963). Both kinds of suppression are at issue here and both need to be halted immediately.

The Court should temporarily restrain and preliminarily enjoin Defendant Gurbir Grewal, in his official capacity as New Jersey Attorney General, from the following three illegal courses of conduct:

(1)   enforcing New Jersey Statutes § 2C:39-9(*l*)(2) (New Jersey Senate Bill 2465 § 3(*l*)(2)) against Plaintiffs,

(2)   directing the Plaintiffs to cease and desist publishing computer files with digital firearms information, and

(3)   directing the Plaintiffs' communication service providers to cease and desist publishing Plaintiffs' computer files with digital firearms information.

## STATEMENT OF THE CASE

Plaintiffs' Complaint states the facts.   Doc. 1 (hereinafter "Compl."). Plaintiffs adopt that pleading here by reference.  *See* Fed. R. Civ. P. 10(c).[1]

## I.    The Plaintiffs publish digital firearms information.

This action has roots in a prior federal action, *Defense Distributed v. United States Department of State*, No. 1:15-CV-372-RP (W.D. Tex.) (hereinafter *Defense Distributed I*).   That case concerned the issue of whether federal law lets the State Department halt the online publication of certain digital firearms information.

Defense Distributed, SAF, and the State Department settled *Defense Distributed I* by entering into a Settlement Agreement, Ex. 14, which, among other things, obligates the State Department to alter certain regulations and grant the *Defense Distributed I* Plaintiffs—including Defense Distributed and SAF—a federal license to freely publish digital firearms information.  *See* Ex. 26 ¶ 16-17.  The State Department did so in July by modifying the regulations, Ex. 16, and issuing the license, Ex. 15.[2]

———————————————

[1] The Court should also employ Federal Rule of Evidence 201 to take judicial notice of facts such as other courts' dockets, *see* Exs. 4, 13, 17, 19, 20; *Orabi v. Att'y Gen. of the U.S.*, 738 F.3d 535, 537 & n.1 (3d Cir. 2014), and the contents of pertinent internet websites, *see* Exs. 6, 27, 29, 30-41, 49; *see United States v. Flores*, 730 F. App'x 216, 221 n.1 (5th Cir. 2018) (unpublished) (Haynes, J., concurring); *Kitty Hawk Aircargo, Inc. v. Chao*, 418 F.3d 453, 457 (5th Cir. 2005); *Helen of Troy, L.P. v. Zotos Corp.*, 235 F.R.D. 634, 640 (W.D. Tex. 2006).
[2] The Department of Justice had long taken the position that such a censorship regime would be unconstitutional.  *See* U.S. Dep't of Justice Office of Legal Counsel ("OLC"), Mem. to Dr. Frank Press, Science Advisor to the President, on the

The regulatory changes and license that resulted from *Defense Distributed I* may be *sufficient* to establish the Plaintiffs' right to share the digital firearms information at issue here.  But as a matter of law, they are *not necessary*.  The Constitution guarantees the Plaintiffs' right to engage in the speech at issue.  The Plaintiffs can legally do so now *regardless* of whether the State Department acknowledges that right with a regulatory modification and/or license.[3]

---

Constitutionality Under the First Amendment of ITAR Restrictions on Public Cryptography (May 11, 1978) (Ex. 42); OLC, Mem. for the Office of Munitions Control, Department of State on the Constitutionality of the Proposed Revision of the International Traffic in Arms Regulations (July 1, 1981) (Ex. 43); OLC, Mem. for the Director, Capital Goods Production Materials Division, Dep't of Commerce on the  Constitutionality of the Proposed Revision of the International Traffic in Arms Regulations (July 28, 1981) (Ex. 44); OLC, Mem. for Davis R. Robinson, Legal Advisor, Dep't of State, on Revised Proposed International Traffic in Arms Regulations (ITAR) (July 5, 1984) (Ex. 45); U.S. Dep't of Justice, Report on the Availability of Bombmaking Information (1997) (Ex. 46).

[3] In *State of Washington v. United States Department of State*, No. 2:18-cv-1115-RSL (W.D. Wash.), New Jersey and other states are suing the State Department to invalidate the regulatory modification and license issuance that occurred in July 2018.   The case concerns whether the State Department complied with the Administrative Procedure Act in performing those actions.  The case's preliminary injunction applies only to the State Department; it does not order Defense Distributed to do or not do anything.  Ex. 20 at 25.  Even if the states in that case ultimately prevail, the State Department will *not* be barred from complying with the Settlement Agreement.  Success for the states in the Washington action means only that the State Department can simply re-perform the regulatory modification and license issuance in accordance with the APA.  Indeed, the Settlement Agreement requires the government to perform its obligations thereunder in a manner "authorized by law (including the Administrative Procedure Act)."  Ex. 14 ¶ 1(a).

**A.     All of the   Plaintiffs publish digital firearms information via the internet.**

Defense Distributed has published digital firearms information to the internet's public domain for lengthy periods of time on multiple occasions.  Indeed, doing so is Defense Distributed's core mission.  *See* Ex. 26 ¶ 4; Ex. 23 ¶ 2.  The nature of the digital firearms information that Defense Distributed has published is well-documented.  *See* Ex. 26 ¶¶ 4-11, 19-20, 26-27; Ex. 23 ¶¶ 3, 8; Ex. 12; Ex. 6 at 1-2; Ex. 13 ¶¶ 25, 36, 44-45; Ex. 53-57[4]; *see also Def. Distributed v. United States Dep't of State*, 838 F.3d 451, 461 (5th Cir. 2016) (Jones, J., dissenting).

First, Defense Distributed published digital firearms information to the internet's public domain via its websites (known as "DEFCAD") in 2012, before *Defense Distributed I* began.  *See* Ex. 26 ¶¶ 8-15; Ex. 23 ¶ 3; Ex. 4 at 15-16, ¶¶ 13-16.  This publication period lasted from December 2012 to May 2013.  *See id.*

Second, Defense Distributed published digital firearms information to the internet via DEFCAD in 2018, after settling *Defense Distributed I.*  *See* Ex. 26 ¶¶ 16-25.  This publication period lasted from July 27 to July 31, 2018.  *See id.*

The digital firearms information that Defense Distributed published on the internet—before and after *Defense Distributed I*—continues to be independently

---

[4] Plaintiffs will be submitting Exhibits 54 and 55 to the Court under seal via an appropriate motion.  Exhibit 54 is intended to be the document filed under seal in *Defense Distributed I* as docket entry number 37-5, which Defendants' counsel has received a copy of already. Exhibit 55 is intended to be the book referred to in Exhibit 53.

republished on the internet.  Most can be located by a simple Google search.  *See* Ex. 24 at 1-2; Ex. 8 at 1; Ex. 28 at 1; Ex. 27 at 10.

Without question, Defense Distributed intends to continue publishing digital firearms information via the internet by making its computer files available for download on DEFCAD.  *See* Ex. 26 ¶¶ 3-7, 20, 21, 23, 32; Ex. 27 at 3-5.  But Defense Distributed refrains from doing so now for fear of being punished by New Jersey's Attorney General.  *See* Ex. 26 ¶¶ 28-32.

The recipients of Defense Distributed's online publications include SAF's members, who refrain from receiving and republishing Defense Distributed's online digital firearms information for fear of being prosecuted by New Jersey's Attorney General.  *See* Ex. 21 ¶¶ 7-9; Ex. 22 ¶¶ 6-9.  Once the Court issues the relief this motion requests, SAF's members will resume receiving information from Defense Distributed and republishing it.  *See* Ex. 21 ¶¶ 7-9; Ex. 22 ¶¶ 6-8.

Similarly, CodeIsFreeSpeech.com has published digital firearms information to the internet's public domain for lengthy periods of time.  *See* Declaration of Brandon Combs.  From July 31, 2018, to February 2, 2019, CodeIsFreeSpeech.com[5] republished a variety of Defense Distributed's most prominent CAD file sets.  *Id.*

---

[5] The CodeIsFreeSpeech project, located online at CodeIsFreeSpeech.com, is a project of Plaintiffs Firearms Policy Coalition, Inc., Firearms Policy Foundation, The Calguns Foundation, California Association of Federal Firearms Licensees, Inc., and individuals, including Plaintiff Brandon Combs.

But on February 2, Grewal cited Section 3(*l*)(2) in issuing an unequivocal takedown command: "You shall delete all files described within 24 hours or we will be forced to press charges in order to preserve the safety of the citizens of New Jersey."  *Id.* CodeIsFreeSpeech.com therefore had no choice but to self-censor under protest and cease making the republished files available.  *Id.*

### B.     Defense Distributed publishes digital firearms information via the U.S. mail.

Apart from online publications, Defense Distributed has spent the last several months distributing digital firearms information by U.S. mail.   In *State of Washington v. United States Department of State*, No. 2:18-cv-1115-RSL (W.D. Wash.), the State Department and the State of New Jersey expressly conceded that Defense Distributed has a right to do just that—to mail digital firearms information without violating any law.[6]

During the Washington action's preliminary injunction hearing, counsel for the State Department stated that "even if the Court were to grant [New Jersey and the other plaintiff states] every ounce of relief that they seek in this case, Defense Distributed could still mail every American citizen in the country the files that are at issue here."  Ex. 19 at 27:12-15. At that same hearing, counsel for New Jersey's

_____

[6] *Cf. Def. Distributed v. U.S. Dept. of State*, 121 F. Supp. 3d 680, 695 (W.D. Tex. 2015) ("As [the State Department] point[s] out, Plaintiffs are free to disseminate the computer files at issue domestically in public or private forums, including via the mail or any other medium that does not provide the ability to disseminate the information internationally.").

Attorney General agreed that, apart from internet publication, Defense Distributed had a right to distribute digital firearms information via the mail or otherwise "hand them around domestically" without violating any law.  Ex. 19 at 23:5-9.

Thus, ever since both the State Department and New Jersey acknowledged Defense Distributed's right to do so legally, Defense Distributed has been distributing digital firearms information files by mailing them via the U.S. Postal Service.  *See* Ex. 26 ¶¶ 5-7, 26-27.  Specifically, "Defense Distributed sold digital firearms information by using an ecommerce platform on DEFCAD to facilitate the transaction and using the U.S. Postal Service as its means of delivering the information."  *Id.* ¶ 26.  After "customers entered an order using DEFCAD's online ecommerce platform," Defense Distributed put the "information on a USB drive or SD card and mailed the drive or card to . . . customers via the U.S. Postal Service."  *Id.* ¶ 27.

For Defense Distributed, SAF, and anyone else interested in digital firearms information, the postal mail alternative to internet publication is not an "adequate substitute[]."  *City of Ladue v. Gilleo*, 512 U.S. 43, 56 (1994).  Internet distribution is essential for many reasons.  Most importantly, it is essential because it enables the

collaborative development of digital firearms information in the public forum now known as the "Open Source Community."[7]

At present, Defense Distributed refrains from distributing digital firearms information via the mail for fear of being punished by New Jersey's Attorney General. Once that threat ceases, Defense Distributed will resume the distribution of its digital firearms information via the mail by making its computer files available for shipment on physical storage devices, *see* Ex. 26 ¶¶ 4-7, 20, 23, 28-32, and SAF's members will go on to receive and republish it, Ex. 21 at ¶¶ 7-9; Ex. 22 ¶¶ 6-9.

## C.   Defense Distributed offers and advertises digital firearms information.

In addition to its actual publications via the internet and mail, Defense Distributed also offers and advertises the distribution of digital firearms information to potential recipients. *See* Ex. 26 ¶¶ 6, 26-27. These efforts include advertisements

---

[7] The "open-source community" is a "loosely organized, ad-hoc community of contributors from all over the world who share an interest in meeting a common need, ranging from minor projects to huge developments, which they carry out using a high-performance collaborative development environment, allowing the organizational scheme and processes to emerge over time." Javier Soriano, Genovea López & Rafael Fernández, *Collaborative Development Environments*, in Goran D. Putnik & Maria M. Cunha, I *Encyclopedia of Networked and Virtual Organizations* at 231 (2008) (Ex. 50). "The concept represents one of the most successful examples of high-performance collaboration and community-building on the Internet." *Id*; *see also* Georg von Krogh, *Open-Source Software Development*, 44 MIT-Sloan Mgmt. Rev. 3, 14 (2003) (Ex. 47); Eric S. Raymond, *The Cathedral and the Bazaar*, 3 First Monday 3 (1998), https://firstmonday.org/article/view/578/499 (Ex. 48).

and offers on DEFCAD itself, participation in trade shows, e-mail advertisements, and media advertising efforts.  Ex. 26 ¶¶ 6, 26, 32; Ex. 9 at 2.

Out of fear of prosecution by New Jersey, Defense Distributed refrains from continuing to offer and advertise its digital firearms information to persons in New Jersey.  Ex. 26 ¶ 32.  Once that threat ceases, Defense Distributed will resume making offers and advertisements about the speech that New Jersey's Attorney General seeks to ban.  *See* Ex. 26 ¶¶ 4-7, 29-32.

## II.   Attorney General Gurbir Grewal is censoring the Plaintiffs.

### A.   Grewal's civil actions erect an informal system of prior restraints.

Apart from and before the enactment of New Jersey's new criminal statute, the New Jersey Attorney General had spent months censoring Defense Distributed and SAF's members with a campaign of civil legal actions that amount to a prior restraint.  He is inflicting this system of informal censorship upon Defense Distributed itself, and is also inflicting this system of informal censorship upon the third party website service providers utilized by both Defense Distributed and CodeIsFreeSpeech.com.

This campaign began on July 26, 2018, when the New Jersey Attorney General sent Defense Distributed a cease-and-desist letter.  Ex. 3.  That cease-and-desist letter claimed that publishing and republishing files on the internet violated New Jersey's "public nuisance and negligence laws."  *Id*. at 1.  Then it commanded Defense Distributed to stop publishing digital firearms information or else: "If you

12

do not halt your efforts to proceed with publication, I will bring legal action against your company. . . ."  Ex. 3 at 1.

Four days later, the Attorney General sued Defense Distributed in a New Jersey state court and sought an *ex parte* temporary restraining order to prevent Defense Distributed's publication of digital firearms information.  *See* Ex. 4; *see also* Exs. 9-10.  This action, a quintessential prior restraint, was removed to federal court and administratively terminated.  Ex. 51.

Additionally, New Jersey's Attorney General is waging an external campaign to silence the Plaintiffs' speech by sending coercive legal letters to interactive computer service providers.  First, the Attorney General urged Dreamhost, an internet hosting provider, to terminate its service contract with Defense Distributed by deploying threats, coercion, and intimidation—all under the banner of "public nuisance law."  Ex. 5 at 1.  Second, the New Jersey Attorney General delivered a similarly threatening, coercive, and intimidating "Legal Request" to Cloudflare, an internet security provider.  Ex. 5 at 3.

The New Jersey Attorney General's own press releases promote these activities as part of a unified and intentional campaign.  The cease-and-desist letters, the intimidation of service providers, and the commencement of civil actions are all part of the New Jersey Attorney General's plan to stop Defense Distributed "from publicly releasing computer files."  Ex. 6 at 1.

13

**B.     Grewal is targeting the Plaintiffs with the new speech crime.**

Senate Bill 2465 amplified New Jersey's existing regime of unconstitutional civil actions by creating a new speech crime.  The Governor signed Senate Bill 2465 at a public ceremony, flanked by the Attorney General and the bill's leading legislative sponsor.  The statements delivered at this event prove that New Jersey's new speech crime was enacted for the purpose of censoring—and eventually, selectively prosecuting—Defense Distributed. [8]

First, the Governor called Senate Bill 2465 part of the very same "fight" and very same "efforts" as the cease-and-desist letter that the Attorney General sent to Defense Distributed:

> The Attorney General has been a national leader in this fight.  Last June he issued *a cease and desist letter to the companies that deal in ghost guns, saying explicitly that New Jersey is off limits to them*.  He joined likeminded attorneys general in successfully stopping in federal court the release of blueprints that would have allowed anyone with a computer and access to a 3D printer the ability to build their own, untraceable firearm.  *This law that we're going to sign today further backs up his efforts*, and I thank him for all that he has done.  Thank you, Gurbir.

Ex. 2 at 7:15-8:1 (emphasis added).  The Governor also praised the Attorney General's campaign of "naming and shaming" Defense Distributed and other companies that engage in constitutionally protected activity.  *Id.* at 9:7.

---

[8] In addition to the event's transcript, Ex. 2, the government's version of the video is at https://www.youtube.com/watch?v=lJiQ6iFH5x4.

14

Next, Attorney General Grewal called out Defense Distributed founder Cody Wilson by name. He said that he needed "stronger tools to stop them" because "a Texan named Cody Wilson," Defense Distributed, and its supporters—i.e., the Second Amendment Foundation—were "not relenting" and "still trying to release these codes online." *Id.* at 12:6-12:24.

Later in the ceremony, the Attorney General called out Defense Distributed founder by name *again*. After tacitly admitting that prior law did not make Defense Distributed's expression illegal, he said that the new criminal law was being enacted "to stop the next Cody Wilson - to fight the ghost gun industry":

> **[B]*ad actors were trying to take advantage of loopholes because no law squarely addressed printable guns or ghost guns*.** So we had to rely on other laws, like our public nuisance law or our assault weapons law, to fight back. Now don't get me wrong: Those laws are important and they're great tools, and they helped us stop the spread of these dangerous, untraceable weapons. But a law right on point strengthens law enforcement's hand even more.
>
> And so today, there is no question that printable guns and ghost guns are deadly, and selling them in New Jersey is illegal. And that's why I'm so proud to support Governor Murphy's efforts and the legislature's efforts to close those loopholes, ***to stop the next Cody Wilson, to fight the ghost gun industry,*** and to regulate the next dangerous gun models before they spread into our communities.

*Id.* at 14:8-25 (emphasis added).

Finally, Attorney General Grewal promised that New Jersey intends to "come after" "anyone who is contemplating making a printable gun" and "the next ghost

15

gun company." *Id.* at 15:1-11. A press release further touted the enforcement threats. Ex. 52.

The Governor signed Senate Bill 2465 into law at the end of that ceremony. Ex. 1, S. 2465, 218th Leg., Reg. Sess., 2018 NJ Sess. Law Serv. Ch. 138 (N.J. 2018) (hereinafter "SB 2465") (Ex. 1). The law took effect immediately. SB 2465 § 4.

Section 3(*l*)(2) of SB 2465 criminalizes speech about firearms. Unlike neighboring provisions about conduct, Section 3(*l*)(2) imposes a freestanding prohibition on speech; its operation does not depend on the previous criminal acts. Speech and speech alone is the event that triggers Section 3(*l*)(2) criminal liability:

> *l*. Manufacturing or facilitating the manufacture of a firearm using a three-dimensional printer. In addition to any other criminal penalties provided under law it is a third degree crime for:
>
> . . .
>
> (2) a person to distribute by any means, including the Internet, to a person in New Jersey who is not registered or licensed as a manufacturer as provided in chapter 58 of Title 2C of the New Jersey Statutes, digital instructions in the form of computer-aided design files or other code or instructions stored and displayed in electronic format as a digital model that may be used to program a three-dimensional printer to manufacture or produce a firearm, firearm receiver, magazine, or firearm component.
>
> As used in this subsection: "three-dimensional printer" means a computer or computer-driven machine or device capable of producing a three-dimensional object from a digital model; and "distribute" means to sell, or to manufacture, give, provide, lend, trade, mail, deliver, publish, circulate, disseminate, present, exhibit, display, share, advertise, offer, or make available via the Internet or by any other means, whether for pecuniary gain or not, and includes an agreement or attempt to distribute.

16

SB 2465 § 3(*l*)(2).  A conviction entails at least three to five years of imprisonment, *see* N.J. Stat. 2C:43-6(a)(3); N.J. Stat. 2C:43-7(a)(4) (sometimes five to ten), and a fine of up to $15,000, *see* N.J. Stat. 2C:43-3(b)(1).

Doubts about whether or not Grewal will apply the new speech crime to Defense Distributed's CAD files were put to rest on February 2, 2019, when he did just that.  In a takedown notice directed at CodeIsFreeSpeech.com, Grewal expressly identified CAD files that Defense Distributed had first published and declared them to be "3D printable firearms in violation of [§ 3(*l*)(2)]."  An erasure was ordered: "You shall delete all files described within 24 hours or we will be forced to press charges in order to preserve the safety of the citizens of New Jersey."  Grewal's February 2, 2019, takedown demand was delivered to CodeIsFreeSpeech.com through an email from "Cloudflare Abuse."

Critically, the takedown demand issued on Saturday was *not* limited to files containing digital instructions in the form of computer-aided design files or other code or instructions stored and displayed in electronic format as a digital model that may be used to program a three-dimensional printer to manufacture or produce a firearm, firearm receiver, magazine, or firearm component. Instead, Grewal cited Section 3(*l*)(2) to demand deletion of *the entire site and its content*.  In other words, the takedown demand sought to compel the complete and total suppression of the political speech at CodeIsFreeSpeech.com, the links to other advocacy websites and

their educational and political resources, links to political tee shirts, and even the very text of the United States Constitution itself.

## ARGUMENT

Plaintiffs move for a temporary restraining order and preliminary injunction against Defendant Gurbir Grewal in his official capacity as New Jersey Attorney General. The Court should temporarily restrain and preliminarily enjoin Grewal from (1) enforcing Section 3(*l*)(2) against Plaintiffs, (2) directing the Plaintiffs to cease and desist publishing computer files with digital firearms information, and (3) directing the Plaintiffs' communication service providers to cease and desist publishing Plaintiffs' computer files with digital firearms information. *See* 42 U.S.C. § 1983; *Ex parte Young*, 209 U.S. 123 (1908).

Well-established law governs requests for TROs and preliminary injunctions. Four issues should be analyzed: "(1) whether the movant has a reasonable probability of success on the merits; (2) whether the movant will be irreparably harmed by denying the injunction; (3) whether there will be greater harm to the nonmoving party if the injunction is granted; and (4) whether granting the injunction is in the public interest." *B.H. ex rel. Hawk v. Easton Area Sch. Dist.*, 725 F.3d 293, 302 (3d Cir. 2013) (en banc). With respect to both the criminal and civil censorship actions at issue here, and with respect to all of the Plaintiffs—Defense Distributed, the Second Amendment Foundation, and CodeIsFreeSpeech.com's sponsors—all four considerations weigh heavily in favor of relief.

18

I.    **The Court should enjoin enforcement of the speech crime.**

    A.    **Plaintiffs will likely succeed on the First Amendment claim.**

The complaint pleads that New Jersey's Attorney General has violated and is threatening to violate 42 U.S.C. § 1983 by acting, under color of state law, to abridge the Plaintiffs' First Amendment freedoms.   With respect to the enforcement of Section 3(*l*)(2), Plaintiffs are likely to succeed on the merits of the First Amendment claim for at least three independent reasons.

Before addressing those arguments, the Court should hold that the Plaintiffs' distribution of the digital firearms information at issue qualifies as First Amendment speech.   In accordance with the complaint, proof shows that the digital firearms information at issue here qualifies as First Amendment speech under all of the applicable modern precedents.   *Compare* Compl. ¶¶ 27-30, Ex. 26 ¶¶ 5-10, 19-20, 26-27 (Defense Distributed's Director explaining the nature of exemplary digital firearms information), Exs. 53-55 (similar), *and* Ex. 25 (industry expert explaining 3D printing processes), *with Sorrell v. IMS Health Inc.*, 564 U.S. 552, 570 (2011) ("[T]he creation and dissemination of information are speech within the meaning of the First Amendment."), *Bartnicki v. Vopper*, 532 U.S. 514, 526-27 (2001) (similar), *Junger v. Daley*, 209 F.3d 481, 482 (6th Cir. 2000) ("Because computer source code is an expressive means for the exchange of information and ideas about computer programming, we hold that it is protected by the First Amendment."), *Universal City Studios, Inc. v. Corley*, 273 F.3d 429, 449 (2d Cir. 2001) ("[C]omputer code, and

19

computer programs constructed from code can merit First Amendment protection."), *Bernstein v. U.S. Dep't of State*, 922 F. Supp. 1426, 1436 (N.D. Cal. 1996) ("For the purposes of First Amendment analysis, this court finds that source code is speech."), Brief of Amicus Curiae Electronic Frontier Foundation in Support of Plaintiffs-Appellants, *Def. Distributed v. U.S. Dep't of State*, 2015 WL 9267338, at * 11, 838 F.3d 451 (5th Cir. 2016) ("The functional consequences of speech are considered not as a bar to protection, but to whether a regulation burdening the speech is appropriately tailored."), *and Def. Distributed v. U.S. Dep't of State*, 121 F. Supp. 3d 680, 692 (W.D. Tex. 2015) ("Plaintiffs made clear at the hearing that Defense Distributed is interested in distributing the files as 'open source.' That is, the files are intended to be used by others as a baseline to be built upon, altered and otherwise utilized. Thus, at least for the purpose of the preliminary injunction analysis, the Court will consider the files as subject to the protection of the First Amendment.").

### 1. Content-based censorship makes Section 3(*l*)(2) unconstitutional.

Section 3(*l*)(2) is a content-based speech restriction.  Facially, the law is content-based because it criminalizes "digital instructions" that "may be used to program a three-dimensional printer to manufacture or produce a firearm, firearm receiver, magazine, or firearm component." SB 2465 § 3(*l*)(2); *see Reed v. Town of Gilbert, Ariz.*, 135 S. Ct. 2218, 2227 (2015); *Nat'l Inst. of Family & Life Advocates v. Becerra* ("*NIFLA*"), 138 S. Ct. 2361, 2371 (2018).  The law's justification also makes it content-based because its enactors created the crime to punish the *idea*

20

being conveyed—digital firearm information.  *See* Ex. 2; *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989); *Boos v. Barry*, 485 U.S. 312, 320-21 (1988).

As a content-based speech restriction, the Constitution renders Section 3(*l*)(2) presumptively invalid; it is valid only if New Jersey "prove[s] that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest." *Reed*, 135 S. Ct. at 2231.  That burden cannot be met for at least four reasons.

First, Section 3(*l*)(2) does not survive strict scrutiny because it does not advance a compelling state interest.  The holding of *Ashcroft v. Free Speech Coalition*, 535 U.S. 234 (2002), applies directly to this case: "The mere tendency of speech to encourage unlawful acts is not a sufficient reason for banning it."  *Id.* at 253.  The government lacks a compelling state interest and "may not prohibit speech" if the speech merely "increases the chance an unlawful act will be committed 'at some indefinite future time.'"  *Id.*  A mere "remote connection" between speech and a third party's criminal conduct is not enough.  *Id.*  "Without a significantly stronger, more direct connection, the Government may not prohibit speech on the ground that it may encourage [third-parties] to engage in illegal conduct."  *Id.*  Under *Ashcroft*, New Jersey lacks a compelling state interest in banning Plaintiffs' expression of digital firearms information.

Second, Section 3(*l*)(2) does not meet the narrow tailing requirement because of plausible, less restrictive alternatives.  New Jersey could achieve its ends by banning only the harmful *conduct* at issue—not speech that is merely and only

21

sometimes remotely associated with that conduct.  *See Bartnicki v. Vopper*, 532 U.S. 514, 529 (2001) ("The normal method of deterring unlawful conduct is to impose an appropriate punishment on the person who engages in it."). Indeed, other provisions of SB 2465 do just that by criminalizing the *possession* of certain firearms.

Third, Section 3(*l*)(2) does not survive strict scrutiny because it is substantially underinclusive.  While it criminalizes the "distribution" of digital firearms information, Section 3(*l*)(2) does nothing about the *possession* of that same information.  While it criminalizes speech regarding "firearms," Section 3(*l*)(2) does nothing about speech regarding other dangerous instrumentalities such as poison and bombs.  And while it criminalizes speech by normal people, Section 3(*l*)(2) does nothing about the speech of firearms manufacturers or wholesalers.  The statute ignores these other appreciable sources of the problem it supposedly targets. Therefore, Section 3(*l*)(2) is *not* narrowly tailored.  *See Reed*, 135 S. Ct. at 2231-32.

Fourth, Section 3(*l*)(2) does not survive strict scrutiny because New Jersey cannot prove that the law actually advances the state's aims.  In the First Amendment context, justifications backed by mere "anecdote and supposition" do not suffice, *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 822 (2000), and neither does "ambiguous proof," *Brown v. Entm't Merchs. Ass'n.*, 564 U.S. 786, 800 (2011). Compelling "empirical support" of efficacy must be given. *Globe Newspaper Co. v. Sup. Ct. for Norfolk Cty.*, 457 U.S. 596, 609 (1982).  None exists here. *Cf. Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292, 2313-14 (2016) ("Determined

22

wrongdoers, already ignoring existing statutes and safety measures, are unlikely to be convinced to adopt safe practices by a new overlay of regulations.").

In particular, the Attorney General's effort to prove efficacy is bound to fail because the information he seeks to censor is already available across the internet. The digital firearms information that Defense Distributed already published was thereby committed to the internet's public domain, where independent republishers beyond New Jersey's control will make those files readily accessible on one website or another forever—regardless of whether New Jersey's Attorney General decides to exact vengeance on the publisher he most dislikes.

New Jersey has repeatedly admitted as much in its own court filings, which take the position that "posting these codes is a bell that can never be un-rung." Ex. 4 at 99; *see also* Ex. 6 at 1 ("Once [Defense Distributed] opens that Pandora's box, it can never be closed."). Proof of this reality is, indeed, overwhelming.[9] Because of this fact, New Jersey cannot possibly establish that post-hoc prosecution of Defense Distributed will effectuate its supposed interest in erasing already-released information from the public domain.

---

[9] *See* Ex. 8 at 1; Ex. 12 at 3; Ex. 23 ¶ 4; Ex. 24; Ex. 27 at 10; Ex. 28 at 1; Ex. 29; Ex. 30; Ex. 32 at 1, 3; Ex. 33; Ex. 37; Ex. 38; Ex. 39; Ex. 40; Ex. 41; Ex. 49; *see also* Ex. 30; Ex. 31.

### 2.      Overbreadth makes Section 3(*l*)(2) unconstitutional.

Plaintiffs are also likely to succeed on the merits of their First Amendment claim because Section 3(*l*)(2) is unconstitutionally overbroad. The overbreadth doctrine "prohibits the Government from banning unprotected speech" where, as is the case with Section 3(*l*)(2), "a substantial amount of protected speech is prohibited or chilled in the process."  *Ashcroft*, 535 U.S. at 255.  Section 3(*l*)(2) violates this doctrine in a litany of ways.

First, Section 3(*l*)(2) is overbroad because it criminalizes speech regardless of its relationship to illegal conduct.   Constitutionally, the "government may not prohibit speech because it increases the chance an unlawful act will be committed 'at some indefinite future time'"; it may "suppress speech for advocating the use of force or a violation of law only if 'such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action.'"  *Id.* at 253-54 (quoting *Hess v. Indiana*, 414 U.S. 105, 108 (1973) (per curiam), and *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969) (per curiam)).

In this context, states can only prohibit speech to prevent illegal conduct when the speech is "*integral* to criminal conduct," *United States v. Stevens*, 559 U.S. 460, 468 (2010) (emphasis added).  But speech cannot be "integral to criminal conduct" if it has only a "contingent and indirect" relationship to that conduct. *Ashcroft*, 535 U.S. at 250. It is not enough for the state to allege, as New Jersey does here, that there is "some unquantified potential for subsequent criminal acts." *Id.*  Indeed, the

24

Supreme Court has recognized that "it would be quite remarkable to hold that speech by a law-abiding possessor of information can be suppressed in order to deter conduct by a non-law abiding third party." *Bartnicki*, 532 U.S. at 529-30.

Virtually all of the speech covered by Section 3(*l*)(2) falls squarely on the protected side of *Brandenburg* and *Ashcroft's* line, either because the expression's recipient commits no illegal act at all or because, if they did, the causal link is merely contingent and indirect. *Cf. Staples v. United States*, 511 U.S. 600, 610 (1994) ("[T]here is a long tradition of widespread lawful gun ownership by private individuals in this country."). Yet Section 3(*l*)(2) still criminalizes every instance of "distribut[ion]" no matter what.

Second, Section 3(*l*)(2) is overbroad because it also criminalizes sharing information about any "firearm component." This covers a wide array of generic items—such as fasteners, nuts, bolts, and screws—that have unlimited potential uses and are not unique to firearms. Even if New Jersey could criminalize certain speech concerning a completed "firearm," it could not possibly criminalize speech about mundane parts available in any hardware store.

Third, Section 3(*l*)(2) is overbroad because it fails to distinguish between information that has, and has not, been committed to the public domain. Digital firearms information is already freely circulating in the public domain because of publications that took place before this law was enacted. *See supra* at pp. 16-17 nn. 5-6. "[T]he Government may not . . . restrict individuals from disclosing information

25

that lawfully comes into their hands in the absence of a 'state interest of the highest order.'" *United States v. Aguilar*, 515 U.S. 593, 605 (1995). However, this statute draws no distinction between truly novel "instructions" and those that anyone has been able to obtain with simple Google searches for months. Therefore, the statute's coverage of these readily-available files renders it overbroad.

Fourth, Section 3(*l*)(2) is overbroad because it makes it a crime to merely "offer" or "advertise" instructions—squarely protected speech—even if no actual distribution of the information occurs. In the case of an unconsummated offer or advertisement, the state lacks a sufficiently compelling interest in applying its content-based speech ban.

Fifth, Section 3(*l*)(2) is overbroad because it criminalizes an "agreement or attempt to distribute." New Jersey lacks a compelling interest to criminalize an "agreement or attempt to distribute" instructions if the distribution never comes to fruition. The same overbreadth logic applies to the statute's criminalization of instructions that "may be used" toward a prohibited purpose but are not in fact.

### 3. A missing scienter element makes Section 3(*l*)(2) unconstitutional.

The Plaintiffs' First Amendment claim is also likely to succeed because Section 3(*l*)(2) lacks a necessary scienter element. States cannot create speech crimes without including a stringent requirement of scienter—that is, knowledge of the fact that truly distinguishes innocent acts from guilty ones. *See, e.g.*, *Holder v. Humanitarian Law Project*, 561 U.S. 1, 16-17 (2010); *New York v. Ferber*, 458 U.S.

26

747, 765 (1982); *Smith v. California*, 361 U.S. 147, 153-54 (1960).  Section 3(*l*)(2)

lacks the needed scienter element because it does not even require the speaker to

know that instructions will "be used to program a three-dimensional printer to

manufacture or produce a firearm, firearm receiver, magazine, or firearm

component"—let alone know that the recipient would use the information to engage

in *illegal* production of a firearm.[10]  Hence, the requisite scienter requirement is

missing.  *See Rice v. Paladin Enters., Inc.*, 128 F.3d 233, 247-48 (4th Cir. 1997); *see*

*also Boos*, 485 U.S. at 320-21.

### B.   Plaintiffs will likely succeed on the Due Process Clause claim.

Plaintiffs are also likely to succeed on the merits of their claim that Section

3(*l*)(2) is void for vagueness under the Due Process Clause.[11]  "A law may be vague

---

[10]  Federal laws permit the manufacture of a firearm for personal use.  *See Does an Individual Need a License to Make a Firearm for Personal Use?*, Bureau of Alcohol, Tobacco, Firearms and Explosives (Nov. 6, 2017), https://www.atf.gov/f irearms/qa/does-individual-need-license-makefirearm-personal-use ("[A] license is not required to make a firearm solely for personal use."); William J. Krouse, *Gun Control: 3D-Printed AR-15 Lower Receivers*, Cong. Res. Serv. Insight, 2 (Aug. 22, 2018), https://fas.org/sgp/crs/misc/IN10957.pdf ("In short, unfinished receivers and the components needed to build fully functional AR-15s and other firearms are legally available on the U.S. civilian gun market and can be purchased without a background check under federal law."); *see also, e.g.*, 18 U.S.C. § 922(a)(1)(a).

[11]  Pre-enforcement facial vagueness challenges are allowed to address the Due Process Clause's concern for "arbitrary and discriminatory enforcement," *Act Now to Stop War & End Racism Coal. & Muslim Am. Soc'y Freedom Found. v. D.C.*, 846 F.3d 391, 410 (D.C. Cir. 2017), and also to the extent that they seek to halt the chilling of protected speech, *Dana's R.R. Supply v. Attorney Gen., Florida*, 807 F.3d 1235, 1241 (11th Cir. 2015*)*.  Plaintiffs' claim implicates both concerns.

in violation of the Due Process Clause for either of two reasons: 'First, it may fail to provide the kind of notice that will enable ordinary people to understand what conduct it prohibits; second, it may authorize and even encourage arbitrary and discriminatory enforcement.'"  *Act Now*, 846 F.3d at 409 (quoting *City of Chicago v. Morales*, 527 U.S. 41, 56 (1999)).  Section 3(*l*)(2) is unconstitutionally vague in both respects.

Specifically, Section 3(*l*)(2) is unconstitutionally vague because it criminalizes code or instructions "*that may be* used to program a three-dimensional printer to manufacture or produce a firearm, firearm receiver, magazine, or firearm component."  But it is impossible for a speaker to know what counts as "code . . . *that may be* used to" engage in the proscribed programming.  In the same way that "(w)hat is contemptuous to one man may be a work of art to another," *Smith v. Goguen*, 415 U.S. 566, 575 (1974), what "may be used" by one programmer can be totally useless to another.  Speakers like Defense Distributed and SAF's members cannot tell in advance which side of the line their speech will fall.  Indeed, like the residual clause at issue in *Johnson v. United States*, 135 S. Ct. 2551 (2015), Section 3(*l*)(2) ties the crime's meaning not to "real-world facts or statutory elements," but to a "judicially imagined" notion of what information "may be used" by hypothetical persons.  *Id.* at 2557.

28

Because of indeterminacies like this, the statute both chills speech nationwide and encourages arbitrary and discriminatory enforcement. *See Smith*, 415 U.S. at 575 ("Statutory language of such a standardless sweep allows policemen, prosecutors, and juries to pursue their personal predilections."). Indeed, this case proves the latter point especially: the statements made during Section 3(*l*)(2)'s signing ceremony show that New Jersey's Attorney General wishes to prosecute Defense Distributed not because it poses some sort of unique threat, but because Defense Distributed and its founder espouse views that New Jersey's politicians dislike. *See* Ex. 2.

### C.    Plaintiffs will likely succeed on the Commerce Clause claim.

Plaintiffs are also likely to succeed on the claim that the Attorney General has subjected and is subjecting the Plaintiffs to an unconstitutional deprivation of the right to be free of commercial restraints that violate the dormant Commerce Clause. Two modes of judicial review occur in dormant Commerce Clause cases. Apart from the default balancing test of *Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970), strict scrutiny applies to any law that discriminates against out-of-state economic interests on its face, in its purpose, or in its practical effect. *E.g.*, *Rocky Mtn. Farmers Union v. Corey*, 730 F.3d 1070, 1087 (9th Cir. 2013).

Section 3(*l*)(2) triggers strict scrutiny because it discriminates against out-of-state economic interests by "regulat[ing] conduct that takes place exclusively outside the state." *Backpage.com, LLC v. Hoffman*, No. 13-CV-03952 DMC JAD, 2013 WL

4502097, at *11 (D.N.J. Aug. 20, 2013).  Specifically, discrimination occurs with respect to website publication: even though speakers like Defense Distributed and Brandon Combs operate their websites in a passive fashion from outside of New Jersey, Section 3(*l*)(2) expressly projects New Jersey's law about what can and cannot be said on the internet throughout the entire Union.  *See Am. Libraries Ass'n v. Pataki*, 969 F. Supp. 160, 182 (S.D.N.Y. 1997).

Discrimination also occurs with respect to the statute's "offer" and "advertisement" bans.  That conduct will often occur entirely outside of New Jersey—such as at the trade shows that Defense Distributed attends—and still qualify as a crime under Section 3(*l*)(2).

Because these applications are direct and substantial parts of the statute, Section 3(*l*)(2) is unconstitutional per se, "regardless of whether the statute's extraterritorial reach was intended by the legislature." *Healy v. Beer Inst.*, 491 U.S. 324, 336 (1989); *see Am. Booksellers Found. v. Dean*, 342 F.3d 96, 104 (2d Cir. 2003); *Pataki*, 969 F. Supp. at 182.  The Court should so hold.

### D. Plaintiffs will likely succeed on the Supremacy Clause claim.

Plaintiffs' complaint pleads that New Jersey is violating 42 U.S.C. § 1983 by censoring speech with state laws that Congress chose to preempt and immunize the citizenry from.  Plaintiffs are likely to succeed on the merits of this claim.

### 1.    CDA Section 230 preempts Section 3(*l*)(2).

First, Congress immunized the Plaintiffs from prosecution under Section 3(*l*)(2) with the Communications Decency Act of 1996 ("CDA"), "Congress's grant of 'broad immunity' to internet service providers 'for all claims stemming from their publication of information created by third parties.'" *Google, Inc. v. Hood*, 822 F.3d 212, 220 (5th Cir. 2016).   CDA Section 230(c)(1) provides that, for interactive computer services such as a website, "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1).[12] Section 230(e)(3), in turn, preempts state laws that are "inconsistent with" subsection (c)(1). 47 U.S.C. § 230(e)(3).

The Plaintiffs' case directly implicates CDA Section 230.  Much of the digital firearms information that Defense Distributed published in the past, and desires to publish in the future, is "information provided by another information content provider."  47 U.S.C. § 230(c)(1).

The digital firearms information that Defense Distributed published in July 2018 is a perfect example.  "With the exception of the Liberator CAD files, which were previously posted by Defense Distributed before receiving the State

---

[12] "The term 'information content provider' means any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service." § 230(f)(3).

Department's letter, the other CAD files posted at this time were created by persons other than Defense Distributed and had been posted on the internet by persons other than Defense Distributed before Defense Distributed republished them on DEFCAD."  Ex. 26 ¶ 19.  Thus, while this action certainly concerns the Plaintiffs' right to publish *new* digital firearms information, for purposes of the CDA, this case also implicates Plaintiffs' right to *republish* digital firearms information that was provided by other people engaged in the open source development process.[13]

CodeIsFreeSpeech.com fits within the CDA's protections even more squarely.  From July 31, 2018 to February 2, 2019, CodeIsFreeSpeech.com republished a prominent set of CAD files that had originally been published by Defense Distributed.  The republished CAD files included, among other things, Defense Distributed's files concerning the "Liberator" firearm, and those were the exact files that Grewal's threat of prosecution under Section 3(*l*)(2) specified.

Section 3(*l*)(2) criminalizes the distribution of information regardless of whether information was *re*published—i.e., "provided by another information content provider."  As such, Section 3(*l*)(2) is facially "inconsistent with" Section 230(c)(1) and preempted.  This fault makes Section 3(*l*)(2) facially invalid, for "there

---

[13] A judgment based solely on the CDA would not provide *complete* relief to Plaintiffs, as Defendants could rely on other provisions of state law—such as "public nuisance and negligence laws"—to prohibit the distribution of *new* digital firearm information. *See infra* Part II.

can be no constitutional application of a statute that, on its face, conflicts with Congressional intent and therefore is preempted by the Supremacy Clause." *United States v. Arizona*, 641 F.3d 339, 346 (9th Cir. 2011).

This conclusion is not novel. Courts have consistently invalidated similar state criminal laws because they were preempted by CDA Section 230. *See Backpage.com, LLC v. Hoffman*, No. 13-CV-03952 DMC JAD, 2013 WL 4502097, at *1 (D.N.J. Aug. 20, 2013); *Backpage.com, LLC v. Cooper*, 939 F. Supp. 2d 805, 823 (M.D. Tenn. 2013); *Backpage.com, LLC v. McKenna*, 881 F. Supp. 2d 1262, 1271 (W.D. Wash. 2012). The Court should follow those decisions here.

## 2. The State Department's authority preempts Section 3(*l*)(2).

Additionally, New Jersey's use of Section 3(*l*)(2) to stop Defense Distributed's publication of digital firearms information is preempted by the federal government's exclusive authority over foreign affairs. Specifically, Congress charged the executive branch with administering and enforcing pertinent provisions of the Arms Export Control Act of 1976 ("AECA"), 22 U.S.C. ch. 39, and the International Traffic in Arms Regulations ("ITAR"), 22 C.F.R. Parts 120-130. *See* 28 U.S.C. §§ 516, 519; *see also* 22 U.S.C. § 2778(a)(1); 22 U.S.C. § 2778(g)(6); 22 U.S.C. § (e)(2)(A); 22 C.F.R. § 126.7(a).

By seeking to criminalize Plaintiffs' publication of matters that the State Department has expressly authorized for publication, New Jersey seeks to have its legislature take over the President's job of "control[ling] the import and the export

33

of defense articles." § 2778(a)(1).  Indeed, Attorney General Grewal declared, "[t]he federal government is no longer willing to stop Defense Distributed from publishing this dangerous code, and so New Jersey must step up."  Ex. 6 at 1.  States cannot regulate this aspect of foreign policy.  *See Armstrong v. Exceptional Child Ctr., Inc.*, 135 S. Ct. 1378, 1384 (2015); *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 375 (2000); *Nat'l Foreign Trade Council, Inc. v. Giannoulias*, 523 F. Supp. 2d 731, 738-742 (N.D. Ill. 2007).

### E.   Plaintiffs will suffer irreparable harm in the absence of immediate relief.

Attorney General Gurbir Grewal's enforcement of Section 3(*l*)(2) causes irreparable harm currently, and unless enjoined, will do so to an even greater extent in the near future.  Plaintiffs have engaged—and would engage in the future—in at least three distinct courses of conduct that the Attorney General's unconstitutional enforcement actions outlaws.  For fear of being prosecuted under New Jersey's new speech crime, Plaintiffs have stopped engaging in these constitutionally protected courses of conduct.  In each respect, Plaintiffs' speech lies squarely within Section 3(*l*)(2)'s proscriptions.  And because the law is unconstitutional, the looming threat of its enforcement against Plaintiffs causes irreparable harm.

First, the enforcement of Section 3(*l*)(2) causes irreparable harm because Defense Distributed, SAF's members, and CodeIsFreeSpeech.com have published digital firearms information on the internet and would do so in the future if not for the Attorney General's threats.  Section 3(*l*)(2) clearly covers this conduct by making

34

it a crime to distribute the banned "digital instructions" "by any means, including the Internet."

Second, the enforcement of Section 3(*l*)(2) causes irreparable harm because Defense Distributed has published digital firearms information via the mail and would do so in the future if not for the Attorney General's threats.  Section 3(*l*)(2) clearly covers this conduct by making it a crime to "distribute" the banned "digital instructions" and defining "distribute" to mean "mail."

Third, the enforcement of Section 3(*l*)(2) causes irreparable harm because Defense Distributed, SAF's members, and CodeIsFreeSpeech.com have offered and advertised digital firearms information and intend to do so in the future.  Section 3(*l*)(2) clearly covers this conduct by making it a crime to "distribute" the banned "digital instructions" and defining "distribute" to mean "offer" and "advertise."

In each of these respects, New Jersey's enforcement of Section 3(*l*)(2) would cause irreparable harm by subjecting the Plaintiffs to unconstitutional punishment.  Moreover, the looming threat of such unconstitutional enforcement causes a nationwide chilling effect that stops Plaintiffs and other law-abiding people from engaging in speech that the Constitution entitles them to express freely.  *See supra* at pp. 5-9; *Dana's*, 807 F.3d at 1241 ("Litigants who are being 'chilled from engaging in constitutional activity,' . . . suffer a discrete harm independent of enforcement.").  Both of these harms—the actual enforcement of New Jersey's unconstitutional criminal law and the chilling effect caused by the specter of its

enforcement—are irreparable.  *See, e.g.*, *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality op.) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."); *Stilp v. Contino*, 613 F.3d 405, 409 (3d Cir. 2010).

### F.    The balance of equities favors the Plaintiffs and a preliminary injunction will serve the public interest.

The balance of equities favors an injunction.  The risk of erroneously denying the injunction entails the "potential for extraordinary harm and a serious chill upon protected speech."  *Ashcroft v. Am. Civil Liberties Union*, 542 U.S. 656, 671 (2004). "The harm done from letting [an] injunction stand pending a trial on the merits, in contrast, will not be extensive," especially where, as here, "[n]o prosecutions have yet been undertaken under the law, so none will be disrupted if the injunction stands."  *Id.*  The state's interest in enforcing under their new law will be just as feasible a few weeks from now as it is at present.

Finally, it is always in the public interest to prevent the violation of a party's constitutional rights.  *See, e.g.*, *O'Donnell v. Goodhart*, 900 F.3d 220, 232 (5th Cir. 2018); *Sypniewski v. Warren Hills Reg'l Bd. of Educ.*, 307 F.3d 243, 258 (3d Cir. 2002) ("[T]he public interest demands respect for both constitutional rights."); *Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly*, 309 F.3d 144, 178 (3d Cir. 2002) ("[T]he public interest clearly favors the protection of constitutional rights.").  And with respect to preemption, in particular, the "[f]rustration of federal statutes and

36

prerogatives are not in the public interest." *United States v. Alabama*, 691 F.3d 1269, 1301 (11th Cir. 2012).

## II.    The Court should enjoin New Jersey's civil enforcement efforts.

The Court should also issue a preliminary injunction against the New Jersey Attorney General's use of civil legal actions to censor the Plaintiffs.  In every key respect, the same constitutional analysis that applies to the new speech crime applies to the Attorney General's use of civil legal methods to achieve the same censorship ends.  Indeed, the application of "public nuisance and negligence laws" to speech on the internet is orders-of-magnitude more overbroad, underinclusive, and vague than Section 3(*l*)(2).  Additionally, the Plaintiffs are likely to succeed on the merits of their Section 1983 action's First Amendment claim because New Jersey's conduct violates the doctrine regarding unconstitutional prior restraints.

New Jersey's delivery of a cease-and-desist letter to Defense Distributed constitutes a prior restraint because it demands—in advance, and upon pain of legal punishment—that Defense Distributed *never* publish "printable-gun computer files for use by New Jersey residents."  Ex. 3 at 1.  So do civil actions like the New Jersey Attorney General's effort to obtain an *ex parte* temporary restraining order against Defense Distributed.  *See* Ex. 4.  And of course, the unequivocal takedown demand issued to CodeIsFreeSpeech.com runs headlong into this prohibition as well.

As prior restraints, the state's civil censorship efforts bear a heavy presumption of unconstitutionality.  *See Bantam Books, Inc. v. Sullivan*, 372 U.S.

37

58, 71-72 (1963); *Test Masters Educ. Servs., Inc. v. Singh*, 428 F.3d 559, 579 (5th Cir. 2005).   But Grewal cannot overcome this burden.   The same reasoning that prevents Section 3(*l*)(2) from surviving strict scrutiny also spells defeat for the civil censorship effort as a prior restraint. *See Bernard v. Gulf Oil Co.*, 619 F.2d 459, 473 (5th Cir. 1980) (en banc), *aff'd*, 452 U.S. 89 (1981).

Importantly, this constitutional violation encompasses both the action taken directly against the Plaintiffs and the efforts to threaten, coerce, and intimidate the internet service providers of both Defense Distributed and CodeIsFreeSpeech.com. *See Backpage.com, LLC v. Dart*, 807 F.3d 229 (7th Cir. 2015); *Okwedy v. Molinari*, 333 F.3d 339 (2d Cir. 2003); *Rattner v. Netburn*, 930 F.2d 204 (2d Cir. 1991). *Backpage.com, LLC* is on all fours, and supports every major element of Defense Distributed's request for this additional category of injunctive relief.

38

## CONCLUSION

The motion for a temporary restraining order and a preliminary injunction should be granted.  The Court should temporarily restrain and preliminarily enjoin Defendant Gurbir Grewal, in his official capacity as New Jersey Attorney General, from the following:

(1) enforcing New Jersey Statute § 2C:39-9(*l*)(2) (New Jersey Senate Bill 2465 § 3(*l*)(2)) against Plaintiffs,

(2) directing the Plaintiffs to cease and desist publishing computer files with digital firearms information, and

(3) directing the Plaintiffs' communication service providers to cease and desist publishing Plaintiffs' computer files with digital firearms information.

Date: February 5, 2019              Respectfully submitted,

BECK REDDEN LLP                   HARTMAN & WINNICKI, P.C.
Chad Flores*                      s/ Daniel L. Schmutter
cflores@beckredden.com            Daniel L. Schmutter
Daniel Hammond*                   dschmutter@hartmanwinnicki.com
dhammond@beckredden.com           74 Passaic Street
Hannah Roblyer*                   Ridgewood, New Jersey 07450
hroblyer@beckredden.com           (201) 967-8040
1221 McKinney Street, Suite 4500
Houston, Texas 77010
(713) 951-3700

*Pro hac vice* motions to be filed

Counsel for Plaintiffs