Page Two

In Reply refer to
DDTC Case CJ 1083-14

designated as technical data under Category I(i) of the United
States Munitions List (USML). A license or other approval is
required pursuant to the ITAR prior to any export or temporary
import.

Should you not agree with this determination and have additional facts not
included in the original submission, you may submit a new CJ request. If you do
not agree with this determination and have no additional facts to present, you may
request that this determination be reviewed by the Deputy Assistant Secretary of
State for Defense Trade Controls.

Should you require further assistance on this matter, please contact Samuel
Harmon at (202) 663-2811 or HarmonSC@state.gov.

Sincerely,

C. Edward Peartree
Director
Office of Defense Trade Controls Policy

Cc: Matthew A. Goldstein
1012 14th Street, NW, Suite 620
Washington, DC 20005
matthew@goldsteinplllc.com

GURBIR S. GREWAL
ATTORNEY GENERAL OF NEW JERSEY
Division of Law
124 Halsey Street
P.O. Box 45029
Newark, New Jersey 07101
Attorney for Plaintiff

By:  Lorraine K. Rak (035771985)
     Deputy Attorney General, Section Chief
     Lara J. Fogel (038292006)
     Melissa Medoway (028422011)
     Jesse J. Sierant (049342013)
     Deputy Attorneys General
     Affirmative Civil Enforcement
     (973) 877-1280

SUPERIOR COURT OF NEW JERSEY
CHANCERY DIVISION, ESSEX COUNTY
DOCKET NO._____

| | |
|---|---|
| GURBIR S. GREWAL, Attorney General of the State of New Jersey,<br><br>                    Plaintiff,<br><br>          v.<br><br>DEFENSE DISTRIBUTED, CODY R. WILSON, and JANE and JOHN DOES 1-20, individually and as owners, officers, directors, shareholders, founders, members, managers, agents, servants, employees, representatives and/or independent contractors of DEFENSE DISTRIBUTED, and XYZ CORPORATIONS 1-20,<br><br>                    Defendants. | **Civil Action**<br><br><br><br>**CERTIFICATION OF DEPUTY CHIEF OF DETECTIVES CHRISTOPHER W. DONOHUE** |

     I, Christopher W. Donohue, of full age, certify as follows:

     1.   I am a citizen of the United States and a resident of the State of New Jersey ("New Jersey").

1

2.    I am over 21 years of age.

3.    I am the Deputy Chief of Detectives, shield #1783, of the Gangs/Organized Crime Bureau of the New Jersey Division of Criminal Justice ("DCJ").

4.    I graduated with honors from the Westchester County Police Academy, in Valhalla, New York in 1996, and became an Investigator for the New York County District Attorney's Office in New York City in the same year.   I attained the rank of Senior Investigator and Field Training Officer (FTO) before leaving in November of 2001.

5.    In 2001, I became a detective with DCJ and was assigned to the Gangs/Organized Crime Bureau.  I was promoted to the rank of Lieutenant in 2009, and remained assigned to the Gangs/Organized Crime Bureau.  In 2014, I was promoted to the rank of Deputy Chief of Detectives of the Gangs/Organized Crime Bureau.

6.    In my current capacity as Deputy Chief of Detectives, I am responsible for overseeing all criminal investigations administered by the Gangs/Organized Crime Bureau.   The Gangs/Organized Crime Bureau is responsible for investigating groups and/or individuals associated with street gangs and organized crime who commit criminal offenses in violation of New Jersey State law, such as narcotics trafficking, weapons offenses, money laundering, and murder.  The vast majority of

2

cases investigated by the Gangs/Organized Crime Bureau involve a firearm.

7. During my career, I have investigated and supervised hundreds of cases involving organized crime, narcotics trafficking, weapons offenses, homicide, and money laundering. Throughout my career, I have served as an affiant on numerous wiretap applications, as well as search and arrest warrant applications.

8. In addition to attending the Westchester County Police Academy, I have also received specialized training over the course of my career from agencies, such as the New York City Police Department, the New Jersey State Police ("NJSP"), the United States Drug Enforcement Administration, and the NY/NJ High Intensity Drug Trafficking Area. I have also participated in numerous in-service trainings from the New York County District Attorney's Office and DCJ. I have also received meritorious commendations from the New Jersey Attorney General, the New York City Police Department, the Federal Bureau of Investigation, the United States Drug Enforcement Administration, the NJSP, and the United States Attorney's Office.

9. I am trained in and qualified to carry several types of firearms. Twice a year, I am required to attend in-service trainings and qualify to carry firearms. I have attended these

twice-a-year trainings and qualifications every year since 1996.

10.   Printable-gun computer files allow anyone with a third dimensional ("3D") printer to download a code and create a fully operational gun.   Because the 3D printed firearms will not have serial numbers or other identifiable marks, they will never be traceable by law enforcement.   This completely subverts New Jersey's system of gun regulation and threatens the health, safety, and welfare of our citizens.

11.   A serial number is required to be placed on all firearms so that they can be traced to their original owners if they are ever used to commit a criminal offense.   Law enforcement traces firearms by finding the owner's name in the gun dealer's records, and then interviewing that person and any other person to whom he sold the gun, and so on.   Through this process, law enforcement is able to determine the manufacturer of the gun, the date it was sold, the dealership, and the purchaser.   This information assists law enforcement in determining what happened to a particular gun after it left the dealer by learning the history of who owned the gun.

12.   Being able to trace a gun is critical in the investigation of gun-related crimes.  The computer-aided design (CAD) codes of defendants Defense Distributed and Cody R. Wilson (collectively, "Defendants") will allow individuals across New Jersey to automatically manufacture untraceable guns

on 3D printers.   If law enforcement is unable to trace 3D guns to determine their owners, law enforcement will be critically hampered in its ongoing efforts to solve gun crimes and prevent new gun crimes from being committed.   This poses a direct and immediate threat to public health, safety, and welfare.

13.   Defendants' codes for 3D guns will also enable individuals to print assault weapons, which are illegal in New Jersey under N.J.S.A. 2C:39-5(f).

14.   In addition, Defendants' codes for 3D guns will be available to everyone in New Jersey, regardless of age, criminal status, history of mental illness, or other disqualifying characteristic.   There will thus be no way for law enforcement to prevent guns from winding up in the hands of those who are prohibited from purchasing firearms under New Jersey law, including the following:

    a.   those who have been convicted of crimes and disorderly persons offenses involving acts of domestic violence (prohibited by N.J.S.A. 2C:58-39(c)(1));

    b.   those who are drug dependent (N.J.S.A. 2C:58-3(c)(2));

    c.   those who are confined for mental disorders to hospitals, mental institutions or sanitariums (N.J.S.A. 2C:58-3(c)(2));

d.   those who suffer from a physical defect or disease that would make it unsafe for them to handle firearms (N.J.S.A. 2C:58-3(c)(3));

e.   those who have been confined for a mental disorder (N.J.S.A. 2C:58-3(c)(3));

f.   those who are alcoholics and are unable to produce proof demonstrating that they no longer suffer from that particular disability in a manner that would interfere with or handicap them in the handling of firearms (N.J.S.A. 2C:58-3(c)(3));

g.   juveniles (N.J.S.A. 2C:58-3(c)(4));

h.   those for whom the issuance of a permit to purchase a handgun or firearms purchaser identification card would not be in the interests of the public health, safety, or welfare (N.J.S.A. 2C:58-3(c)(5));

i.   those who are subject to restraining orders issued pursuant to the "Prevention of Domestic Violence Act" prohibiting them from possessing firearms (N.J.S.A. 2C:58-3(c)(6);

j.   those who were adjudicated delinquent for offenses which, if committed by an adult, would constitute a crime involving the unlawful use or possession of weapons, explosives, or destructive devices (N.J.S.A. 2C:58-3(c)(7));

k.   those who had a firearm seized pursuant to the Prevention of Domestic Violence Act (N.J.S.A. 2C:58-3(c)(8)); and

l.   those who are named on the consolidated Terroristic Watchlist maintained by the Terrorist Screening Center administered by the Federal Bureau of Investigation (N.J.S.A. 2C:58-3(c)(9)).

15.   The New Jersey Legislature has passed these laws prohibiting the foregoing groups of individuals from obtaining permits to purchase handguns and firearms purchaser identification cards because the legislative judgment is that if such persons had access to guns, there would be a direct threat to public safety. However, if Defendants' codes for 3D guns are readily available to the general public, everyone with access to a 3D printer will be able to manufacture a gun, and law enforcement will have no way to ensure that guns are not possessed by persons who are prohibited from possessing them under current New Jersey law. This undermines the legislative will and poses a direct and immediate threat to public health, safety, and welfare of New Jersey residents.

16.   Of particular concern are certain persons who are prohibited from purchasing, owning, possessing, or controlling any and all firearms under N.J.S.A. 2C:39-7(b), due to their prior convictions for aggravated assault, arson, burglary,

escape, extortion, homicide, kidnapping, robbery, aggravated sexual assault, sexual assault, bias intimidation, endangering the welfare of a child, stalking, or a crime involving domestic violence. Those persons face a mandatory term of imprisonment with at least five years of parole ineligibility if they purchase, own, possess, or control a firearm. But the 3D codes will allow them to easily download firearms, which will severely hamper law enforcement's ongoing efforts to keep dangerous guns out of the hands of dangerous criminals.

17. I was able to log on to the Defense Distributed website (located at https://defcad.com) and register simply by providing a username and email address. There was nothing on the website requiring that I attest to being over a certain age, not having a criminal background, or being otherwise ineligible to possess a weapon. The website indicated that the download will be free starting August 1, 2018. Thus, on August 1, 2018, any person in New Jersey will be able download the 3D gun codes for free, regardless of that person's eligibility to legally purchase or possess a weapon.

18.  I read Defense Distributed's Complaint filed on July 29, 2018, in the Western District of Texas, where it claimed that "[u]sers with New Jersey based IP addresses are currently blocked from accessing the files[.]"   Later that day, I attempted to and was still able to log on to the website using a smartphone while in New Jersey, contrary to Defense Distributed's claim.

19.  Even were Defense Distributed's controls effective, that does not fix the problem.  I still would be able to travel to the State of New York quickly, download the code one time, return to New Jersey, and print the 3D guns in New Jersey indefinitely.

20.  In sum, Defendants' codes for 3D guns will facilitate the illegal possession of weapons to criminals and other unlawful users, will undermine New Jersey's comprehensive scheme for keeping guns out of dangerous criminals' hands, and will undermine the safety of New Jersey residents.  Based upon my experience, to allow individuals to download the 3D gun from Defendants' website will result in printable 3D guns that will flood the illegal firearms market and pose a direct threat to the public safety of New Jersey.

I certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

CHRISTOPHER W. DONOHUE

Dated: July 30, 2018

GURBIR S. GREWAL
ATTORNEY GENERAL OF NEW JERSEY
Division of Law
124 Halsey Street
P.O. Box 45029
Newark, New Jersey 07101
Attorney for Plaintiff

By:  Lorraine K. Rak (035771985)
     Deputy Attorney General, Section Chief
     Lara J. Fogel (038292006)
     Melissa Medoway (028422011)
     Jesse J. Sierant (049342013)
     Deputy Attorneys General
     Affirmative Civil Enforcement
     (973) 877-1280

SUPERIOR COURT OF NEW JERSEY
CHANCERY DIVISION, ESSEX COUNTY
DOCKET NO._____

|  |  |
|---|---|
| GURBIR S. GREWAL, Attorney General of the State of New Jersey,<br><br>                    Plaintiff,<br><br>          v.<br><br>DEFENSE  DISTRIBUTED,  CODY  R. WILSON, and JANE and JOHN DOES 1-20, individually and as owners, officers, directors, shareholders, founders,  members,  managers, agents,  servants,  employees, representatives and/or independent contractors  of  DEFENSE DISTRIBUTED, and XYZ CORPORATIONS 1-20,<br><br>                    Defendants. | Civil Action<br><br><br><br>CERTIFICATION OF INVESTIGATOR AZIZA SALIKHOVA |

I, Aziza Salikhova, of full age, certify as follows:

1.   I make this Certification based upon my personal knowledge and review of documents in my possession.

2.   I am currently employed as an Investigator with the New Jersey Division of Consumer Affairs ("Division"), Office of Consumer Protection.   I have held this position since approximately March 10, 2001.

3.   In that capacity, I am responsible for investigating possible violations of New Jersey laws and regulations.

4.   Defense Distributed has a website[1] located at https://defdist.org ("DD Website").   The "About" section of the DD Website provides as follows:

7/26/2018                          About | Defense Distributed

# ABOUT

Defense Distributed is a non-profit, private defense firm principally engaged in the research, design, development, and manufacture of products and services for the benefit of the American rifleman. Since 2012, DD has been headquartered in Austin, Texas.

Media inquiries: crw@defdist.org

5.   Defendants have posted their Computer Aided Design ("CAD") files on https://defcad.org ("DefCad Website"), a

---

[1]   On July 26, 2018 I was able to access Defense Distributed's websites located at https://defdist.org, https://defcad.com, and https://ghostgunner.net.   I completed electronic captures of these web sites which are available to be produced upon request.

website they created to serve as an open-source repository for weapons designs.

6.   The DD Website currently states as follows:

Defense Distributed |

(DD) ABOUT  CONSULTING   LOGIN  JOIN

AUGUST 1
2018

Defense Distributed relaunches DEFCAD after reaching a settlement agreement with the US Department of State, concluding a multi-year federal lawsuit. The age of the downloadable gun begins.

7.   The DefCad Website includes data to automatically manufacture the "Liberator" pistol, which is a plastic firearm. The DefCad Website depicts the Liberator pistol as follows:



8.    Through the related website of https://ghostgunner.net ("GG Website"), Defense Distributed also manufactures and sells a "computer-controlled milling machine" called the "Ghost Gunner," which is designed to allow its owner to carve gun parts out of aluminum.    The GG Website includes the following depiction of the Ghost Gunner:





GHOST GUNNER 2
An open source hardware project

Ghost Gunner is a general purpose CNC mill, built upon a large body
of open source work, grbl g-code motion control, and popular
microcontrollers.

View specifications ▸
Learn more ▸

SHOP NOW

---

## FOR 80 PERCENT RECEIVERS AND FRAMES
### No prior CNC experience required

Ghost Gunner is specially designed to manufacture a growing library of mil-spec 80 percent lowers to
completion. With simple tools and point and click software, the machine automatically finds and aligns
to your 80% lower to get to work. No prior CNC knowledge or experience is required to manufacture
from design files. Legally manufacture unserialized rifles and pistols in the comfort and privacy of home.

9.   On July 26, 2018, I created a user account on the
DefCad Website.  During the process I was not asked to verify my
age, criminal background, or any other factors that would render
me ineligible to possess a firearm.

I certify that the foregoing statements made by me are
true.  I am aware that if any of the foregoing statements made
by me are willfully false, I am subject to punishment.

_____
AZIZA SALIKHOVA

Dated:  July 30, 2018
        Newark, New Jersey

5

SUPERIOR COURT OF NEW JERSEY
CHANCERY DIVISION, ESSEX COUNTY
DOCKET NO. ESX-C-

GURBIR S. GREWAL, Attorney
General of the State of New
Jersey,

        Plaintiff,

    v.

DEFENSE DISTRIBUTED, CODY R.
WILSON, and JANE and JOHN DOES
1-20, individually and as
owners, officers, directors,
shareholders, founders, members,
managers, agents, servants,
employees, representatives
and/or independent contractors
of DEFENSE DISTRIBUTED, and XYZ
CORPORATIONS 1-20,

        Defendants.

Civil Action

## PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF ORDER TO SHOW CAUSE WITH TEMPORARY RESTRAINTS

GURBIR S. GREWAL
ATTORNEY GENERAL OF
THE STATE OF NEW JERSEY
Division of Law
124 Halsey Street
P.O. Box 45029
Newark, New Jersey 07101
(973) 877-1280
Attorney for Plaintiff

<u>Of Counsel and On the Brief</u>
Lorraine K. Rak (035771985)
Deputy Attorney General, Section Chief
Lara J. Fogel (038292006)
Melissa Medoway (028422011)
Jesse J. Sierant (049342013)
Deputy Attorneys General
Affirmative Civil Enforcement

## PRELIMINARY STATEMENT

In just two days, Defense Distributed and its founder Cody Wilson are planning to take an unprecedented and dangerous action - to publish Computer Aided Design ("CAD") files that enable anyone, including terrorists, domestic abusers, criminals, gang members and juveniles, to print firearms using a three-dimensional ("3D") printer directly from the comfort of their own homes.  Worse still, the codes they plan to post enable individuals to print extremely dangerous assault weapons' that are illegal under New Jersey law.  And that is not all - because the printed guns would not have serial numbers, they would not be traceable by law enforcement, which would undermine law enforcement's ongoing efforts to solve and reduce gun crime. The implications for public safety and homeland security are clear and the risk is imminent; once Defendants open that Pandora's Box, it can never be closed.  This lawsuit seeks to enjoin Defendants from heading down this path.

For years, the Federal Government and multiple federal courts recognized that Defense Distributed's plans posed a direct threat to public safety and national security across the United States, and so the Government barred the company from publishing the CAD files.  Indeed, the Federal Government stated in litigation that Defense Distributed's plans to publish these

2

firearm codes posed a specific and unique risk to the national security and foreign policy interests of the United States. That was, unfortunately, unsurprising; founder Cody Wilson had made clear that the company's objective is for <u>everyone</u> to have access to guns and to make <u>any</u> firearm regulations impossible, even stating that "common sense gun reforms" would no longer be possible. And although the Federal Government had properly challenged Defense Distributed's ability to publish codes that will enable terrorists and criminals to print firearms, just recently the Federal Government disclosed that it had earlier settled this litigation. Troublingly, the Federal Government has now abruptly flipped positions (even after multiple courts had agreed about the pending risk to public safety) and decided to allow Defense Distributed to proceed with its plans to share these computer codes on the Internet, available to all.

But New Jersey law provides a separate and independent basis to prevent Defense Distributed and Cody Wilson from engaging in this dangerous, irreversible conduct. New Jersey's public nuisance law provides a cause of action to hold firearm manufacturers accountable – and to enjoin imminent violations of the law – when their plans would facilitate the illegal sale of weapons to criminals and other prohibited users, and when the manufacturer has done too little to prevent that illegal market

3

from developing.  And that is what will happen here - Defendants will make accessible codes that will allow terrorists, domestic violence abusers, criminals, gang members and juveniles to print guns at home, even though they cannot lawfully possess them. More than that, Defendants' codes will enable individuals to create firearms without serial numbers, again in direct contravention of state law.  But Defendants have done nothing to prevent the flood of illegal, 3D-printed weapons that is sure to result, and as noted above, have instead wholeheartedly embraced and encouraged these troubling results.

In light of the grave and imminent harm posed with the release of printable-gun computer files, which can, and will, be used to create illegal and untraceable firearms in New Jersey, the Attorney General requests that the Court immediately enter an order enjoining and restraining Defendants from publishing and distributing these dangerous printable-gun computer files, which Defendants plan to publish this Wednesday, on August 1, 2018.

## FACTUAL BACKGROUND

In 2012, Defense Distributed, founded by Cody Wilson, began exporting technical data related to firearms through the publication of CAD files, without restriction, on the Internet. (Defense Distributed v. U.S. Dept. of State, Civil Action No.

4

1:15-CV-00372-RP, W.D. Tex. ("DD v. U.S."), Dkt. 32, p.1; Dkt. 8, pp. 5-6; Defense Distributed v. U.S. Dept. of State, 838 F.3d 451, 460-61 (5th Cir. 2016).)   These files are computer files with instructions for how to create guns and gun components through the use of three-dimensional printers.   (DD v. U.S., Dkt. 32, p.5.)   Defense Distributed posted these CAD files on DefCad.org ("Website"), a website it created to serve as an open-source repository for weapons designs.   (DD v. U.S., Dkt. 32; Dkt. 8.)   The site accepts user financial contributions and has a users' comments feature where information can be posted or shared.   (See https://defdist.org/; https://defcad.com.)   The files Defense Distributed put online included data to automatically manufacture its first model—what it termed the "Liberator" pistol.   (DD v. U.S., Dkt. 32, 8.)   The Liberator is a plastic firearm that contains a six ounce piece of steel that can be easily removed enabling the firearm to be undetected in walk-through metal detectors.   (DD v. U.S., Dkt. 32; Dkt. 8.)

In May 2013, the State Department's Directorate of Defense Trade Controls ("DDTC") advised Defense Distributed that its publication of CAD files without authorization from the DDTC potentially violated the International Traffic in Arms Regulations ("ITAR") administered by DDTC.   (Executive Order 13637(n)(iii); 22 C.F.R. §§ 120-130.)   The violation stemmed

from the fact that the CAD files were being made available outside the United States via the Internet. (DD v. U.S., Dkt. 32, pp. 5-7.)  After a review, DDTC concluded that several of the CAD files were subject to regulation under ITAR.  (DD v. U.S., Dkt. 32, pp. 5-7.)  To make the CAD files available outside the United States, ITAR required Defendants to seek preapproval of publication. (DD v. U.S., Dkt. 32.)

On May 6, 2015, Defense Distributed, the Second Amendment Foundation ("SAF") and Conn Williamson (collectively, "DD/SAF/CW") brought suit in the United States District Court for the Western District of Texas, seeking a declaration that the DDTC's preapproval requirement for privately generated unclassified information was an unconstitutional government action and violated the First, Second, and Fifth Amendments. (DD v. U.S., Dkt. 1.)  When the Federal Government opposed the suit, Lisa V. Aguirre, the Director of the Office of Defense Trade Controls Management, testified that:  (a)  "[t]he 'Liberator' firearm included in DD/SAF/CW's CAD designs presented a specific and unique risk to the national security and foreign policy interests of the United States"; (b) making the CAD files available online would provide terrorist organizations with firearms, which could be used against the United States or its allies; and (c)  "[a]ccess to weapons

6

technology coupled with the uncontrolled ubiquitous means of productions . . . could contribute to armed conflict, terrorist or criminal acts, and seriously undermine global export and non-proliferation regimes designed to prevent the dangerous and destabilizing spread and accumulation of weapons and related technologies." (<u>DD v. U.S.</u>, Dkt. 32-1, ¶ 35.)

After a hearing, the District Court denied DD/SAF/CW's request for a preliminary injunction, finding among other things that the public interest in national defense and national security outweighed any countervailing interests. (<u>DD v. U.S.</u>, Dkt. 43.) The Fifth Circuit affirmed the denial, relying on the same national security concerns. (<u>Defense Distributed v. U.S. Dept. of State</u>, 838 F.3d, 451, 461 (5th Cir. 2016), <u>cert. denied</u> 138 S. Ct. 638 (2018).)

Litigation continued until April 30, 2018, when DD/SAF/CW notified the court that the parties had reached a tentative settlement. The parties approved the settlement on June 28, 2018. The settlement agreement, which was only recently made publicly available, provided:

a.) The Federal Government will commit to draft and pursue a notice of proposed rulemaking and final rule that would exclude the data on the CAD files at issue from ITAR regulation;

b.)  The Federal Government will announce on or before July 27, 2018, a temporary modification to exclude the data on the CAD files from ITAR regulation;

c.)  The Federal Government will issue a letter to DD/SAF/CW on or before July 27, 2018, advising that certain files are approved for public release and are exempt from the ITAR licensing requirements;

d.)  The Federal Government will acknowledge that the temporary modification referenced above permits "any United States person . . . to access, discuss, use, reproduce, or otherwise benefit from the technical data" that is the subject of the litigation;

e.)  The Federal Government's payment of $39,581 to DD/SAF/CW; and

f.)  The Federal Government will file a stipulation of dismissal no sooner than August 1, 2018, which it ultimately filed on July 27, 2018.  (DD v. U.S., Dkt. 112.)

Relying on that settlement, Defendants announced their plans to re-launch the CAD file repository on August 1, 2018. (See https://defdist.org/; https://defcad.com.)  In addition to older models, the Website will contain a repository of firearm computer files for "more exotic DIY semi-automatic weapons." (Andy Greenberg, "A Landmark Legal Shift Opens Pandora's Box for

8

DIY Guns, Wired (July 10, 2018), available at https://www.wired.com/story/a-landmark-legal-shift-opens-pandoras-box-for-diy-guns/.) The new database "will be available to anyone anywhere in the world with an uncensored internet connection to download, alter, remix, and fabricate into legal weapons with tools like 3D printers and computer-controlled milling machines." (Ibid.) According to Wilson, "What's about to happen is a Cambrian explosion of the digital content related to firearms . . . [a]ll this Parkland stuff, the students, all these firearms of 'common sense gun reforms'? No. The internet will serve guns, the gun is downloadable... No amount of petitions or die-ins or anything else can change that." (Ibid.)

Throughout the litigation with the Federal Government, Defendants "developed a trove of other 3-D-printable weapon blueprints, including Assembly AR-15s and AR-10s." (Deanna Paul, "Meet the man who might have brought on the age of 'downloadable guns,'" Washington Post (July 18, 2018), available at https://www.washingtonpost.com/news/post-nation/wp/2018/07/18/meet-the-man-who-wants-to-bring-on-the-age-of-downloadable-guns-and-may-have-already-succeeded/?utm_term=.725b8a04f11a.) Members of the United States armed forces routinely use firearms in semiautomatic mode

in combat conditions, and the designs of many semiautomatic firearms are inherently military. (Giffords Law Center Comment Letter to the Director of Defense Trade Controls, July 9, 2018, at 4.) Assault rifles like the AR-15 were originally designed for military use. (Giffords Law Center Comment Letter to the Director of Defense Trade Controls, July 9, 2018, at 4.) The military included the option to fire in semiautomatic mode because military combat sometimes requires use of a firearm in semiautomatic mode. (Giffords Law Center Comment Letter to the Director of Defense Trade Controls, July 9, 2018, at 4.) Shooting in semiautomatic mode is more accurate and hence more lethal. (With AR-15s, Mass Shooters Attack with the Rifle Firepower Typically Used by Infantry Troops, NY Times, Feb. 28, 2018, https://www.nytimes.com/interactive/2018/02/28/ar-15-rifle-mass-shootings.html.) In fact, military-style semiautomatic firearms were used to perpetrate the tragedies that occurred in an elementary school in Newtown, Connecticut, at a music festival in Las Vegas, Nevada, at a workplace in San Bernardino, California, in a movie theatre in Aurora, Colorado, and at a high school in Parkland, Florida, among others. (Giffords Law Center Comment Letter to the Director of Defense Trade Controls, July 9, 2018, at 5.)

Because of the dangerous nature of these weapons, New

Jersey and seven (7) other states, including New York and California, have banned them. (See Giffords Law Center to Prevent Gun Violence, Assault Weapons at http://lawcenter.giffords.org/gun-laws/policy-areas/hardware-ammunicition/assault-weapons/.)   In New Jersey, certain AR-15 semiautomatic models are banned as assault weapons and ownership is highly restrictive.   N.J.S.A. 2C:39-1w(1); N.J.S.A. 2C:39-5(f).   But printable-gun computer files will allow them to be printed anyway.

Defendants' printable-gun computer files will allow individuals across New Jersey to generate lethal firearms that are untraceable.   This means that if a printed gun was used in an act of violence or other crime, law enforcement would be unable to determine who manufactured, purchased, or transferred the gun – taking away a critical tool that New Jersey law enforcement consistently uses in seeking to combat and reduce gun crime.   In addition, at least some of the printed plastic guns can be modified to be virtually undetectable in metal detectors, which poses a public safety problem for venues such as airports, arenas, schools, and courthouses.

Responding to this threat, on July 26, 2018, Attorney General Grewal sent a cease-and-desist letter (the "New Jersey Cease-And-Desist Letter"), instructing Defense Distributed not

to publish the files online.   Defense Distributed responded the next day.   Although Defense Distributed said that it would "attempt to restrict files made available on the internet to prevent download within New Jersey" by blocking users with New Jersey-based IP addresses from accessing the files, it made clear its intent to proceed with publication of the codes on August 1.

On July 25, 2018, The Brady Campaign to Prevent Gun Violence, Everytown for Gun Safety Action Fund, Inc. and Giffords (collectively, "Proposed Intervenors") sought to intervene in the Texas litigation and requested a temporary restraining order and a preliminary injunction to enjoin Defense Distributed from publishing the printable gun-computer files at issue here to prevent immediate and irreparable harm to United States national security.   On Friday, July 27, 2018, a hearing was held before the Honorable Robert Pitman wherein both of the proposed Intervenors' motions were denied.

On July 29, 2018, Defense Distributed filed a Complaint in the United States District Court for the Western District of Texas seeking declaratory and injunctive relief, damages, and attorney's fees against Attorney General Grewal and Michael Feuer, the Los Angeles City Attorney ("Feuer").   Defense Distributed and SAF initiated this lawsuit against Grewal in

response to the New Jersey Cease-And-Desist Letter, alleging, among other things, that it constitutes an unconstitutional prior restraint.

On July 30, 2018, the Commonwealth of Pennsylvania, Governor Tom Wolf, Attorney General Josh Shapiro and the Pennsylvania State Police (together, the "Plaintiffs") filed a complaint against Defense Distributed, DEFCAD, Ghost Gunner and Cody Wilson (collectively, "PA Defendants") for declaratory judgment and a preliminary injunction, as well as a motion for a temporary restraining order and preliminary injunction to enjoin the PA Defendants from publishing the printable-gun computer files that are at issue in the instant litigation.

This lawsuit followed.

<u>LEGAL ARGUMENT</u>

**BECAUSE AN IMMEDIATE AND DIRECT THREAT TO PUBLIC SAFETY IN NEW JERSEY EXISTS, <u>INJUNCTIVE RELIEF IS WARRANTED</u>**

The Court should grant the State's application for injunctive relief to safeguard the health and safety of New Jersey's residents. Defendants' planned dissemination of computer codes directing the manufacture and assembly of untraceable and unlicensed firearms endangers the citizens of this State and violates New Jersey's public nuisance and negligence laws. The codes allow anyone with a 3D printer to

13

create a fully operational gun with a few clicks. Defendants seek to make the codes available to everyone, including criminals, juveniles, and domestic abusers, which undermines New Jersey's comprehensive scheme for keeping guns out of criminals' hands and jeopardizes the safety of New Jersey residents.

All the preliminary relief factors point in favor of enjoining Defendants from publishing their codes. To obtain relief, the moving party must demonstrate by clear and convincing evidence that: (1) relief is needed to prevent irreparable harm; (2) the applicant's claim rests on settled law and has a reasonable probability of succeeding on the merits; and (3) a balancing of hardships reveals that greater harm would occur if a stay is not granted than if it were. See Crowe v. DeGioia, 90 N.J. 126, 132-34 (1982); Brown v. City of Paterson, 424 N.J. Super. 176, 183 (App. Div. 2012). When a case presents an issue of "significant public importance," as here, courts must also consider a fourth factor: harm to the public interest. See Garden State Equality v. Dow, 216 N.J. 314, 320-21 (2013). Notably, "[i]n acting only to preserve the status quo, the court may 'place less emphasis on a particular Crowe factor if another greatly requires the issuance of a remedy.'" Brown, 424 N.J. Super. at 183. As this brief explains, each factor points in favor of granting the State's application for injunctive relief.

14

A.    **Plaintiff will suffer immediate and irreparable injury if a preliminary injunction is not issued.**

First, injunctive relief is needed to prevent irreparable harm. "Harm is generally considered irreparable in equity if it cannot be redressed adequately by monetary damages." Crowe, 90 N.J. at 132. Threats to public safety are the quintessential irreparable harm; indeed, "danger of increased mortality" is "as irreparable a harm as any that can be imagined." Somerset Air Service, Inc. v. Township of Bedminster, 2006 WL 861498, at *4 (Sup. Ct. Law Div., Somerset Cnty., Apr. 4, 2006).

The irreparable harm here is clear: the moment that Defendants post their codes on the Internet, it can be downloaded, saved, and forever used to print guns with a few clicks. And that poses a grave and permanent threat to public safety. First, the availability of these codes means that individuals who are otherwise banned for purchasing and possessing firearms will be able to print them; law enforcement cannot stop individuals from owning 3D printers. That means the "codes will be available to everyone in New Jersey—regardless of age, criminal status, history of mental illness, or other disqualifying characteristic. There will thus be no way for law enforcement to prevent guns from winding up in the hands of those who are prohibited from purchasing firearms under New Jersey law, including" individuals on the FBI Terroristic Watch

15

List, persons with criminal convictions (even for violent offenses), domestic abusers (even if subject to ongoing restraining orders), and juveniles. (Certification of Deputy Chief of Detective Christopher W. Donohue ("Donohue Cert."), ¶ 14.) This "will severely hamper law enforcement's ongoing efforts to keep dangerous guns out of the hands of dangerous criminals." (Id. ¶16.) And not only does this give criminals access to weapons, but to illegal ones - Defendants' codes will also "enable individuals to print assault weapons, which are illegal in New Jersey." (Id. ¶ 13.)

Another irreparable harm is sure to follow - the use of these codes will make it harder for law enforcement to solve and reduce gun crime. Because "the 3D printed firearms will not have serial numbers or other identifiable marks, they will never be traceable by law enforcement." (Id. ¶ 10). As Deputy Chief Donohue explains,

> A serial number is required to be placed on all firearms so that they can be traced to its original owners if they are ever used to commit a criminal offense. Law enforcement traces firearms by finding the owner's name in the gun dealer's records, and then interviewing that person and any other person to whom he sold the gun, and so on. Through this process, law enforcement is able to determine the manufacturer of the gun, the date it was sold, the dealership, and the purchaser. This information assists law enforcement in determining what happened to a particular gun after it left the dealer

16

by learning the history of who owned the gun.

Being able to trace a gun is critical in the investigation of gun-related crimes. The [CAD] codes of [Defendants] will allow individuals across New Jersey to automatically manufacture untraceable guns on 3D printers. If law enforcement is unable to trace 3D guns to determine their owners, law enforcement will be critically hampered in its ongoing efforts to solve gun crimes and prevent new gun crimes from being committed. This poses a direct and immediate threat to public health, safety, and welfare.

(Id. ¶¶ 11-12.)

And the Director of the New Jersey Office of Homeland Security and Preparedness, Jared Maples, agrees, noting that law enforcement agencies "use the results of these traces to identify the methods by which firearms entered the illegal market and to devise strategies to disrupt these criminal networks. But if there were to be a proliferation of untraceable 3D guns, these crimes and criminal networks might go unsolved and the perpetrators might go on to commit additional acts of violence." (Certification of New Jersey Office of Homeland Security Director Jared Maples ("Maples Cert."), ¶ 12.)

The risks to homeland security are equally pressing. As Director Maples has explained, "terrorists and other networks directing violence at the United States and in New Jersey could use this technology to manufacture guns, including assault

17

firearms." (Id. ¶ 10.) Moreover, "proliferation of untraceable guns would also give terrorist groups a significant advantage and deprive NJOHSP the ability to gather the necessary intelligence to combat them and reduce their threat they pose to our citizens." (Id. ¶ 11.) And finally, at least one code is for a "plastic firearm that can be produced in a way as to be both fully operable and virtually undetectable by conventional security measures. 3D firearms can defeat normal detection such as metal detectors and wands, and present a problem to public safety in venues such as airports, arenas, schools, government buildings, and/or courthouses." (Id. ¶ 16.) As a result, "Defendants' effort to post these CAD files represents a direct threat to New Jersey's homeland security." (Id. ¶ 20.)

For all of these reasons, other courts have recognized that "very strong public interest[s]" would be irreparably harmed by Defendants' threatened conduct. Defense Distributed v. U.S. Dep't of State, 838 F.3d 451, 458 (5th Cir. 2016). Indeed, the U.S. Court of Appeals for the Fifth Circuit refused to allow Defense Distributed to release the same computer files it threatens to release here, because the government's "national defense and national security interest would be harmed forever" if Defense Distributed were permitted to follow through on its threatened activities. Id. at 460; see also Defense Distributed

18

v. U.S. Dep't of State, 121 F. Supp. 3d 680, 689-90 (W.D. Tex. 2015). New Jersey is in the same position now - it has a strong sovereign interest in protecting homeland security within its borders, and that interest would be irreparably harmed if the Court permits Defendants to follow through on their threats.

The Defense Distributed decisions comport with decisions from other courts finding that state governmental interests would be impaired by conduct of the exact kind threatened here. In Tracy Rifle & Pistol LLC v. Harris, 118 F. Supp. 3d 1182 (E.D. Cal. 2015), for example, the court acknowledged California's sovereign interest in enforcing a law that prohibited retail firearms dealers from advertising or displaying handguns, such that the advertisement or display could readily be seen from the outside. The court determined that the State's interest in preventing the proliferation of hand guns outweighed the dealer's interest in having the regulation preliminarily enjoined. See id. at 1183, 1193-95. As that court put it, "[t]he costs of being mistaken, on the issue of whether the injunction would have a detrimental effect on handgun crime, violence, and suicide, would be grave. These costs would affect members of the public, and they would affect the Government which is tasked with managing handgun violence." Id. at 1193. The Ninth Circuit upheld the district court's

19

order allowing the ban to remain in place, likewise recognizing that "serious public risks are implicated" by the activity the firearms dealer sought to undertake. Tracy Rifle & Pistol LLC v. Harris, 637 Fed. App'x 401, 402 (9th Cir. Feb. 23, 2016).

Moreover, the harms to New Jersey identified in Deputy Chief of Detectives Donohue's and Director Maples's Declarations are at least as severe as the harms to "law enforcement and public safety interests" underlying decisions granting states' requests for temporary equitable relief in other contexts. See, e.g. Maryland v. King, 133 S. Ct. 1, 3 (2012) (Roberts, C.J.) (finding that a state was irreparably harmed by a lower court decision enjoining collection of DNA samples from individuals charged with certain crimes because DNA testing "provides a valuable tool for investigating unsolved crimes and thereby helping to remove violent offenders from the general population"); Coleman v. Paccar Inc., 424 U.S. 1301, 1307 (1976) (Rehnquist, C.J.) (finding that the government would suffer irreparable harm if it could not enforce certain motor vehicle safety standards for even a 60-day period, where delay would leave manufacturers "free to produce as many vehicles as they can and . . . obtain substantial stockpiles of noncomplying vehicles for later sale," resulting in a "serious setback" for "the goals of federal motor vehicle safety"). New Jersey would

suffer immeasurably more harm if the State were flooded with the 3-D guns that Defendants seek to make available to everyone.

All these public harms - in the form of increased mortality, increased lawlessness, and decreased security - cannot be addressed outside of an injunction. See Crowe, 90 N.J. at 132. That is so for one simple reason: posting these codes is a bell that can never be un-rung. Criminals, gangs, and terrorist networks only need to download a code once to benefit from it permanently. The consequences of publishing the printable-gun codes are grave and irreversible, and no money can restore or make up for the threats to public safety and law enforcement safety that will follow. Accordingly, the Court should order an injunction to prevent irreparable harm to the residents of New Jersey.

**B.  Plaintiff has demonstrated a settled legal right and a likelihood of success on the merits.**

Second, Defendants' planned actions violate New Jersey public nuisance and negligence law. The Attorney General can therefore demonstrate a reasonable probability of success on the merits. Crowe, 90 N.J. at 133. Nonetheless, "mere doubt as to the validity of [a] claim is not an adequate basis for refusing to maintain the status quo." Crowe, 90 N.J. at 133-34 (citing Naylor v. Harkins, 11 N.J. 435 (1953)). "Indeed, the point of temporary relief is to maintain the parties in substantially the

21

same condition when the final decree is entered as they were when the litigation began." Id. at 134 (citation and internal quotation marks omitted).

    1.  Public Nuisance

    To state a public nuisance claim, a plaintiff must allege "an unreasonable interference with a right common to the general public." In re Lead Paint Litig., 191 N.J. 405, 425 (2007) (citing The Restatement (Second) of Torts § 821B (1979)). The interference need not involve "conduct that is proscribed by statute or other legislative act." James v. Arms Tech., Inc., 359 N.J. Super. 291, 330 (App. Div. 2003). Rather, a public nuisance may exist "if the conduct complained of involves a 'significant interference' with the public welfare or 'is of a continuing nature or has produced a permanent or long-lasting effect, and, as the actor knows or has reason to know, has a significant effect upon the public right.'" Id. (quoting Restatement § 821B(2)(a) and (c)). So long as the tortfeasor's conduct was a "substantial factor" in causing the injury, regardless of the presence of other intervening causes, the causation element will be satisfied. James, 359 N.J. Super. at 311.

    James controls this case. There, the Appellate Division upheld a public nuisance claim asserted by New Jersey

municipalities against firearms manufacturers.   The plaintiffs alleged that the manufacturers intentionally marketed and sold firearms to persons who would bring them illegally into Newark. Id. at 307.   The municipalities alleged that defendants' unlawful "distribution, promotion, and sale of guns" constituted "an unreasonable interference with . . . the public's right to be free from danger," and that the conduct "resulted in . . . significant costs to the City of Newark in order to enforce the laws and to treat the victims of crimes facilitated through the use of [d]efendants' firearms." Id. at 306-307.   The possible actions of intervening third parties did not mean that the municipalities were incapable of establishing that defendants exercised control over the use of illegal firearms. Id. at 332. The nuisance was not the specific guns; instead, the Court focused on the manufacturers' participation in "the creation and supply of this illegal market." James, 359 N.J. Super. at 332. Because manufacturers controlled their own participation in the "creation and supply" of the market, the court held the municipalities had sufficiently pleaded their public nuisance claim, including for causation. Id.

With those principles in mind, the Appellate Division had little trouble understanding why these municipalities had stated a claim against these firearms manufacturers. First, the Court

23

in *James* explained, "[n]o one can seriously debate" that regulated guns are "dangerous instrumentalities" and thus implicate New Jersey public nuisance law. Id. at 320. Second, the Court held, it would violate New Jersey law for manufacturers to "flood the gun market" through a high volume of sales, while failing to develop "reasonable safeguards over the distribution scheme" and "refus[ing] to oversee or supervise the control of handgun distribution in order to prevent the foreseeable channeling of guns to such an illegal market." Id. at 312. And so, the Appellate Division concluded, when a defendant floods the gun market and fails to take steps to prevent these distributions from ending up in criminals' hands, they could be held responsible under public nuisance law when their acts "facilitate[d] the illegal sale of weapons to criminals and other unlawful users." Id.

There is no doubt that, under *James*, Defendants will commit a public nuisance if they proceed with their plans to publish computer files, which will allow anyone with a 3-D printer to download a code and create a fully operational gun with just a few clicks. There is no question that these files will interfere with the public's safety by "flood[ing] the market" with illicit arms. Again, as Deputy Chief Donohue explained, the "codes will be available to everyone in New Jersey."

(Donohue Cert. ¶ 14.)

In addition, these actions will directly undermine New Jersey's statutory scheme – further evidence that they are creating a public firearms nuisance. For one, under N.J.S.A. 2C:39-9(d), it is illegal to manufacture a weapon without a license. And yet Defendants plan to distribute codes that would enable individuals to do just that – to print a gun at home, without a license, and without going through a Federal Firearms Licensee. For another, "certain persons . . . are prohibited from purchasing, owning, possessing, or controlling any and all firearms under N.J.S.A. 2C:39-7(b), due to their prior convictions for aggravated assault, arson, burglary, escape, extortion, homicide, kidnapping, robbery, aggravated sexual assault, sexual assault, bias intimidation, endangering the welfare of a child, stalking, or a crime involving domestic violence. Those persons face a mandatory term of imprisonment with at least five years of parole ineligibility if they purchase, own, possess, or control a firearm. But the 3D codes will allow them to easily download firearms at home, which will severely hamper law enforcement's ongoing efforts to keep dangerous guns out of the hands of dangerous criminals." (Donohue Cert., ¶ 16.)   Still more, Defendants' codes will "enable individuals to print assault weapons, which are illegal

25

in New Jersey under N.J.S.A. 2C:39-5(f)."  (Id. ¶ 13.)

And last—and critically—Defendants made no effort to develop "reasonable safeguards over the distribution scheme" or to "oversee or supervise the control of handgun distribution in order to prevent the foreseeable channeling of guns to such an illegal market."  In fact, just the opposite is true: Defendants actively believe their codes should be accessible to individuals who are prohibited from owning weapons.  Wilson has stated that his database "will be available to anyone anywhere in the world with an uncensored internet connection, to download, alter, remix, and fabricate into legal weapons with tools like 3D printers and computer-controlled milling machines."  (Greenberg, supra.)  According to Wilson, "What's about to happen is a Cambrian explosion of the digital content related to firearms . . . [a]ll this Parkland stuff, the students, all these firearms of 'common sense gun reforms'?  No.  The internet will serve guns, the gun is downloadable . . . No amount of petitions or die-ins or anything else can change that."  (Ibid.)  He also posted a picture of a tombstone in the ground, engraved with the phrase "American Gun Control."  What this all shows is that Defendants' interference with New Jersey's firearm safety regulations is intentional and thus per se unreasonable – and it certainly confirms that Defendants will not put reasonable

26

safeguards in place to keep guns out of prohibited persons' hands.

All of the other traditional public nuisance factors only confirm that relief is warranted. Defendants are in complete control of the CAD files and their publication, and thus would create, or at a minimum would be a substantial factor in creating, the nuisance by allowing unrestricted access of the files on the Internet through its Website. The public nuisance is also foreseeable to Defendants. Again, Wilson has publicly stated that the database "will be available to anyone anywhere in the world with an uncensored internet connection." (Greenberg, supra.) And Defendants were put on notice by the Federal Government and multiple federal courts that the publication of their CAD files, which permanently make the files available to those with Internet access, would forever harm national defense and national security. (Defense Distributed v. U.S. Dept. of State, 838 F.3d 451, 461 (5th Cir. 2016).) For all these reasons, in light of James, little doubt exists that Defendants' actions constitute a public nuisance.

2.   Negligence

For the same reasons that Plaintiff has proven a public nuisance claim, their plan is also negligent. Defendants' planned widespread dissemination of printable-gun code is

27

negligent because it encourages an illegal gun market, which will foreseeably lead to increased crime and violence in New Jersey, and to an increase in expenditures of government funds to prevent crime and protect the public's health. See James, 359 N.J. Super. at 308-324 (finding legally valid negligence claim against gun manufacturers, trade organizations, and gun distributors and retailers that flooded illegal gun market); see also Ileto v. Glock, Inc., 349 F.3d 1191, 1214-16 (9th Cir. 2003) (reversing dismissal of plaintiffs' claims that gun manufacturers negligently created an illegal secondary market for guns); City of Cincinnati v. Beretta U.S.A. Corp., 95 Ohio St.3d 416, 421-23 (reversing dismissal of city's negligence counts and finding that city had a viable negligence claim against defendant gun manufacturers, trade associations, and distributors).

In James, the trial court denied defendants' motions to dismiss the City of Newark's negligence claim and found that the defendants owed a duty of care to the City of Newark. Id. at 307. In doing so, the trial court considered the "inherent dangerousness of handguns." Ibid. On appeal, the Appellate Division upheld that determination, finding "the dangerous propensity of handguns is self-evident, and the consequence of their misuse is well documented." Id. at 323. Similarly, in

28

the instant case, Defendants have a duty to the citizens of New Jersey.  The printed guns peddled by Defendants are even more dangerous than the guns in James, because they are unserialized and undetectable by traditional law enforcement measures, providing further support for a finding that Defendants owe a duty of care to New Jersey residents.  As in James, the State has a valid, viable negligence claim against Defendants.

Accordingly, the State has demonstrated a probability of ultimate success, as to both its public nuisance and negligence claims.

## C.  On balance, a greater and substantial harm will result if an injunction is not issued.

Any harm to the Defendants arising from the issuance of the requested injunctive relief is clearly outweighed by the resultant harm to New Jersey residents' safety if Defendants flood the illegal gun market and put untraceable weapons in the hands of criminals and minors.  When an interlocutory injunction seeks to maintain the status quo, "a court may take a less rigid view" of the Crowe factors.  Waste Mgmt. of N.J., Inc. v. Union County Mun. Utils. Auth., 399 N.J. Super 508, 520 (App. Div. 2008).  Here, if injunctive relief is granted, Defendants will stand in the same place tomorrow that they stand today. Defendants removed their printable-gun code from the Internet in 2013.  Defense Distributed, 121 F.Supp.3d at 687.  An injunction

simply preserves this status quo. Conversely, unfettered access to the printable-gun code poses a severe risk to public safety that is irreversible and permanent. Again, the codes will be available to everyone – regardless of age, criminal status, or history of mental illness. (Donohue Cert., ¶ 14.) The only requirement to obtain a gun would be a 3-D printer. Permitting dissemination of the code would undermine all the systems, laws, and regulations currently in place to ensure that those exact individuals do not possess firearms. (Id., ¶ 15.) Additionally, the guns would not have serial numbers and would not contain metal. (Donohue Cert., ¶ 14; Maples Declaration, ¶ 16.) They would thus be untraceable and undetectable, further hamstringing law enforcement efforts. The balance of hardships and the fact that the relief just maintains the status quo both weigh heavily in favor of granting a temporary restraining order.

Notably, the Texas district court and the U.S. Court of Appeals for the Fifth Circuit have already weighed similar harms in determining whether then-plaintiff Defense Distributed was itself entitled to a preliminary injunction. Ultimately, both courts found that the equities weighed in favor of prohibiting dissemination. Defense Distributed, 838 F.3d at 458-61. Even after Defense Distributed contended that "the balance of

30

interests tilts in their favor because 'it is always in the public interest to prevent the violation of a party's constitutional rights,'" the district court rejected that bald assertion as lacking and determined that the public had a "keen interest in restricting the export of defense articles." Defense Distributed, 121 F.Supp.3d at 689.  The Fifth Circuit readily agreed.  Defense Distributed, 838 F.3d at 458-61.  New Jersey has a similar interest in restricting the proliferation of untraceable, undetectable weapons, and so the balancing of equities should yield the same result in this case.

D.   **The public interest favors the issuance of an injunction.**

This case is one of "significant public importance," and, consequently, in determining whether to issue an injunction, the Court must also consider the harm to the public interest.  See Garden State Equality, 216 N.J. at 320-21.  That is why "Courts, in the exercise of their equitable powers, 'may, and frequently do, go much farther both to give and withhold relief in furtherance of the public interest than they are accustomed to go when only private interests are involved.'" Waste Mgmt of N.J., Inc., 399 N.J. Super at 520-21, quoting Yakus v. United States, 321 U.S. 414, 441 (1944).  For many of the reasons already given, this factor likewise weighs strongly in favor of granting the State's application for injunctive relief.

31

Threats to public safety and law enforcement safety are the quintessential harm to the public interest. As the Appellate Division has held, "New Jersey has a strong public interest in protecting the public from the violence and social cost associated with the criminal misuse of firearms." James, 359 N.J. Super. at 320. And as explained above, Defendants' plans directly undermine that public interest. Defendants have made it abundantly clear that they wish to flood New Jersey with untraceable and unlicensed firearms, including illegal assault weapons. Again, Defendant Cody Wilson has stated "All this Parkland stuff, the students, all these dreams of 'common sense gun reforms'? No. The internet will serve guns, the gun is downloadable." (Greenberg, supra.) The code will give minors, felons, and domestic abusers access to guns that they would not otherwise have. (Donohue Cert., ¶ 14.) This will lead to an increase in violence, lawlessness, and, ultimately, mortality.

Moreover, permitting dissemination of the printable gun code undermines the democratic process. The New Jersey Legislature has enacted comprehensive gun restrictions to ensure the safety of New Jersey residents. See N.J.S.A. 2C:58-1 et. seq. The dissemination of Defendants' code undermines those restrictions, undermining the democratic process and harming the public. An injunction must thus be entered to avoid significant

32

and grave harm to the public safety and to New Jersey's statutory scheme.

**E.   This Court should enjoin Defendants from publishing their codes.**

In order to fully protect New Jersey citizens, any injunction must completely preclude Defendants from disseminating the printable-gun code on the Internet. An injunction limited only to publication in New Jersey would be, essentially, a nullity. If the code were disseminated elsewhere, the files could be downloaded and then disseminated further, including on other websites not run by Defense Distributed. That is not academic: when Wilson posted the code for a single gun in 2013 for just a few days before the Federal Government stepped in, that code was downloaded 100,000 times. (Greenberg, supra.) Moreover, a criminal network could access the code in New York, and share it with other members in New Jersey. Merely limiting access from New Jersey IP addresses, as Defense Distributed promises it will do (temporarily) in response to the New Jersey Cease-And-Desist Letter, accomplishes next to nothing. Criminals, gangs, terrorist groups – to name just a few – have a reach that spans across state borders, and would easily access the code, and then continue using it to print firearms in New Jersey. And individuals could likewise do so with ease – all it takes is one trip to New York to download

the code, and then that individual could print weapons in New Jersey for years to come. In addition, it is remarkably easy to mask an IP address using a virtual private network ("VPN"). In fact, web providers such as Google Chrome even sell a way to mask IP addresses via VPN through its website. (See https://chrome.google.com/webstore/detail/hide-my-ip-vpn/keodbianoliadkoelloecbhllnpiocoi.)

The only solution that will protect New Jersey's public safety is for this Court to enjoin Defendants from publishing their codes altogether. The consequences of making these codes widely accessible across the United States on the Internet are grave and irreversible, and will plainly and severely impact New Jersey.

## CONCLUSION

For the foregoing reasons, the Attorney General respectfully urges this Court to enter the proffered Order to Show Cause so that temporary, preliminary and thereafter final relief can be entered to ensure that Defendants' publication of the printable-gun computer files for use in New Jersey are restricted and, as such, are no longer in a position to irreversibly endanger the health, safety, peace, and comfort of New Jersey citizens.

34

Respectfully submitted,

GURBIR S. GREWAL
ATTORNEY GENERAL OF NEW JERSEY

By: _____
    Lara J. Fogel
    Deputy Attorney General

35