# EXHIBIT 42

268

Asst. �<span>Att</span>oney General
United States Courts

Department of Justice

Washington, D.C. 20530

*i'1-May 78*
*11:::::   9*

MEMORANDUM TO DR. FRANK PRESS
Science Advisor to the President

Re: Constitutionality Under the First Amendment
of ITAR Restrictions on Public Cryptography

The purpose of this memorandum is to discuss the con-
stitutionality under the First Amendment of restrictions
imposed by the International Traffic in Arms Regulation
(ITAR), 22 C.F.R. § 121 et seq. (1977), the regulation imple-
menting § 38 of the Arms Export Control Act, 22 U.S.C.A.
§ 2778 (1977), on dissemination of cryptographic informa-
tion developed independent of government supervision or
support by scientists and mathematicians in the private
sector.1/ Our discussion is confined to the applicability
of the regulation to the speech elements of public cryptography,
and does not address the validity of the general regulatory
controls over exports of arms and related items. We have
undertaken our review of the First Amendment issues raised
by the ITAR as an outgrowth of our role in implementing
Presidential Directive NSC-24.2/

_____

1/   The cryptographic research and development of scientists
     and mathematicians in the private sector is known as
"public cryptography." As you know, the serious concern ex-
pressed by the academic community over government controls
of public cryptography, see, e.g., 197 Science 1345 (Sept.
30, 1977), led the Senate Select Committee on Intelligence
to conduct a recently concluded study of certain aspects of
the field.

2/   Our research into the First Amendment issues raised by
     government regulation of public cryptography led tan-
gentially into broader issues of governmental control over
dissemination of technical data. Those questions are numerous,
complex, and deserving of extensive study, but are beyond
the scope of this memorandum.

269

participation in briefings and symposia) and dis-
closed to foreign nationals in the United States
(including plant visits and participation in
briefings and symposia).

Thus ITAR requires licensing of any communication of crypto-
graphic information,4/ whether developed by the government
or by private researchers, which reaches a foreign national.5/

   The standards governing license denial are set out in
§ 123.05.  The Department of State may deny, revoke, suspend
or amend a license:

     whenever the Department deems such action to be
     advisable in furtherance of (1) world peace;
     (2) the security of the United States; (3) the
     foreign policy of the United States; or (4) when-
     ever the Department has reason to believe that
     section 414 of the Mutual Security Act of 1954,
     as amended, or any regulation contained in this
     subchapter shall have been violated.

Upon any adverse decision, the applicant may present addi-
tional information and obtain a review of the case by the

---

4/   The ITAR does exempt from the licensing requirement un-
     classified technical data available in published form.
22 C.F.R. § 125.11(a).  The scope of that exemption is some-
what unclear, although it does appear that the burden of
ascertaining the ITAR status of possibly exempt information
is on the individual seeking publication.  See 22 C.F.R.
§ 125 n.3.  In order to claim the exemption, an "exporter"
must comply with certain certification procedures.  22 C.F.R.
§ 125.22.

5/   For example, in one instance the Office of Munitions
     Control, the office in the State Department which ad-
ministers the ITAR, refused to issue licenses to a group of
scientists preparing to address a conference on space technology
in Madrid.  The scientists, who had already arrived in Spain,
were refused permission to deliver papers at the symposium
on the subject of rocket propulsion and re-entry problems of
space vehicles.  Note, Arms Control-State Department Regu-
lation of Exports of Technical Data Relating to Munitions
Held to Encompass General Knowledge and Experience, 9 N.Y.U.
Int'l Law J. 91, 101 (1976).

- 3 -

270

ITAR Provisions and Statutory Authority

Under the ITAR, exports of articles designated on the
United States Munitions List as "arms, ammunition, and im-
plements of war" must be licensed by the Department of State.
22 C.F.R. §§ 123, 125.  Cryptographic devices are included
on the list, 22 C.F.R. § 121.01, Category XIII, as are re-
lated classified and unclassified technical data, Category
XVII, Category XVIII.  It is this control over the export
of unclassified technical data which raises the principal
constitutional questions under the ITAR.3/

The broad definition of the term technical data in
the ITAR includes:

Any unclassified information that can be used, or
be adapted for use, in the design, production,
manufacture, repair, overhaul, processing, en-
gineering, development, operation, maintenance,
or reconstruction of arms, ammunition and imple-
ments of war on the U.S. Munitions List.

22 C.F.R. § 125.01.  The definition of the term "export" is
equally broad.  Under § 125.03 of the ITAR an export of
technical data takes place:

Whenever technical data is inter alia, mailed or
shipped outside the United States, carried by
hand outside the United States, disclosed through
visits abroad by American citizens (including

---

3/   Unclassified technical data would generally encompass
    only privately developed, nongovernmental cryptographic
research.  It is our understanding that government-sponsored
cryptographic research traditionally has been classified.
The only unclassified government cryptographic information
of which we are aware is the Data Encryption Standard (DES)
algorithm.  The DES was developed for public use by IBM with
National Security Agency assistance and published in the
Federal Register by the National Bureau of Standards.

- 2 -

271

Department.  § 123.05(c).  No further review is provided.

Nearly all of the present provisions of the ITAR were
originally promulgated under § 414 of the Mutual Security
Act of 1954 (former 22 U.S.C. § 1934).  That statute gave
the President broad authority to identify and control the
export of arms, ammunition, and implements of war, including
related technical data, in the interest of the security and
foreign policy of the United States.  Congress recently
substituted for that statute a new § 38 of the Arms Export
Control Act, 22 U.S.C.A. § 2778 (1977), as amended, 22 U.S.C.A.
§ 2778 (Supp. 3 1977).  This statute substitutes the term
"defense articles and defense services" for the term "arms,
ammunition, and implements of war."6/  ·The President delegated
his authority under both statutes to the Secretary of State
and Secretary of Defense.  Exec. Order No. 11,958, 42 Fed.
Reg. 4311 (1977), reprinted in 22 U.S.C.A. § 2778 (Supp. 1
1977); Exec. Order No. 10,973, 3 C.F.R. 493 (Supp. 1964).
A willful violation of § 38 of the Arms Export Control Act
or any regulation thereunder is punishable by a fine up to
$100,000, imprisonment up to two years, or both.  22 U.S.C.A.
§ 2778(c).7/

6/   The ITAR has not yet been amended to reflect the statu-
     tory change.  We understand, however, that the Depart-
ment of State has nearly completed a draft revision of the
ITAR.  It is our understanding that the revision is not in-
tended to make any major substantive changes in the ITAR,
but rather to update and clarify the regulatory language.

7/   Although the focus of this memorandum is on the First
     Amendment issues raised by the ITAR, we feel that one
comment about the breadth of the two statutes is in order.
It is by no means clear from the language or legislative
history of either statute that Congress intended that the
President regulate noncommercial dissemination of informa-
tion, or considered the problems such regulation would en-
gender.  We therefore have some doubt whether § 38 of the
Arms Export Control Act provides adequate authorization for
the broad controls over public cryptography which the ITAR
imposes.

- 4 -

272

## The First Amendment Issues

The ITAR requirement of a license as a prerequisite to "exports" of cryptographic information clearly raises First Amendment questions of prior restraint.[8/] As far as we have been able to determine, the First Amendment implications of the ITAR have received scant judicial attention.

The Ninth Circuit presently has a case under consideration which squarely presents a First Amendment challenge to the ITAR and could serve as a vehicle for the first comprehensive judicial analysis of its constitutionality.  In that case, United States v. Edler, No. 76-3370, the defendants, Edler Industries, Inc. and Vernon Edler its president, were charged with exporting without a license technical data and assistance relating to the fabrication of missile components. Although the State Department had denied defendants an export license to provide technical data and assistance to a French aerospace firm, the government alleged that defendants nonetheless delivered data and information to the French during meetings in both France and the United States.  Defendants were tried before a jury and found guilty.  The trial court, the United States District Court for the Central District of California, did not issue an opinion in the case. On appeal, the defendants contend that the ITAR is both overbroad and establishes an unconstitutional prior restraint. The government's rejoinder to those claims is that the ITAR licensing provisions involve conduct not speech and that any effect upon First Amendment freedoms is merely incidental

---

[8/]   In addition, the regulatory provisions present questions of overbreadth and vagueness.  "Overbreadth" is a First Amendment doctrine invalidating statutes which encompass, in a substantial number of their applications, both protected and unprotected activity.  The "vagueness" concept, on the other hand, originally derives from the due process guarantee, and applies where language of a statute is insufficiently clear to provide notice of the activity prohibited.  The same statute or regulation may raise overlapping questions under both doctrines.

- 5 -

273

and therefore valid.  We anticipate that the resolution of
these issues by the Ninth Circuit may provide substantial
guidance as to the First Amendment implications of the ITAR.9/

     The only published decision addressing a First Amend-
ment challenge to the ITAR of which we are aware is United
States v. Donas-Botto, 363 F.Supp. 191 (E.D. Mich. 1973),
aff'd sub nom. United States v. Van Hee, 531 F.2d 352 (6th
Cir. 1976).  The defendants in that case were charged with
conspiracy to export technical data concerning a Munitions
List item without first obtaining an export license or
written State Department approval.  The exports by the
defendants both of blueprints and of their technical knowledge
concerning an armored amphibious vehicle were alleged to
be in violation of § 414 of the Mutual Security Act and
the ITAR.  In a motion to dismiss the indictments, defendants
contended that inclusion of technical knowledge within the
statute violated the First Amendment.  The trial court dis-
posed of that contention summarily, stating:

          [W]hen matters of foreign policy are involved
          the government has the constitutional authority
          to prohibit individuals from divulging "technical
          data" related to implements of war to foreign
          governments.

363 F. Supp. at 194.  The Sixth Circuit upheld the conviction
of one of the defendants without reaching any First Amend-
ment questions since none was presented on appeal.10/

     The First Amendment analysis of the ITAR in the case
thus is limited to a paragraph in the district court's
opinion.  In reaching the conclusion that the prosecutions
did not violate the First Amendment, that court relied upon
two Espionage Act decisions, Gorin v. United States, 312 U.S.

---

9/   We understand that the case was argued this past March.

10/  The court did agree with the trial judge that the ample
     scope of the term "technical data" in the ITAR encom-
passed unwritten technical knowledge.  531 F.2d at 537.

- 6 -

274

19 (1941), and United States v. Rosenberg, 195 F.2d 583
(2d Cir.), cert. denied, 344 U.S. 838 (1952). While those
cases establish that the First Amendment does not bar prose-
cutions for disclosing national defense information to a
foreign country, they by no means resolve the prior restraint
question.11/

A decision in a somewhat analogous area, the use of
secrecy agreements by government agencies as a means of
protecting against the unauthorized disclosure of informa-
tion by present or former employees, while not directly
applicable to the First Amendment questions we confront
under the ITAR, is helpful for its discussion of government's
power to control the dissemination of government information.
That case, United States v. Marchetti, 466 F.2d 1309 (4th
Cir.), cert. denied, 409 U.S. 1063 (1972), after remand,
Alfred A. Knopf, Inc. v. Colby, 509 F.2d 1362 (4th Cir.),
cert. denied, 421 U.S. 992 (1975), involved an action for
an injunction brought by the United States to prevent a
former CIA agent from publishing certain information he had
obtained as a result of his CIA employment. The court held
that the particular secrecy agreement was valid and enforce-
able in spite of Marchetti's First Amendment objections,
but observed that:

> The First Amendment limits the extent to which
> the United States, contractually or otherwise,
> may impose secrecy agreements upon its employees
> and enforce them with a system of prior censor-
> ship. It precludes such restraints with respect
> to information which is unclassified or officially
> disclosed.

Id. at 1313. The general principle we derive from the case
is that a prior restraint on disclosure of information
generated by or obtained from the government is justifiable
under the First Amendment only to the extent that the infor-
mation is properly classified or classifiable.

---

11/  It is not clear from reading the district court's opinion
     on what First Amendment ground or grounds the defendants
based their unsuccessful motion to dismiss.

- 7 -

275

Our research into areas in which the government has restricted disclosure of nongovernmental information provided little additional guidance.  Perhaps the closest analogy to controls over public cryptography are the controls over atomic energy research.12/ Under the Atomic Energy Act of 1954, 42 U.S.C. § 2011 et seq. (1970), all atomic energy information, whether developed by the government or by private researchers, is automatically classified at its creation and subjected to strict nondisclosure controls.13/ Although neither the Atomic Energy Act nor its accompanying regulations establish formal procedures for prior review of proposed atomic energy publications, the Atomic Energy Commission (whose functions are now divided

---

12/   Atomic energy research is similar in a number of ways
      to cryptographic research.  Development in both fields
has been dominated by government.  The results of government
created or sponsored research in both fields have been auto-
matically classified because of the imminent danger to national
security flowing from disclosure.  Yet meaningful research
in the fields may be done without access to government in-
formation.  The results of both atomic energy and cryptographic
research have significant nongovernmental uses in addition
to military use.  The principal difference between the fields
is that many atomic energy researchers must depend upon the
government to obtain the radioactive source materials necessary
in their research.  Cryptographers, however, need only ob-
tain access to an adequate computer.

13/   See Green, Information Control and Atomic Power Develop-
      ment, 21 Law and Contemporary Problems 91 (1956); Newman,
Control of Information Related to Atomic Energy, 56 Yale L.J.
769 (1947).  The Atomic Energy Act uses the term "Restricted
Data" to describe information which the government believes
requires protection in the interest of national security.
"Restricted data" is defined in 42 U.S.C. § 2014(4).  The
information control provisions of the Act are set out at 42
U.S.C. §§ 2161-2164.

- 8 -

276

between the Nuclear Regulatory Commission and the Department
of Energy) has been empowered to maintain control over publi-
cations through threat of injunction or of heavy criminal
penalties, two potent enforcement tools provided under the
Act.  42 U.S.C. §§ 2271-2277, 2280.  It does not seem, how-
ever, that the broad information controls of the Atomic
Energy Act have ever been challenged on First Amendment
grounds.  Our search for judicial decisions in other areas
in which the government has imposed controls over the flow
of privately generated information was equally unavailing.14/

        In assessing the constitutionality of the ITAR restric-
tions on the speech elements of public cryptography we there-
fore have turned to Supreme Court decisions enunciating
general First Amendment principles.  It is well established
that prior restraints on publication are permissible only
in extremely narrow circumstances and that the burden on
the government of sustaining any such restraint is a heavy
one.  See, e.g., Nebraska Press Association v. Stuart, 427
U.S. 539 (1976); New York Times Co. v. United States, 403
U.S. 713 (1971); Organization for a Better Austin v. Keefe,
402 U.S. 415 (1971); Carroll v. Princess Anne, 393 U.S. 175
(1968); Near v. Minnesota, 283 U.S. 697 (1931).  Even in
those limited circumstances in which prior restraints have
been deemed constitutionally permissible, they have been
circumscribed by specific, narrowly drawn standards for
deciding whether to prohibit disclosure and by substantial
procedural protections.  Erznoznik v. City of Jacksonville,
422 U.S. 205 (1975); Blount v. Rizzi, 400 U.S. 410 (1971);
Freedman v. Maryland, 380 U.S. 51 (1965); Niemotko v. Maryland,

---

14/  For example, it does not appear that the broad controls
     over exports of technical data and related information
under the Export Administration Act of 1969, 50 U.S.C. App.
§ 2401 et seq. (1970), and accompanying regulations have been
judicially tested on First Amendment grounds.  Nor have the
provisions of the patent laws restricting patentability of
inventions affecting national security, 35 U.S.C. § 181 et
seq. (1970), nor governmental restrictions on communications
with Rhodesia, 22 U.S.C. § 287c (1970); Exec. Order No. 11,322

- 9 -

277

340 U.S. 268 (1951); Kunz v. New York, 340 U.S. 290 (1951)
Hague v. C.I.O., 307 U.S. 496 (1939).15/

Even if it is assumed that the government's interest
in regulating the flow of cryptographic information is
sufficient to justify some form of prior review process,
the existing ITAR provisions we think fall short of satis-
fying the strictures necessary to survive close scrutiny
under the First Amendment.  There are at least two funda-
mental flaws in the regulation as it is now drawn:  first,
the standards governing the issuance or denial of licenses
are not sufficiently precise to guard against arbitrary
and inconsistent administrative action; second, there is
no mechanism established to provide prompt judicial review
of State Department decisions barring disclosure.  See, e.g.,
Blount v. Rizzi, supra; Freedman v. Maryland, supra; Hague
v. C.I.O., supra.  The cases make clear that before any
restraint upon protected expression may become final it
must be subjected to prompt judicial review in a proceeding
in which the government will bear the burden of justifying
its decisions.  The burden of bringing a judicial proceed-
ing cannot be imposed upon those desiring export licenses
in these circumstances.  The ITAR as presently written fails
to contemplate this requirement.16/

---

15/  In Freedman, 380 U.S. at 58-59, the Court summarized
      the procedural protections necessary to sustain a scheme
of prior review:
      1.  A valid final restraint may be imposed only upon
a judicial determination;
      2.  The administrator of a licensing scheme must act
within a specified brief period of time;
      3.  The administrator must be required either to issue
a license or go to court to seek a restraint;
      4.  Any restraint imposed in advance of a final judicial
determination on the merits must be limited to preservation
of the status quo for the shortest period compatible with
sound judicial resolution;
      5.  The licensing scheme must assure a prompt final
judicial decision reviewing any interim and possibly erroneous
denial of a license.

16/  The government's argument to the Ninth Circuit in Edler,
      that the impact of the ITAR upon protected communications
is merely incidental, and that the ITAR should be viewed as
(Cont. on p. 11)

- 10 -

278

For these reasons it is our conclusion that the present
ITAR licensing scheme does not meet constitutional standards.
There remains the more difficult question whether a licens-
ing scheme covering either exports of or even purely domestic
publications of cryptographic information might be devised
consistent with the First Amendment.  Recent Supreme Court
decisions certainly suggest that the showing necessary to
sustain a prior restraint on protected expression is an
onerous one.  The Court held in the Pentagon Papers case
that the government's allegations of grave danger to the
national security provided an insufficient foundation for
enjoining disclosure by the Washington Post and the New
York Times of classified documents concerning United States
activities in Vietnam.  New York Times Co. v. United States,
supra. 17/  The Court also invalidated prior restraints when
justified by such strong interests as the right to fair
trial, Nebraska Press Ass'n, supra, and the right of a
homeowner to privacy, Organization for a Better Austin v.
Keefe, supra.  Such decisions raise a question whether a

_____

16/  (Cont.)
a regulation of conduct not speech, deserves note.  According
to that argument, the less rigorous constitutional standard
of United States v. O'Brien, 391 U.S. 367 (1968), would
govern the validity of the ITAR.  Although that may be true
with respect to certain portions of the ITAR, even a cursory
reading of the technical data provisions reveals that those
portions of the ITAR are directed at communication.  A more
stringent constitutional analysis than the O'Brien test is
therefore mandated.

17/  The Pentagon Papers case produced a total of ten opinions
from the Court, a per curiam and nine separate opinions.
All but Justices Black and Douglas appeared willing to accept
prior restraints on the basis of danger to the national security
in some circumstances.  There was, however, no agreement among
the Justices on the appropriate standard.  Justice Brennan
stated his view that a prior restraint on publication was
justified only upon:

"proof that publication must inevitably, directly,
and immediately cause the occurrence of an event
kindred to imperiling the safety of a transport
already at sea. . . ."

(Cont. on p. 12)

- 11 -

279

generalized claim of threat to national security from publica-
tion of cryptographic information would constitute an adequate
basis for establishing a prior restraint.  Nonetheless, it
is important to keep in mind that the Court has consistently
rejected the proposition that prior restraints can never be
employed.  See, e.g., Nebraska Press Ass'n, supra at 570.
For example, at least where properly classified government
information is involved, a prior review requirement may be
permissible.  United States v. Marchetti, supra.

     In evaluating the conflicting First Amendment and national
security interests presented by prior restraints on public
cryptography, we have focused on the basic values which the
First Amendment guarantees.  At the core of the First Amend-
ment is the right of individuals freely to express political
opinions and beliefs and to criticize the operations of
government.  See, e.g., Landmark Communications v. Virginia,
46 U.S.L.W. 4389, 4392 (May 1, 1978); Buckley v. Valeo, 424
U.S. 1, 14 (1976); Mills v. Alabama, 384 U.S. 214, 218 (1966).
Adoption of the Amendment reflected a "profound national
commitment to the principle that debate on public issues
should be uninhibited, robust, and wide-open," New York
Times v. Sullivan, 376 U.S. 254, 270 (1964), and was in-
tended in part to prevent use of seditious libel laws to
stifle discussion of information embarrassing to the govern-
ment.  New York Times Co. v. United States, supra at 724
(concurring opinion of Mr. Justice Douglas).

     Prior restraints pose special and very serious threats
to open discussion of questions of public interest.  "If it
can be said that a threat of criminal or civil sanctions
after publication 'chills' speech, prior restraint 'freezes' it
at least for the time."  Nebraska Press Ass'n, supra at 559.

---

17/  (Cont.)
403 U.S. at 726-27.  Justice Stewart, with whom Justice White
concurred, suggested that a prior restraint would be permissible
only if disclosure would "surely result in direct, immediate
and irreparable damage to our Nation or its people."  Id. at
730.  Several other Justices declined, given the facts and
procedural posture of the case, to formulate a standard.

- 12 -

280

Since views on governmental operations or decisions often
must be aired promptly to have any real effect, even a
temporary delay in communication may have the effect of
severely diluting "uninhibited, robust, and wide-open"
debate.  And protection of any governmental interest may
usually be accomplished by less restrictive means.  One
avenue generally available to the government, and cited by
Supreme Court as the most appropriate antedote, is to counter
public disclosures or criticisms with publication of its
own views.  See, e.g., Whitney v. California, 274 U.S. 357,
375 (1927) (concurring opinion of Mr. Justice Brandeis).

The effect of a prior restraint on cryptographic infor-
mation, however, differs significantly from classic restraints
on political speech.  Cryptography is a highly specialized
field with an audience limited to a fairly select group of
scientists and mathematicians.  The concepts and techniques
which public cryptographers seek to express in connection
with their research would not appear to have the same topical
content as ideas about political, economic or social issues.
A temporary delay in communicating the results of or ideas
about cryptographic research therefore would probably not
deprive the subsequent publication of its full impact.

Cryptographic information is, moreover, a category of
matter "which is both vital and vulnerable to an almost
unique degree."18/  Once cryptographic information is dis-
closed, the damage to the government's interest in protecting

---

18/   New York Times Co. v. United States, 403 U.S. 713, 736
n. 7 quoting H.R. Rep. No. 1895, 81st Cong., 2d Sess.,
1 (1950).  That report pertains to the bill which became 18
U.S.C. § 798, the criminal statute prohibiting disclosure
of information concerning the cryptographic systems and
communications intelligence activities of the United States.
Section 798 does not reach disclosure of information pub-
lished by public cryptographers, as its coverage is restricted
to classified information.  Classified information by defini-
tion is information in which the government has some proprietary
interest.  See  § 1(b) of the May 3, 1978 draft of the Executive
Order on national security proposed to replace Executive Order
11,652; cf. 22 C.F.R. § 125.02.

281

national security is done and may not be cured.   Publication
of cryptographic information thus may present the rare
situation in which "more speech" is not an alternative
remedy to silence.19/ See Whitney v. California, supra at
376 (concurring opinion of Mr. Justice Brandeis).

Given the highly specialized nature of cryptographic
information and its potential for seriously and irremediably
impairing the national security, it is our opinion that a
licensing scheme requiring prepublication submission of
cryptographic information might overcome the strong consti-
tutional presumption against prior restraints.   Any such
scheme must, as we have said, provide clear, narrowly defined
standards and procedural safeguards to prevent abuse.

While a detailed discussion of the specific provisions
and procedures of a valid scheme of prior review of crypto-
graphic information or of its practical and political
feasibility is beyond the scope of this memorandum, some

---

19/  In stressing the differences between cryptographic
information and other forms of expression we do not
mean to imply that the protections of the First Amendment
are not applicable to cryptographic information or that
they are confined to the exposition of ideas.   See Winters
v. New York, 333 U.S. 507, 510 (1948).   We recognize that
the scope of the amendment is broad.   It encompasses, for
example, purely commercial speech, Virginia State Board of
Pharmacy v. Virginia Citizens Consumer Council, Inc. 425
U.S. 748 (1976), and communicative conduct, Cohen v. California
403 U.S. 15 (1971).   We believe, however, that the extent
of First Amendment protection may vary depending upon the
nature of communication at issue.   It is established in
the area of commercial speech that greater governmental regu-
lation may be tolerated due to the special attributes of
that form of speech.   Virginia State Board of Pharmacy v.
Virginia Citizens Consumer Council, supra at 770-71 and n.24.
Speech in the labor context also presents special First Amend-
ment considerations.   See, e.g., N.L.R.B. v. Gissel Packing
Co., 395 U.S. 575 (1969).   And obscene communications have
received specialized treatment from the courts.   See, e.g.,
Roth v. United States, 354 U.S. 476 (1957).

- 14 -

282

general observations are in order.  First, we wish to emphasize
our doubts that the executive branch may validly provide
for licensing or prior review of exports of cryptographic
information without more explicit Congressional authoriza-
tion.  The scope of the existing delegation of authority
from Congress to the President, as we note above, is some-
what unclear.  Before imposing a prior restraint on exports
of public cryptographic information, we believe that a more
clear cut indication of Congressional judgment concerning
the need for such a measure is in order.  See United States
v. Robel, 389 U.S. 248, 269 (1967) (concurring opinion of
Mr. Justice Brennan); cf. Yakus v. United States, 321 U.S.
414 (1944).

Second, further Congressional authorization would ob-
viously be necessary in order to extend governmental controls
to domestic as well as foreign disclosures of public crypto-
graphic information.  Such an extension might well be necessary
to protect valuable cryptographic information effectively.
Indeed, limiting controls to exports while permitting unregulated
domestic publication of cryptographic research would appear
to undermine substantially the government's position that
disclosure of cryptographic information presents a serious
and irremediable threat to national security.20/

---

20/  A question which would arise from complete governmental
    control over cryptographic information is whether the
government would be required under the Fifth Amendment to
pay just compensation for the ideas it had effectively "con-
demned."  For example, the patent and invention provisions
of the Atomic Energy Act require the government to pay for
patents which it revokes or declares to be affected with the
public interest.  42 U.S.C. §§ 2181-2190.  A cryptographic
algorithm, however, would not appear to be a patentable
process.  See Gottschalk v. Benson, 409 U.S. 63 (1972).  And
it is unresolved whether copyright protection is available
for computer software.  See Nimmer on Copyright, § 13.1
(Supp. 1976).  We are therefore uncertain as to the status
of cryptographic ideas under the Fifth Amendment.

- 15 -

283

Third, no final restraint on disclosure may be imposed with-
out a judicial determination.  We recognize that a require-
ment of judicial review presents substantial problems.  The
proof necessary in order to demonstrate to a judge that
highly technical cryptographic information must be withheld
from publication because of the overriding danger to national
security might be burdensome and might itself endanger the
secrecy of that information.  It is our opinion, however,
that any system which failed to impose the burden on govern-
ment of seeking judicial review would not be constitutional.21/
See, e.g., Blount v. Rizzi, supra.

Finally, any scheme for prior review of cryptographic
'nformation should define as narrowly and precisely as
possible both the class of information which the government
must review to identify serious threats to the national
security and the class of information which the government
must withhold.22/  The scheme clearly should exempt from a

---

21/  The threat to national security posed by a judicial re-
     view procedure could be reduced substantially by con-
ducting the review in camera.  See Alfred A. Knopf, Inc. v.
Colby, 509 F.2d 1362 (4th Cir.), cert. denied, 421 U.S. 992
(1975); cf. 5 U.S.C. 552(a)(4)(B) (Supp. 1975) (in camera
review provision of the Freedom of Information Act).  The
Supreme Court, in any event, has been unimpressed by argu-
ments that disclosure of sensitive national security infor-
mation to a court raises such serious problems of public
dissemination that exemption from constitutional require-
ments is appropriate.  See United States v. U.S. District
Court, 407 U.S. 297 (1972).

22/  In other words, we assume that the information submitted
     under the scheme would not be coextensive with the in-
formation withheld.  We note, however, that the authority
of the government to require prepublication submission of
information which is neither classified nor classifiable
is unsettled.  That issue is posed in the suit recently filed
by the Department of Justice in the United States District
Court for the Eastern District of Virginia against former
CIA employee Frank Snepp for breach of  his secrecy agree-
ment.  United States v. Snepp, Civil Action No. 78-92-A.

- 16 -

284

submission requirement any information, such as that which
is publicly available or which poses no substantial security
threat, that the government has no legitimate interest in
keeping secret.23/  Failure to draft provisions narrowly
might well invite overbreadth challenges for inclusion of
protected communication. See, e.g., NAACP v. Alabama, 357
U.S. 449 (1958). And a precisely drawn scheme is also
necessary to avoid objections of vagueness. See, e.g.,
Smith v. Goguen, 415 U.S. 566 (1974).24/

　　　In conclusion, it is our view that the existing provisions
of the ITAR are unconstitutional insofar as they establish
a prior restraint on disclosure of cryptographic ideas and
information developed by scientists and mathematicians in
the private sector. We believe, however, that a prepublica-
tion review requirement for cryptographic information might
meet First Amendment standards if it provided necessary
procedural safeguards and precisely drawn guidelines.

　　　　　　　　　　　　　John M. Harmon
　　　　　　　　　　　Assistant Attorney General
　　　　　　　　　　　　Office of Legal Counsel

23/  As we noted above, at n.4, supra, the present ITAR pro-
　　　visions attempt to exempt publicly available information.
But the scope of that exemption and the procedures for invok-
ing it, particularly with respect to oral communications,
are somewhat clear.

24/  Although we mention questions of overbreadth and vague-
　　　ness raised by the technical data provisions of the
ITAR previously in this memorandum, we have not attempted
to identify and analyze particular problems for several
reasons.  First, our opinion that a prior restraint on public
cryptography might survive First Amendment scrutiny is a
limited one and does not purport to apply to the many other
types of technical data covered by the ITAR.  Second, we
believe that public cryptography presents special considera-
tions warranting separate treatment from other forms of
technical data, and that a precise and narrow regulation
or statute limited to cryptography would be more likely to
receive considered judicial attention.  Finally, we are
uncertain whether the present legislative authority for the
technical data provisions of the ITAR is adequate.

- 17 -