IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| DEFENSE DISTRIBUTED and<br>SECOND AMENDMENT FOUNDATION, INC.,<br>    Plaintiffs,<br><br>    v.<br><br>UNITED STATES DEPARTMENT<br>OF STATE, ANTONY J. BLINKEN, in his<br>official capacity as Secretary of State;<br>DIRECTORATE OF DEFENSE TRADE<br>CONTROLS; MIKE MILLER, in his official<br>capacity as Acting Deputy Assistant Secretary of<br>Defense Trade Controls; SARAH HEIDEMA, in<br>her official capacity as Director of Policy, Office<br>of Defense Trade Controls Policy,<br><br>and<br><br>MATTHEW J. PLATKIN, Acting Attorney<br>General of the State of New Jersey<br>                    Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Case No. 1:18-CV-637<br><br><br><br><br><br>Plaintiffs' Motion for a<br>Preliminary Injunction<br>Against the New Jersey<br>Attorney General |

# Table of Contents

                                                                                          **Page**

Table of Contents..................................................................................................i

Summary of the Argument .................................................................................1

Statement of the Case .........................................................................................2

    I.      Defense Distributed's Digital Firearms Information is Speech............................2

    II.    New Jersey is Violating Defense Distributed & SAF's Rights. .............................4

    III.   The Case Against the New Jersey AG is Ready to Resume....................................6

Argument ............................................................................................................8

    I.      There is a sufficient likelihood of success on the merits. ........................................8

        A.    Plaintiffs will likely succeed on the First Amendment claim......................9

            1.      Content-based censorship makes the speech crime unconstitutional. ........................................................................10

            2.      Overbreadth makes the speech crime unconstitutional. ................12

            3.      A missing scienter element makes the speech crime unconstitutional. ........................................................................13

        B.    Plaintiffs will likely succeed on the Due Process Clause claim. ...............14

        C.    Plaintiffs will likely succeed on the Commerce Clause claim. .................15

        D.    The civil enforcement efforts are just as unconstitutional as the speech crime. ......................................................................................16

    II.    Irreparable harm will occur without a preliminary injunction. .............................17

    III.   The balance of equities favors a preliminary injunction. .......................................19

    IV.   The public interest favors a preliminary injunction.................................................20

    V.    Request for expedited consideration.........................................................................20

Conclusion .........................................................................................................20

Certificate Of Service .......................................................................................22

## Summary of the Argument

This case concerns extraordinarily important questions of free speech regarding the First Amendment right to speak about the Second Amendment. Defense Distributed and the Second Amendment Foundation are peaceful, law-abiding organizations committed to preserving, protecting, and promoting America's individual right to keep and bear Arms in both traditional and modern contexts. They litigate here in vindication of the modern constitutional right to speak about the Second Amendment by sharing computer files containing digital firearms information.

The New Jersey Attorney General forbids the publication of digital firearms information because he resents the Second Amendment and anything that Defense Distributed does to serve it. Even though federal protections enable Defense Distributed's publication of the speech at issue, the New Jersey AG insists on repressing it with extreme acts of civil and criminal censorship. He first censored Defense Distributed by suing it in civil actions and intimidating its service providers. Now he threatens to criminally prosecute and jail Defense Distributed for engaging in free speech. The New Jersey AG is on a witch hunt against Defense Distributed and its director, Cody Wilson. The New Jersey AG's ends are illegitimate. His means violate the Constitution. His ongoing censorship inflicts irreparable harm upon Defense Distributed, SAF, and the citizenry at large. A preliminary injunction stopping these First Amendment abridgements should issue immediately.

Now is the time for a preliminary ruling on the merits. The procedural gamesmanship that delayed the merits' consideration for years is over. The Court need not wait for any case to arrive from New Jersey. This case—the original case that was first filed and should have been ruled on years ago—is ripe for decision and ready to proceed. *See* Doc. 173. The Fifth Circuit has mandated that this Court has both jurisdiction, *Defense Distributed v. Grewal*, 971 F.3d 485 (5th Cir. 2020), and venue, *Defense Distributed v. Bruck*, 30 F.4th 414 (5th Cir. 2022), and has told the Court to hear this motion "expeditiously." *Id*. at 414 n.2. No more delay should be tolerated.

1

## Statement of the Case

The facts are stated by the Second Amended Complaint, Doc. 117 (hereinafter "Compl."), which Plaintiffs incorporate here by reference, *see* Fed. R. Civ. P. 10(c).[1]  The facts are proven by the evidence submitted in the Appendices, Docs. 64, 148, and appended to this motion, Ex. A.[2]

## I.    Defense Distributed's Digital Firearms Information is Speech.

The speech at issue is the "digital firearms information" defined in full detail by the complaint.  Compl. at 10-12, ¶¶ 36-41.  It is "digital" because it exists in the form of coded computer files, as opposed to analog media.  *Id*.  It is "information" because it conveys knowledge without advocating, inciting, or producing any action.  *Id*.

With respect to 3D-printing processes, digital firearms information does not produce anything readily or automatically.  Compl. at 11, ¶ 40.  The files at issue are not functional software.  *Id*.  They do not self-execute.  *Id*.  They are mere passive information stores.  *Id*.  To fabricate an object as designed in a CAD or CAM file, a user must know how and choose to orchestrate a process involving substantial additional software (to interpret and implement the files

---

[1] Plaintiffs' Notice of Vacatur and Related Litigation explains how *Defense Distributed v. Bruck*, 30 F.4th 414 (5th Cir. 2022), and this Court's vacatur of the April 2021 transfer/severance decision have, as a matter of law without the need for further Court order or party pleading amendments, revived the Plaintiffs' case against the New Jersey AG as pleaded by the Second Amended Complaint.  Doc. 173.  Alternatively, even if the Court were to deem it necessary for Plaintiffs to perform a technical formality of re-filing the Second Amendment Complaint, Plaintiffs hereby request leave to do under Federal Rule of Civil Procedure 15.  In no event does the need to take such steps delay or stop the Court's adjudication of this motion for a preliminary injunction. See 11A Charles Alan Wright & Arthur R. Miller et al., Federal Practice & Procedure § 2949 & nn. 5-6 (3d ed. West 2018) ("The grant of a temporary injunction need not await any procedural steps perfecting the pleadings or any other formality attendant upon a full-blown trial of this case.").

[2] The Court should take judicial notice of facts such as other courts' dockets, *Orabi v. Att'y Gen. of the U.S.*, 738 F.3d 535, 537 & n.1 (3d Cir. 2014), and pertinent internet websites, *see United States v. Flores*, 730 F. App'x 216, 221 n.1 (5th Cir. 2018) (unpublished) (Haynes, J., concurring).

into the motions of a 3D print head), substantial additional hardware (*e.g.*, the computer running the software, the 3D printer), substantial physical labor, substantial amounts of time, and the requisite raw materials. *See id.*

The physical laws governing 3D-printer fabrication processes apply to all objects, including firearms. Compl. at 12, ¶ 41. Even with a perfectly accurate set of digital firearms information, the most powerful software, and a state-of-the-art 3D printer, the digital model of a firearm component does not fabricate the component on its own. *Id.* Firearm component fabrication is not an automatic process. *Id.* It occurs only if and when a person chooses to perform a complex series of actions entailing considered volition and judgment, such as adapting and tailoring the design, selecting suitable materials, choosing an effective manufacturing process, and opting to personally complete an extensive set of fabrication steps with the requisite software, hardware, and raw materials. *Id.*

Defense Distributed exists to promote the Second Amendment's individual right to keep and bear Arms. Compl. at 12, ¶ 42; Doc. 148-74; Doc 148-76 at 1-2. To that end, Defense Distributed has published, is publishing, and intends to continue publishing a wide variety of digital firearms information to the American public. Compl. at 12, ¶ 42; Ex. A at 1-2; Doc 148-76 at 1-2; Doc. 148-74; at 2-3. Defense Distributed's primary (but not exclusive) publication medium is, was, and will continued to be the DEFCAD.com website. *See* Compl. at 14, ¶ 52; Ex. A at 1-2; Doc 148-76 at 1-2. Via DEFCAD and other means, Defense Distributed published substantial sets of computer files with digital firearms information in 2012 and 2013, *see* Compl. at 14-15, ¶¶ 53-54; ; Ex. A at 1-2; Doc. 148-76 at 3-4, in July 2018, *see* Compl. at 15-16, ¶¶ 55-57; Ex. A at 1-2; Doc. 148-76 at 4-6, in August 2018 through November 2018, Compl. at 16, ¶¶ 58-59; Ex. A at 1-2; Doc. 148-76 at 6-8, and from March 2020 to present, see Compl. at 17, ¶¶ 61-66; Ex. A at

1-2. But because of the New Jersey AG's actions, Defense Distributed and the SAF members' constitutional right to engage in this speech has been and is being abridged.

## II. New Jersey is Violating Defense Distributed & SAF's Rights.

### A. The New Jersey AG Engages in Civil Censorship.

On July 26, 2018, the New Jersey AG issued Defense Distributed a nationwide cease-and-desist letter that commanded Defense Distributed to cease publishing its digital firearms information: "You are directed to cease and desist from publishing printable-gun computer files for use by New Jersey residents." Compl. at 38, ¶ 133; Doc. 148-15 at 1. The nationwide cease-and-desist letter demanded a publication stop on pain of legal punishment: "As the chief law enforcement officer for New Jersey, I demand that you halt publication of the printable-gun computer files. Should you fail to comply with this letter, my Office will initiate legal action barring you from publishing these files before August 1, 2018." Compl. at 38-39, ¶ 133; Doc. 148-15 at 2. This command has never ceased. The New Jersey AG adheres to this position today.

The New Jersey AG also took coercive action against Defense Distributed by targeting its internet security service providers, DreamHost and Cloudflare, Inc. Compl. at 39-40, ¶¶ 134-140; Doc. 148-20; Doc. 148-21. Coercively, he delivered to each service provider parallel versions of the cease-and-desist letter, urging each to stop servicing Defense Distributed's website. *Id.*

### B. New Jersey AG Engages in Criminal Censorship.

On November 8, 2018, New Jersey armed the Attorney General with Senate Bill 2465's Section 3(*l*)2. S. 2465, 218th Leg., Reg. Sess. (N.J. Nov. 2018). The law now codified as New Jersey Code of Criminal Justice § 2C:39 9(*l*)(2) establishes the following speech crime:

> *l.* Manufacturing or facilitating the manufacture of a firearm using a three dimensional printer. In addition to any other criminal penalties provided under law it is a third degree crime for:
>
> . . .

4

> (2) a person to distribute by any means, including the Internet, to a person in New Jersey who is not registered or licensed as a manufacturer as provided in chapter 58 of Title 2C of the New Jersey Statutes, digital instructions in the form of computer-aided design files or other code or instructions stored and displayed in electronic format as a digital model that may be used to program a three-dimensional printer to manufacture or produce a firearm, firearm receiver, magazine, or firearm component.
>
> As used in this subsection: "three-dimensional printer" means a computer or computer-driven machine or device capable of producing a three-dimensional object from a digital model; and "distribute" means to sell, or to manufacture, give, provide, lend, trade, mail, deliver, publish, circulate, disseminate, present, exhibit, display, share, advertise, offer, or make available via the Internet or by any other means, whether for pecuniary gain or not, and includes an agreement or attempt to distribute.

N.J. Stat 2C:39-9(*l*)(2).

Section 2C:39 9(*l*)(2) is a speech crime that outlaws the sharing of digital firearms information. It does not criminalize conduct. It criminalizes speech as such: any "digital instructions" that "may be used" by a person to "produce a firearm" with a "three dimensional printer." N.J. Stat 2C:39-9(*l*)(2). It is now a "third degree crime" to "distribute" that speech "to a person in New Jersey" (except for licensed manufacturers). *Id*. Convictions under the new speech crime entail a prison sentence of three to five years. N.J. Stat 2C:43-6.

New Jersey's new speech crime is extraordinarily broad in reach. It criminalizes every possible mode of communication by defining "distribute" as "to sell, or to manufacture, give, provide, lend, trade, mail, deliver, publish, circulate, disseminate, present, exhibit, display, share, advertise, offer, or make available via the Internet or by any other means, whether for pecuniary gain or not, and includes an agreement or attempt to distribute." N.J. Stat 2C:39-9(*l*)(2). It lets the New Jersey AG jail speakers—regardless of whether any actual danger or harm exists—by providing that the crime occurs if the information "may be used" in a proscribed way. *Id*. (emphasis added). It also lacks any meaningful intent requirement. This is all unprecedented.

5

New Jersey's speech crime was enacted for the purpose of discriminating against and censoring Defense Distributed and SAF's members, in particular.  *See* Compl. at 42-43 ¶ 147-52; Doc. 148-32.  The New Jersey AG calls the new speech crime a "tool" he will use to jail Defense Distributed, SAF, and anyone else that dares to share the computer files at issue.  Compl. at 42-43 ¶ 147-52; Doc. 148-32 at 21.  His threat is unabashed: "we will come after you."  Compl. at 42-43 ¶ 147-52; Doc. 148-32 at 15.  This threat has never ceased and remains in full force.

### C.    The New Jersey AG's Illegal Conduct Causes Irreparable Harm.

Because of the New Jersey AG's censorship, Defense Distributed no longer speaks freely to the people of New Jersey.  *See, e.g.*, Ex. A at 2.  The DEFCAD website that used to offer free downloads to all has been walled off, and shipments of USB drives have been halted.  Compl. at 14-17, 47-48  ¶¶ 53-66, 173-78; Ex. A at 1-2; Doc 148-37 at 10;  Doc. 148-38 at 11; Doc. 148-76 at 6-9.  In the past, the New Jersey AG's illegal conduct irreparably harmed Defense Distributed and SAF by causing them to refrain from publishing digital firearms information they have a right to publish, receive, and republish, and by otherwise chilling their exercise of free speech rights; and at present, the New Jersey AG's illegal conduct continues to irreparably harms Defense Distributed and SAF in these same ways.  *See id.*

Once the New Jersey AG's illegal threats cease, Defense Distributed will resume engaging in this speech with persons in New Jersey and SAF's members in New Jersey will resume receiving it, benefitting from it, and republishing it.  *See id*.  But there is no end in sight.  Despite all that has gone on so far, both the civil and criminal threats remain in full force.

### III.    The Case Against the New Jersey AG is Ready to Resume.

No court has ever ruled on the merits of Plaintiffs' request for a preliminary injunction. Plaintiffs have been diligently seeking it again and again, in court after court, for *over three years*. But at every step of the way, justice has been delayed by the New Jersey AG's jurisdictional shell

game.  Plaintiffs have spent this entire time chasing him from court to court, all in an effort to enjoin the same unconstitutional censorship.  In each court they asked for the same relief they seek here, and in each court the New Jersey AG refused to let this critical ruling occur.  When the case began in Texas, the New Jersey AG argued that a preliminary injunction request had to be decided in New Jersey; and when the case was in New Jersey, the New Jersey AG said that a preliminary injunction request had to be decided back in Texas.  When the request was posed to the Fifth Circuit, the New Jersey AG pulled the plug on his own petition for rehearing just to avoid a decision.  Every time a ruling nears, the New Jersey AG uses improper gamesmanship to skirt judicial scrutiny. His delay tactics have delayed the administration of justice and prejudiced Plaintiffs by wildly increasing litigation costs.  But now those efforts have all been beaten.

The Fifth Circuit has now squarely rejected both of the New Jersey AG's evasive efforts. The threshold issue of personal jurisdiction is no longer disputable because of *Defense Distributed v. Grewal*, 971 F.3d 485 (5th Cir. 2020), and the threshold issue of venue is no longer disputable because of *Defense Distributed v. Bruck*, 30 F.4th 414 (5th Cir. 2022).  The Fifth Circuit has rightly recognized that "Defense Distributed has yet to secure a court decision condemning what appear to be flagrant prior restraints," and has therefore rightly instructed this Court to resolve the instant motion for a preliminary injunction "expeditiously."  *Id*. at 414 n.2.

The New Jersey AG's co-defendants at the State Department are in retreat.  Though their past wrongdoing is still very much actionable, an immediate injunction against the State Department is not being sought because the State Department supposedly "no longer regulates" the files at issue in this litigation. Doc. 159 at 3.  But not the New Jersey AG.  Instead of relenting, his censorship remains in full force, causing more irreparable harm with every passing day.  The instant motion is therefore completely ripe, and the need for relief is extraordinarily dire.

## Argument

Plaintiffs move for a preliminary injunction against Defendant Matthew J. Platkin in his official capacity as New Jersey's Acting Attorney General.[3]   The Court should enjoin the New Jersey AG from (1) enforcing New Jersey Statute § 2C:39-9(*l*)(2) against the Plaintiffs, and (2) using cease-and-desist letters and other civil legal actions to stop the Plaintiffs' publication of digital firearms information.  *See* 42 U.S.C. § 1983; *Ex parte Young*, 209 U.S. 123 (1908).

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  But "none of the four prerequisites has a fixed quantitative value." *Tex. v. Seatrain Int'l, S.A.*, 518 F.2d 175, 180 (5th Cir. 1975)."  "Rather, a sliding scale is utilized, which takes into account the intensity of each in a given calculus." *Id*. With respect to both the criminal and civil censorship at issue here, the injunction test is met.

## I.     There is a sufficient likelihood of success on the merits.

The question presented is whether the New Jersey AG's use of state civil and criminal law to censor Defense Distributed and SAF violates the First Amendment, the Due Process Clause, the Commerce Clause, and other free speech protections.  It does.  Defense Distributed and SAF are likely to succeed in having the speech crime held unconstitutional and its enforcement permanently enjoined.  They are also likely to succeed in having the New Jersey AG's parallel civil enforcement actions held unconstitutional and permanently enjoined.

---

[3] Because the United States Secretary of State and New Jersey Attorney General are being sued in their official capacities and the suit's previously named officers left those offices, Federal Rule of Civil Procedure 25(d) automatically substitutes their successors as defendants.

### A. Plaintiffs will likely succeed on the First Amendment claim.

Plaintiffs plead that the New Jersey AG has violated, is violating, and is threatening to violate 42 U.S.C. § 1983 by acting, under color of state law, to abridge Plaintiffs' First Amendment freedoms. Compl. at 71-73, ¶¶ 257-67. Plaintiffs are likely to succeed on the merits of the First Amendment claim for at least three independent reasons.

Before addressing those arguments, the Court should hold that the Plaintiffs' distribution of the digital firearms information at issue qualifies as First Amendment speech. Extensive proof shows that the computer files at issue meet the test under all applicable precedents. *Compare* Compl. at 10-12, ¶ 36-41, Doc. 148-51 (exemplary digital firearms information), Doc. 148-75 (declaration of the seminal industry expert), Doc. 148-71 (declaration of Defense Distributed's Director), *and* Doc. 148-55 (industry publication explaining 3D printing processes), *with Sorrell v. IMS Health Inc*., 564 U.S. 552, 570 (2011) ("[T]he creation and dissemination of information are speech within the meaning of the First Amendment."), *Bartnicki v. Vopper*, 532 U.S. 514, 526–27 (2001) ("[G]iven that the purpose of [the delivery of a tape recording] is to provide the recipient with the text of recorded statements, it is like the delivery of a handbill or a pamphlet, and as such, it is the kind of 'speech' that the First Amendment protects."), *Junger v. Daley*, 209 F.3d 481, 482 (6th Cir. 2000) ("Because computer source code is an expressive means for the exchange of information and ideas about computer programming, we hold that it is protected by the First Amendment."), *Universal City Studios, Inc. v. Corley*, 273 F.3d 429, 449 (2d Cir. 2001) ("[C]omputer code, and computer programs constructed from code can merit First Amendment protection."), and *Bernstein v. U.S. Dep't of State*, 922 F. Supp. 1426, 1436 (N.D. Cal. 1996) ("source code is speech").

### 1. Content-based censorship makes the speech crime unconstitutional.

New Jersey's speech crime, § 2C:39 9(*l*)(2), is a content-based speech restriction. Facially, the law is content-based because it criminalizes "digital instructions" that "may be used to program a three-dimensional printer to manufacture or produce a firearm, firearm receiver, magazine, or firearm component." N.J. Stat 2C:39-9(l)(2); *see NIFLA v. Becerra*, 138 S. Ct. 2361, 2371 (2018); *Reed v. Town of Gilbert, Ariz.*, 135 S. Ct. 2218, 2227 (2015). The law's justification also makes it content-based because its enactors created the crime to punish the idea being conveyed—digital firearm information. *See Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989).

As a content-based speech restriction, the Constitution renders the speech crime presumptively invalid; it is valid only if New Jersey "prove[s] that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest." *Reed*, 135 S. Ct. at 2231. That burden cannot be met for at least four reasons.

First, New Jersey's speech crime does not advance a compelling state interest because "[t]he mere tendency of speech to encourage unlawful acts is not a sufficient reason for banning it." *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 253 (2002). "Without a significantly stronger, more direct connection" between the speech and a third party's criminal conduct, "the Government may not prohibit speech on the ground that it may encourage [third-parties] to engage in illegal conduct." *Id.*; *see also Edenfield v. Fane*, 507 U.S. 761, 770-71 (1993) (state cannot impose a "flat ban" on solicitations by public accountants on the ground that solicitations "create[] the dangers of fraud, overreaching, or compromised independence"). Yet that is precisely what New Jersey has done. It has violated the rule that "a free society prefers to punish the few who abuse [their] rights . . . after they break the law than to throttle them and all others beforehand." *Se. Promotions Ltd. v. Conrad*, 420 U.S. 546, 559 (1975).

Second, New Jersey's speech crime does not meet the narrow tailing requirement because plausible, less restrictive alternatives exist. "The normal method of deterring unlawful conduct is to impose an appropriate punishment on the person who engages in it," *Bartnicki*, 532 U.S. at 529, not on tangential, third-party speakers. But rather than opting for the former approach and banning the harmful *conduct* it fears, New Jersey has elected to target *speech* that is, at most, remotely and only sometimes associated with that conduct.

Third, New Jersey's speech crime is substantially underinclusive. *See Brown v. Entm't Merchants Ass'n*, 564 U.S. 786, 802 (2011). While it criminalizes speech by normal people, § 2C:39 9(l)(2) does nothing about the speech of firearms manufacturers or wholesalers that can just as easily cause the harms New Jersey contemplates. While it criminalizes speech regarding "firearms," New Jersey's speech crime does nothing about speech regarding other dangerous instrumentalities such as poison or bombs. And most tellingly, while it criminalizes the "distribution" of digital firearms information, New Jersey's speech crime does nothing about the *possession* or *use* of that same information to, for example, produce an illegal or undetectable firearm—the primary evil that New Jersey means to combat.

Fourth, New Jersey cannot prove that the speech crime actually advances the state's aims. In the First Amendment context, justifications backed by mere "anecdote and supposition" do not suffice, *United States v. Playboy Entertainment Group, Inc.*, 529 U.S. 803, 822 (2000), and neither does "ambiguous proof," *Brown*, 564 U.S. at 800. Compelling "empirical support" of efficacy must be given. *Globe Newspaper Co. v. Sup. Ct. for Norfolk Cty.*, 457 U.S. 596, 609 (1982). The proof must demonstrate that the "restriction will in fact alleviate" its concerns. *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 555 (2001). It is not enough to offer "mere speculation or conjecture." *Id*. No proof of efficacy exists here. *Cf. Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292,

11

2313-14 (2016) ("Determined wrongdoers, already ignoring existing statutes and safety measures, are unlikely to be convinced to adopt safe practices by a new overlay of regulations.").

In particular, the New Jersey AG's effort to prove efficacy is bound to fail because the information he seeks to censor is already available across the internet. The digital firearms information that Defense Distributed already published was thereby committed to the internet's public domain, where independent republishers beyond New Jersey's control will make those files readily accessible on one website or another forever—regardless of whether the New Jersey AG decides to exact vengeance on the publisher he most dislikes.

The New Jersey AG admitted as much in his own court filings, which take the position that "posting these codes is a bell that can never be un-rung." Doc. 148-22 at 87. But overwhelming proof establishes that this "Pandora's box" has already been opened, and, by New Jersey's own admission, it "can never be closed." Doc. 148-22 at 11. Post-hoc prosecution of Defense Distributed under § 2C:39 9(*l*)(2)certainly will not help.

### 2.  Overbreadth makes the speech crime unconstitutional.

Plaintiffs are also likely to succeed on the merits of their First Amendment claim because New Jersey's speech crime is unconstitutionally overbroad. The overbreadth doctrine "prohibits the Government from banning unprotected speech" where "a substantial amount of protected speech is prohibited or chilled in the process." *Ashcroft*, 535 U.S. at 255. New Jersey's speech crime violates this doctrine in a litany of ways.

First, New Jersey's speech crime is overbroad because it criminalizes speech regardless of its relationship to illegal conduct. Constitutionally, a state may "suppress speech for advocating the use of force or a violation of law only if such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action." *Id*. at 253. A "contingent

and indirect" relationship to criminal conduct will not suffice, nor will an allegation, like New Jersey's, that there is "some unquantified potential for subsequent criminal acts." *Id*. at 250.

New Jersey's speech crime does not target speech that is "directed to inciting or producing *imminent lawless action* and is likely to incite or produce such action." *Ashcroft*, 535 U.S. at 253 (emphasis added). Instead, virtually all the speech it covers falls squarely on the protected side of the line, either because the expression's recipients commit no illegal act at all or because, if they did, the causal link is merely contingent and indirect. *Cf. Staples v. United States*, 511 U.S. 600, 610 (1994) ("[T]here is a long tradition of widespread lawful gun ownership by private individuals in this country.").  Yet this law still criminalizes every instance of "distribut[ion]" no matter what.

Second, New Jersey's speech crime is overbroad because it also criminalizes sharing information about any "firearm component."  This covers a wide array of generic items—such as fasteners, nuts, bolts, and screws—that have unlimited potential uses and are not unique to firearms.  Even if New Jersey could criminalize certain speech about a completed "firearm," it could not possibly criminalize speech about mundane parts for available in any hardware store.

Third, New Jersey's speech crime is overbroad because it fails to distinguish between information that has, and has not, been committed to the public domain.  As noted, digital firearms information is already freely circulating in the public domain, and "the Government may not . . . restrict individuals from disclosing information that lawfully comes into their hands in the absence of a state interest of the highest order." *United States v. Aguilar*, 515 U.S. 593, 605 (1995).  Yet this statute draws no distinction between truly novel "instructions" and those that everyone with a smartphone or computer has been able to obtain with simple Google search.

### 3. A missing scienter element makes the speech crime unconstitutional.

The Plaintiffs' First Amendment claim is also likely to succeed because New Jersey's speech crime lacks a necessary scienter element.  States cannot create speech crimes without

including a stringent requirement of scienter—that is, knowledge of the fact that truly distinguishes innocent acts from guilty ones. *See, e.g.*, *Holder v. Humanitarian Law Project*, 561 U.S. 1, 16-17 (2010); *New York v. Ferber*, 458 U.S. 747, 765 (1982); *Smith v. California*, 361 U.S. 147, 153–54 (1960). New Jersey's speech crime lacks the needed scienter element because it does not even require the speaker to *know* that instructions will "be used to program a three dimensional printer to manufacture or produce a firearm, firearm receiver, magazine, or firearm component"—let alone know that the recipient would use the information to engage in *illegal* production of a firearm. Hence, the requisite scienter requirement is missing. *See Rice v. Paladin Enters., Inc.*, 128 F.3d 233, 247-48 (4th Cir. 1997).

### B. Plaintiffs will likely succeed on the Due Process Clause claim.

Plaintiffs are also likely to succeed on the merits of their claim that New Jersey's speech crime is void for vagueness under the Due Process Clause.[4] "A law may be vague in violation of the Due Process Clause for either of two reasons: 'First, it may fail to provide the kind of notice that will enable ordinary people to understand what conduct it prohibits; second, it may authorize and even encourage arbitrary and discriminatory enforcement.'" *Act Now*, 846 F.3d at (D.C. Cir. 2017). Section (*l*)(2) is unconstitutionally vague in both respects.

Specifically, New Jersey's speech crime is unconstitutionally vague because it criminalizes code or instructions "*that may be* used to program a three-dimensional printer to manufacture or produce a firearm, firearm receiver, magazine, or firearm component." N.J. Stat 2C:39-9(l)(2) (emphasis added). But it is impossible for a speaker to know what counts as "code . . . *that may*

---

[4] Pre-enforcement facial vagueness challenges are allowed to address the Due Process Clause's concern for "arbitrary and discriminatory enforcement," *Act Now to Stop War & End Racism Coal. & Muslim Am. Soc'y Freedom Found. v. D.C.*, 846 F.3d 391, 410 (D.C. Cir. 2017), and also to the extent that they seek to halt the chilling of protected speech, *Dana's R.R. Supply v. Attorney Gen., Florida*, 807 F.3d 1235, 1241 (11th Cir. 2015). Plaintiffs' claim implicates both concerns.

be used to" engage in such programming.  In the same way that "(w)hat is contemptuous to one man may be a work of art to another," *Smith v. Goguen*, 415 U.S. 566, 575 (1974), what "may be used" by one programmer can be totally useless to another.  Speakers like Defense Distributed cannot tell in advance on which side of the line their speech will fall.

Because of indeterminacies like this, the statute both chills speech nationwide and encourages arbitrary and discriminatory enforcement.  *See id*. ("Statutory language of such a standardless sweep allows policemen, prosecutors, and juries to pursue their personal predilections.").  Indeed, the statements made during the New Jersey speech crime's signing ceremony show that the New Jersey AG wishes to prosecute Defense Distributed not because it poses some sort of unique threat, but because the New Jersey AG has a vehement political dislike for Defense Distributed's founder.  *See* Doc. 148-32 at 12-14, 20 (repeatedly targeting "Cody Wilson").  As the Fifth Circuit has already put it, the New Jersey AG is enforcing this law because he wants to "crush Defense Distributed's operations and not simply limit the dissemination of digital files in New Jersey."  *Def. Distributed v. Grewal*, 971 F.3d 485, 493 (5th Cir. 2020).

### C.    Plaintiffs will likely succeed on the Commerce Clause claim.

Plaintiffs are also likely to succeed on the claim that the Attorney General has subjected and is subjecting the Plaintiffs to an unconstitutional deprivation of the right to be free of commercial restraints that violate the dormant Commerce Clause.  Under this doctrine, New Jersey's speech crime triggers strict scrutiny because it "regulat[es] conduct that takes place exclusively outside the state."  *Backpage.com, LLC v. Hoffman*, No. 13-CV-03952 DMC JAD, 2013 WL 4502097, at *11 (D.N.J. Aug. 20, 2013).  Even though speakers like Defense Distributed operate their websites in a passive fashion from Texas, New Jersey's speech crime expressly projects New Jersey's law about what can and cannot be said on the internet throughout the entire Union.  Because this extraterritorial application is a direct and substantial part of the statute, New

15

Jersey's speech crime is unconstitutional per se, "regardless of whether the statute's extraterritorial reach was intended by the legislature." *Healy v. Beer Inst.*, 491 U.S. 324, 336 (1989); *see Am. Booksellers Found. v. Dean*, 342 F.3d 96, 104 (2d Cir. 2003); *Am. Libraries Ass'n v. Pataki*, 969 F. Supp. 160, 182 (S.D.N.Y. 1997).

### D. The civil enforcement efforts are just as unconstitutional as the speech crime.

In every key respect, the same constitutional analysis that applies to the new speech crime applies to the New Jersey AG's use of civil legal methods to achieve the same ends. Plaintiffs are likely to succeed on their Section 1983 action's First Amendment claim because the New Jersey AG's conduct violates the doctrine regarding unconstitutional prior restraints. The New Jersey AG's deployment of a cease and desist letter to Defense Distributed constitutes a prior restraint because it demands—in advance, and upon pain of legal punishment—that Defense Distributed *never* publish "printable-gun computer files for use by New Jersey residents." Doc. 148-15 at 1-2. So do civil actions like the New Jersey AG's effort to obtain an *ex parte* temporary restraining order against Defense Distributed. *See* Doc. 65-4. As prior restraints, the New Jersey AG's civil censorship efforts bear a heavy presumption of unconstitutionality. *See Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 71–72 (1963); *Test Masters Educ. Servs., Inc. v. Singh*, 428 F.3d 559, 579 (5th Cir. 2005). But the New Jersey AG cannot overcome this burden. The same reasoning that prevents New Jersey's speech crime from surviving strict scrutiny also spells defeat for the civil censorship effort. *See Bernard v. Gulf Oil Co.*, 619 F.2d 459, 473 (5th Cir. 1980) (en banc), *aff'd*, 452 U.S. 89 (1981).

Importantly, this constitutional violation encompasses both the action taken directly against the Plaintiffs and the *indirect* efforts to threaten, coerce, and intimidate internet service providers. *See Backpage.com, LLC v. Dart*, 807 F.3d 229 (7th Cir. 2015); *Okwedy v. Molinari*,

333 F.3d 339 (2d Cir. 2003); *Rattner v. Netburn*, 930 F.2d 204 (2d Cir. 1991). Both types of censorship should be enjoined.

## II.     Irreparable harm will occur without a preliminary injunction.

Defense Distributed and SAF's members knew of New Jersey's speech crime's passage on the day that it became law and witnessed the signing ceremony. *See* Compl. at 43-44, ¶¶ 153-54; Ex. A at 1-2; Doc 148-70; Doc. 148-76; Doc. 148-77. From that time to present, Defense Distributed and SAF's members reasonably feared that the New Jersey AG would at any moment commence enforcement of the new law against Defense Distributed, its officers, its employees, and/or its agents, as well as SAF's members. *See id.* Hence, the New Jersey AG has caused illegal censorship of three distinct categories of Defense Distributed and SAF's speech. *See id.* If not for the New Jersey AG's illegal actions, Defense Distributed and SAF's members would be freely exercising their rights in all three respects; but because of the illegal conduct they are not. *See id.*

Category one is the free and open publication of digital firearms information *on the internet* to persons in New Jersey, which New Jersey's speech crime prohibits by making it a crime to "distribute" the banned "digital instructions" "by any means, including the Internet." Defense Distributed now refrains from freely and openly publishing digital firearms information via the internet to persons in New Jersey for fear of being punished by the New Jersey AG. *See* Compl. at 48, ¶ 176; Ex. A at 2; Doc. 148-30 at 2; Doc 148-37 at 10; Doc. 148-38 at 11; Doc. 148-76 at 6-9; Doc. 148-77. This right has been exercised in the past by Defense Distributed; and if not for the New Jersey AG's ongoing censorship, Defense Distributed would exercise this right in the future. *See id.* SAF members would as well. *See* Doc. 148-70 at 2.

Category two is the free and open publication of digital firearms information *via the mail* to persons in New Jersey, which New Jersey's speech crime prohibits by defining "distribute" to mean "mail." Defense Distributed also now refrains from freely and openly distributing digital

17

firearms information via the mail to persons in New Jersey for fear of being punished by the New Jersey AG.  *See* Compl. at 48, ¶ 177; Ex. A at 2; Doc. 148-76 at 6-9.  This right has been exercised in the past by Defense Distributed; and if not for the New Jersey AG's ongoing censorship, would be exercised in the future by Defense Distributed.  *See id.*

Category three is the free and open *offering and advertisement* of digital firearms information to persons in New Jersey, which New Jersey's speech crime prohibits by defining "distribute" to mean "offer" and "advertise."  Defense Distributed now refrains from freely and openly offering and advertising its mailed digital firearms information to persons in New Jersey for fear of being punished by the New Jersey AG.  *See* Compl. at 48, ¶ 178; Ex. A at 2; Doc 148-37 at 10;  Doc. 148-38 at 11; Doc. 148-76 at 6-9.  This right too has been exercised in the past by Defense Distributed; and if not for the New Jersey AG's ongoing censorship, would be exercised in the future by Defense Distributed and SAF's members.  *See id.*

The New Jersey AG's *civil* censorship covers all three categories of conduct as well.  *See* Compl. at 45, ¶ 159; Ex. A at 2.  His cease and-desist order said to "halt publication" of any and all so-called "printable gun computer files."  *See id.*  The civil lawsuits sought prior restraints against all manner of "distributing" "printable-gun computer files."  *See id.*; Doc. 148-29.  And the threats against internet service providers targeted all "computer files" with digital firearms information.  *See* Compl. at 45, ¶ 159.

The New Jersey AG's censorship of *non-internet speech* is completely unique.  *See* Compl. at 45, ¶ 160.  Neither the federal government nor any other state government seeks to censor the non-internet speech that the New Jersey AG does.  *See id.*  The resulting censorship of constitutionally protected speech is uniquely attributable to the New Jersey AG alone.  *See id.*

The New Jersey AG's censorship of internet speech is unique as well—both in breadth and nature. *See* Compl. at 45, ¶ 161. His civil and criminal censorship efforts against Defense Distributed and SAF's internet speech apply to more speech than federal officials' efforts do, impose different burdens than federal officials' efforts do, and threaten far greater penalties than federal officials' efforts do. *See id.* The resulting censorship of constitutionally protected speech is uniquely attributable to the New Jersey AG alone. *See id.*

For all three categories of censorship, irreparable harm is clearly evident. The chilling of these constitutionally protected activities itself constitutes irreparable harm, *see Dana's Railroad Supply v. Attorney General, Florida*, 807 F.3d 1235, 1241 (11th Cir. 2015), and threatening to enforce the speech crime imposes an unconstitutional prior restraint. *See, e.g.*, *Fairley v. Andrews*, 578 F.3d 518, 525 (7th Cir. 2009). If enforced as the New Jersey AG threatens, moreover, the speech crime would result in unconstitutional convictions. *See, e.g.*, *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 932–33 (1982). All of these lost freedoms are irreparable harms.

## III. The balance of equities favors a preliminary injunction.

The balance of equities favors a preliminary injunction. The risk of erroneously denying the injunction entails the "potential for extraordinary harm and a serious chill upon protected speech." *Ashcroft v. ACLU*, 542 U.S. 656, 671 (2004). "The harm done from letting [an] injunction stand pending a trial on the merits, in contrast, will not be extensive," especially where, as here, "[n]o prosecutions have yet been undertaken under the law, so none will be disrupted if the injunction stands." *Id.*

Indeed, New Jersey will not suffer any harm—and certainly not irreparable harm—if the status quo is restored during this suit's pendency. The only viable interest New Jersey could have is a retrospective one: punishing citizens for past speech. But there is nothing urgent about that draconian goal; the punishment can be doled out a year from now just as well as it can today.

19

Moreover, whatever interests the New Jersey AG might have in immediate censorship (none) will never be achieved because the bell has already been rung. Every file that has already been introduced to the internet's public domain will always be there, as independent republishers beyond anyone's control have made and will continue to make the files readily accessible forever. *See* Doc. 148-74 at 3; Doc. 148-57. It therefore does the government no harm whatsoever to temporarily stall whatever punitive enforcement actions they have in mind.

## IV.    The public interest favors a preliminary injunction.

Preserving constitutional rights always serves the public interest, *see, e.g.*, *O'Donnell v. Goodhart*, 900 F.3d 220, 232 (5th Cir. 2018), whereas "enforcement of an unconstitutional law is always contrary to the public interest," *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013).

*NetChoice, LLC v. Paxton*, No. 21A720, 2022 WL 1743668 (U.S. May 31, 2022), provides further support for Plaintiffs' motion. There the Supreme Court issued relief akin a preliminary injunction against a novel state law regulating important speech on the internet. The same kind of relief is warranted here because, as compared to *NetChoice*, the speech at issue is equally important and the New Jersey AG's censorship is far *more unconstitutional*.

## V.    Request for expedited consideration.

The Court should give this motion expedited treatment because the Fifth Circuit has already held that it is to be handled "expeditiously." *Defense Distributed v. Bruck*, 30 F.4th 414, 414 n.2 (5th Cir. 2022). For over three years, the New Jersey AG has wielded a blatantly unconstitutional speech crime and civil prior restraints against Defense Distributed and SAF, violating irreparable constitutional rights with every passing day. Time is of the essence.

### Conclusion

The motion for a preliminary injunction should be granted.

Date: June 6, 2022.                    Respectfully submitted,

                                       BECK REDDEN LLP

                                       By    /s/ Chad Flores
                                             Chad Flores
                                             cflores@beckredden.com
                                             State Bar No. 24059759
                                             Hannah Roblyer
                                             hroblyer@beckredden.com
                                             State Bar No. 24106356
                                       1221 McKinney St., Suite 4500
                                       Houston, TX 77010
                                       (713) 951-3700 | (713) 952-3720 (fax)

                                       CLARK HILL PLC
                                       Matthew A Goldstein
                                       mgoldstein@clarkhill.com
                                       D.C. Bar No. 975000
                                       1001 Pennsylvania Avenue Northwest
                                       Suite 1300 South
                                       Washington, DC 20004
                                       (202) 550-0040 | 202-552-2371 (fax)

                                       Josh Blackman
                                       joshblackman@gmail.com
                                       Texas Bar No. 24118169
                                       1303 San Jacinto Street
                                       Houston, TX 77002
                                       (202) 294-9003 | (713) 646-1766 (fax)

                                       Attorneys for Plaintiffs Defense Distributed
                                       and Second Amendment Foundation, Inc.

21

**Certificate Of Service**

I certify that a copy of this filing was served on all parties and/or their counsel of record through a manner authorized by Federal Rule of Civil Procedure 5(b) on June 6, 2022.

*/s/ Chad Flores*
Chad Flores

**May 28, 2021**
**Declaration of Cody Wilson**

I, Cody R. Wilson, declare under penalty of perjury that the following statements are true

and correct:

1.  I co-founded Defense Distributed and have led its operations since 2012.

2.  Defense Distributed is a non-profit corporation organized under the laws of the State of
    Texas.  Defense Distributed is organized to publish and distribute to the Internet, at no cost
    and in the promotion of the public interest, information and knowledge regarding the
    fabrication of firearms.

3.  To that end, Defense Distributed has published, is publishing, and intends to continue
    publishing a wide variety of important digital firearms information to the American public.

4.  The digital firearms information that Defense Distributed has published, is publishing, and
    intends to continue publishing is an important expression of technical, scientific, artistic,
    and political matter.  I know this is true if only because Gurbir Grewal would suppress it.
    Each and every computer file at issue has these values in the abstract, apart from any
    application that the information's recipient might choose to devote it to.

5.  The digital firearms information that Defense Distributed has published, is publishing,
    and intends to continue publishing is accurately described by paragraphs of 43 through 52
    of Plaintiffs' Second Amended Complaint in *Defense Distributed et al. v. Grewal et al.*,
    No. 1:18-cv-00637-RP (W.D. Tex.).

6.  Defense Distributed's Publications.

    a)  From approximately December 2012 to May 2013, Defense Distributed published a
        substantial set of computer files with digital firearms information to DEFCAD by
        letting any site visitor download them directly for free.  Defense Distributed's 2012–
        2013 Publications are accurately described by paragraphs of 53 through 54 of
        Plaintiffs' Second Amended Complaint in *Defense Distributed et al. v. Grewal et al.*,
        No. 1:18-cv-00637-RP (W.D. Tex.).

    b)  In July 2018, Defense Distributed published a substantial set of computer files with
        digital firearms information to DEFCAD by letting any site visitor download them
        directly for free. Defense Distributed's July 2018 Publications are accurately described
        by paragraphs 55 through 57 of Plaintiffs' Second Amended Complaint in *Defense
        Distributed et al. v. Grewal et al.*, No. 1:18-cv-00637-RP (W.D. Tex.).

    c)  From approximately August 2018 to November 2018, Defense Distributed distributed
        a substantial set of computer files with digital firearms information via the mail by
        making its computer files available for shipment on physical storage devices. Defense
        Distributed's  August-November  2018  Publications  are  accurately  described  by

paragraphs 58 through 60 of Plaintiffs' Second Amended Complaint in *Defense Distributed et al. v. Grewal et al.*, No. 1:18-cv-00637-RP (W.D. Tex.).

d) From March 27, 2020, to present (except for the April 2021 period described below), Defense Distributed published a substantial set of computer files with digital firearms information via defcad.com for access by U.S. persons in the United States only. Defense Distributed's 2020-2021 Publications are accurately described by paragraphs 61 through 67 of Plaintiffs' Second Amended Complaint in *Defense Distributed et al. v. Grewal et al.*, No. 1:18-cv-00637-RP (W.D. Tex.).

e) For several days in April 2021, Defense Distributed published a large set of important computer files with digital firearms information regarding 3D-printed firearms to defcad.com for free download by the public ("the April 2021 Files"). Defense Distributed's April 2021 Publications are accurately described by the April 30, 2021 Declaration of Cody Wilson, which is filed as Document 148-074 in *Defense Distributed et al. v. Grewal et al.*, No. 1:18-cv-00637-RP (W.D. Tex.).

f) In the immediate future, Defense Distributed will continue to create, obtain, edit, and possess new files that are substantially similar in form and function to the files of its prior publications.

7. Grewal's Censorship

a) Gurbir Grewal's imminent threats of adverse legal action have stopped Defense Distributed from publishing—both on defcad.com for free and direct download and via the mail—all of the aforementioned existing files to residents of and persons in the State of New Jersey who do not possess a federal firearms license.

b) Were it not for Gurbir Grewal's imminent threats of adverse legal action, Defense Distributed would now be publishing—both on defcad.com for free and direct download and via the mail—all of the aforementioned existing files to persons in the State of New Jersey who do not possess a federal firearms license.

c) Gurbir Grewal's imminent threats of adverse legal action will stop Defense Distributed from publishing—both on defcad.com for free and direct download and via the mail— the immediately forthcoming files mentioned above to residents of and persons in the State of New Jersey who do not possess a federal firearms license.

d) Were it not for Gurbir Grewal's imminent threats of adverse legal action, Defense Distributed would now be publishing—both on defcad.com for free and direct download and via the mail—the immediately forthcoming files mentioned above to persons in the State of New Jersey who do not possess a federal firearms license.

8. I executed this declaration on May 28, 2021.

Cody R. Wilson