## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

Defense Distributed,
Second Amendment Foundation, Inc.,
                    *Plaintiffs*,

                v.

Matthew J. Platkin, Acting New Jersey
Attorney General,
                    *Defendant*.

No. 3:19-cv-04753

### Plaintiffs' Brief in Opposition to
### Defendant's Motion to Dismiss

Motion day: January 3, 2023

BECK REDDEN LLP
Chad Flores
cflores@beckredden.com
1221 McKinney Street, Suite 4500
Houston, Texas 77010
(713) 951-3700

HARTMAN & WINNICKI, P.C.
Daniel L. Schmutter
dschmutter@hartmanwinnicki.com
74 Passaic Street
Ridgewood, New Jersey 07450
(201) 967-8040

Counsel for Plaintiffs

**Table of Contents**

Table of Authorities.................................................................................. ii

Argument.................................................................................................. 1

I.      Most of the claims regarding civil censorship are unchallenged. ................. 2

II.     The AG's briefs cannot narrow his censorship after the fact........................ 4

III.    The First Amendment Claims Succeed......................................................... 9

        A.      The content-based censorship theory succeeds................................ 10

                1.      The speech crime's plain text makes it content based............. 10

                2.      The speech crime's purpose makes it content based. ............. 13

        B.      The content-neutral censorship theory succeeds.............................. 14

                1.      The asserted state interest is not legitimate. ........................... 15

                2.      The asserted state interest is not actually advanced. .............. 18

                3.      The speech crime is not narrowly tailored.............................. 19

        C.      The overbreadth theory succeeds.................................................... 20

IV.     The Second Amendment Claims Succeed. ................................................... 23

        A.      The AG's restrictions implicate the Second Amendment
                right to "keep and bear Arms." ....................................................... 23

        B.      The AG's restrictions are inconsistent with the Second
                Amendment...................................................................................... 24

V.      The Equal Protection Clause Claims Succeed. ........................................... 30

VI.     The Due Process Clause Claims Succeed. ................................................... 31

VII.    The Commerce Clause Claims Succeed. ..................................................... 33

VIII.   The Arms Export Control Act Claims Succeed. .......................................... 36

IX.     The Communications Decency Act Claims Succeed.................................... 38

X.      The Tortious Interference Claims Succeed. ................................................ 40

Conclusion............................................................................................... 40

## Table of Authorities

**Case**                                                                              **Page(s)**

*Am. Booksellers Found. v. Dean*,
   342 F.3d 96 (2d Cir. 2003)................................................................................35

*Am. Libraries Ass'n v. Pataki*,
   969 F. Supp. 160 (S.D.N.Y. 1997)...............................................................34, 35

*Andrews v. State*,
   50 Tenn. 165 (1871)...........................................................................................24

*Armstrong v. Exceptional Child Ctr., Inc.*,
   135 S. Ct. 1378 (2015) ......................................................................................37

*Ashcroft v. Free Speech Coalition*,
   535 U.S. 234 (2002) ....................................................................................15, 16

*Backpage.com, LLC v. Cooper*,
   939 F. Supp. 2d 805 (M.D. Tenn. 2013) ...........................................................39

*Backpage.com, LLC v. Hoffman*,
   No. 13-CV-03952 DMC JAD, 2013 WL 4502097 (D.N.J. Aug. 20,
   2013).............................................................................................................34, 39

*Backpage.com, LLC v. McKenna*,
   881 F. Supp. 2d 1262 (W.D. Wash. 2012) ........................................................39

*Bartnicki v. Vopper*,
   532 U.S. 514 (2001) ......................................................................................9, 19

*Benham v. City of Charlotte, N.C.*,
   635 F.3d 129 (4th Cir. 2011)...............................................................................6

*Bernstein v. U.S. Dep't of State*,
   922 F. Supp. 1426 (N.D. Cal. 1996) ...................................................................9

*Brandywine-Main Line Radio, Inc. v. F.C.C.*,
   473 F.2d 16 (D.C. Cir. 1972) .............................................................................24

*Brown v. Entm't Merchants Ass'n*,
   564 U.S. 786 (2011) ....................................................................................18, 19

*City of Austin v. Reagan National Advertising of Austin, LLC*,
   142 S. Ct. 1464 (2022) .............................................................................12, 29, 30

*City of Houston, Tex. v. Hill*,
   482 U.S. 451 (1987) ......................................................................................20, 36

*Colon Health Centers of Am., LLC v.* Hazel,
   813 F.3d 145 (4th Cir. 2016)................................................................................36

*Crosby v. Nat'l Foreign Trade Council*,
   530 U.S. 363 (2000) ............................................................................................37

*Defense Distributed v. Bruck*,
   30 F.4th 414 (5th Cir. 2022)................................................................................31

*Defense Distributed* v. U.S. Dep't of State, 121 F. Supp. 3d 680 (W.D.
   Tex. 2015), *aff'd sub nom. Def. Distributed v. United States Dep't
   of State*, 838 F.3d 451 (5th Cir. 2016)................................................................16

*DeJohn v. Temple Univ.*,
   537 F.3d 301 (3d Cir. 2008)..................................................................................6

*Edenfield v. Fane*,
   507 U.S. 761 (1993) ............................................................................................16

*Edgar v. Haines*,
   2 F.4th 298 (4th Cir. 2021)....................................................................................6

*Ezell v. City of Chicago*,
   651 F.3d 684.........................................................................................................23

*FCC v. Beach Commc'ns, Inc.*,
   508 U.S. 307 (1993) ............................................................................................35

*Frein v. Pennsylvania State Police*,
   47 F.4th 247 (3d Cir. 2022)..................................................................................24

*Globe Newspaper Co. v. Sup. Ct. for Norfolk Cty.*,
   457 U.S. 596 (1982) ............................................................................................18

*Google, Inc. v. Hood*,
   822 F.3d 212 (5th Cir. 2016)................................................................................38

*Healy v. Beer Inst.*,
  491 U.S. 324 (1989) ............................................................................................34

*Holder v. Humanitarian Law Project*,
  561 U.S. 1 (2010) ...............................................................................................22

*Ill. Ass'n of Firearms Retailers v. City of Chicago*,
  961 F. Supp. 2d 928 (N.D. Ill. 2014) .................................................................23

*Junger v. Daley*,
  209 F.3d 481 (6th Cir. 2000) ...............................................................................9

*Konigsberg v. State Bar of Cal.*,
  366 U.S. 36 (1961) .............................................................................................25

*Lacey v. Cessna Aircraft Co.*,
  862 F.2d 38 (3d Cir. 1988) .................................................................................16

*Lapides v. Board of Regents of University System of Georgia*,
  535 U.S. 613 (2002) ...........................................................................................40

*Lorillard Tobacco Co. v. Reilly*,
  533 U.S. 525 (2001) ...........................................................................................18

*McCullen v. Coakley*,
  573 U.S. 464 (2014) .....................................................................................15, 18

*Nat'l Foreign Trade Council, Inc. v. Giannoulias*,
  523 F. Supp. 2d 731 (N.D. Ill. 2007) .................................................................37

*New York State Rifle & Pistol Association, Inc. v. Bruen*,
  213 L. Ed. 2d 387 (2022) ...............................................................16, 23, 24, 25

*New York v. Ferber*,
  458 U.S. 747 (1982) ...........................................................................................22

*NIFLA v. Becerra*,
  138 S. Ct. 2361 (2018) .......................................................................................12

*Pike v. Bruce Church, Inc.*,
  397 U.S. 137 (1970) .....................................................................................33, 35

*Reed v. Town of Gilbert, Arizona,*
   576 U.S. 155 (2015) .................................................................................11, 12, 13

*Rhode Island Ass'n of Realtors, Inc. v. Whitehouse,*
   199 F.3d 26 (1st Cir. 1999) ...................................................................................5

*Rice v. Paladin Enters., Inc.,*
   128 F.3d 233 (4th Cir. 1997)...............................................................................22

*Rigby v. Jennings,*
   No. CV 21-1523 (MN), 2022 WL 4448220 (D. Del. Sept. 23,
   2022)....................................................................................................................13

*Smith v. California,*
   361 U.S. 147 (1960) ............................................................................................22

*Smith v. Goguen,*
   415 U.S. 566 (1974) ............................................................................................32

*Sorrell v. IMS Health Inc.,*
   564 U.S. 552 (2011) ..............................................................................................9

*Staples v. United States,*
   511 U.S. 600 (1994) ............................................................................................20

*Turner Broad. Sys., Inc. v. F.C.C.,*
   512 U.S. 622 (1994) ............................................................................................13

*United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt.
Auth.,*
   550 U.S. 330 (2007) ............................................................................................35

*United States v. Aguilar,*
   515 U.S. 593 (1995) ............................................................................................21

*United States v. Marzzarella,*
   614 F.3d 85 (3d Cir. 2010)..................................................................................17

*United States v. Playboy Entertainment Group, Inc.,*
   529 U.S. 803 (2000) ............................................................................................18

*Universal City Studios, Inc. v. Corley,*
   273 F.3d 429 (2d Cir. 2001)............................................................................9, 13

*Ward v. Rock Against Racism*,
  491 U.S. 781 (1989) ............................................................................................14

*Washington v. United States Dep't of State*,
  318 F. Supp. 3d 1247 (W.D. Wash. 2018) ..........................................................37

*Whren v. United States*,
  517 U.S. 806 (1996) ............................................................................................30

*Wyoming v. Oklahoma*,
  502 U.S. 437 (1992) ............................................................................................33

**Statutes**

22 U.S.C.
  ch. 39 ...................................................................................................................36
  § 2778(a)(1)....................................................................................................36, 37
  § 2778(g)(6).........................................................................................................36
  § (e)(2)(A) ...........................................................................................................36

28 U.S.C. §§ 516, 519 ............................................................................................36

47 U.S.C.
  § 230(c)(1).......................................................................................................38, 39
  § 230(e)(3).............................................................................................................38

N.J. Stat.
  2C:39-9(*l*)(2) .......................................................................................................32
  § 2C:39-9(*l*)(2) ............................................................................................4, 5, 23

**Rules**

Fed. R. Civ. P. 12(b)..................................................................................................1

**Other Authorities**

22 C.F.R.
  Parts 120-130.......................................................................................................36
  § 126.7(a)..............................................................................................................36

Charles Winthrop Sawyer,
  Firearms in American History 145 (1910) ..........................................................25

David B. Kopel,
    Does the Second Amendment Protect Firearms Commerce?,
    127 HARV. L. REV. F. 230, 234 (2014) ...........................................................26

Francis Newton Thorpe,
    The Federal and State Constitutions, Colonial Charters, and Other
    Organic Laws of the States, Territories, and Colonies Now or
    Heretofore Forming the United States of America 3787-88
    (Francis Newton Thorpe ed., 1909).....................................................................25

Jake Charles,
    Ghost Guns, History, and the Second Amendment, DUKE
    CENTER FOR FIREARMS LAW (Apr. 27, 2022),
    https://firearmslaw.duke.edu/2022/04/ghost-guns-history-and-
    thesecond-amendment/...........................................................................................29

James B. Whisker,
    The Gunsmith's Trade 5 (1992) ...................................................................25, 28

John G.W. Dillin,
    The Kentucky Rifle 96 (1975).............................................................................27

Joseph G. S. Greenlee,
    The American Tradition of Self-Made Arms, 54 ST. MARY'S L.J.
    (forthcoming 2022).................................................................25, 26, 27, 28, 29

Laws of Va., Feb. 1676-77, Va. Stat. at Large, 2 Hening 403 (1823).....................26

Letter from Secretary of State Thomas Jefferson to British
    Ambassador to the United States George Hammond, May 15,
    1793, in 7 The Writings of Thomas Jefferson 325-26 (Paul Ford
    ed., 1904)..............................................................................................................27

M.L. Brown,
    Firearms in Colonial America: The Impact on History and
    Technology 1492-1792 127 (1980).....................................................................26

What is ATF Doing in Regards to People Making Their Own
    Firearms, BUREAU OF ALCOHOL, TOBACCO, FIREARMS
    AND EXPLOSIVES (May 14, 2015), https://bit.ly/3YyRxX1 (last
    visited December 18, 2022)...................................................................................29

**Argument**

The AG's Rule 12(b)(6) motion is incomplete and wrong.  It is incomplete because it argues only about the censorship's criminal aspects and not about the equally actionable civil aspects.  The unchallenged claims survive automatically.  The AG's motion is wrong because of rudimentary failures.  It violates Rule 12 by ignoring the complaint's key facts and skewing others his way instead of the Plaintiffs'.  It is a classic jury argument (or stump speech), not a real 12(b)(6) motion.

First Amendment claims lead the way and all of the pleaded theories are valid. Most importantly, the Section ($l$)(2) speech crime is content-based because it censors speech on the basis of the speech's "subject matter," "ideas," and "message."  *See, e.g.*, *Reed v. Town of Gilbert, Ariz*, 576 U.S. 155 (2015).  It is content-based because it criminalizes the "subject matter" of  "firearms"—not any other weapon or item of concern.  It is content-based because it criminalizes the "idea" of producing using a "three-dimensional printer"—not any other production method.  It is content-based because it criminalizes any "message" that "may be used" in *favor* of this Second Amendment exercise—not any message against.  The AG himself even touted the law as existing for one purpose only: to "stop" Defense Distributed founder "Cody Wilson" and "his supporters."  SAC at 42, ¶ 149.  This unprecedented barrage of content-based censorship triggers strict scrunity multiple times over.  The First Amendment claims are all valid and so are the rest.  The motion should be denied.

## I.   Most of the claims regarding civil censorship are unchallenged.

Plaintiffs' case against the AG targets both his civil and criminal methods of unconstitutionally censoring Defense Distributed and SAF.  Civil censorship (via cease-and-desist letters) and criminal censorship (via the speech crime) are distinct unconstitutional means the AG uses to accomplish his overall unconstitutional ends.

To warrant a total dismissal, the AG needs to have grappled with both of the unconstitutional means at issue—the civil *and* criminal aspects of his censorship. But the AG's motion argues *only* about the speech crime and says essentially nothing about the civil censorship efforts that are just as actionable and well pleaded.  SAC at 38-40, 45, 47-49, 70-71 ¶¶ 132-140, 159-61, 171-179, 255-56.

Because of this, the AG's motion is fatally incomplete in multiple respects. Specifically, the AG's motion should be quickly denied as to all of the following claims because his argument pertains only to the speech crime and says nothing about the equally-actionable cease-and-desist letters.

- Plaintiffs' First Amendment claim regarding the AG's imposition of prior restraints via civil efforts such as the cease-and-desist letters. *See* SAC at 71 ¶¶ 257-260, 261, 265-67.

- Plaintiffs' First Amendment claim regarding the AG's imposition of content-based censorship via civil efforts such as the cease-and-desist letters. *See* SAC at 71-72 ¶¶ 257-260, 262, 265-67.

2

- Plaintiffs' First Amendment claim regarding the AG's imposition of content-neutral censorship via civil efforts such as the cease-and-desist letters.  *See* SAC at 72 ¶¶ 257-260, 263, 265-67.

- Plaintiffs' First Amendment claim regarding the AG's imposition of overbroad speech restrictions via civil efforts such as the cease-and-desist letters. *See* SAC at 72 ¶¶ 257-260, 263, 265-67.

- Plaintiffs' Equal Protection Clause claim regarding the AG's imposition of overbroad speech restrictions via civil efforts such as the cease-and-desist letters. *See* SAC at 74-75 ¶¶ 276-283.

- Plaintiffs' Due Process Clause claim regarding the AG's imposition of overbroad speech restrictions via civil efforts such as the cease-and-desist letters. *See* SAC at 75-76, ¶¶ 284-293.

- Plaintiffs' Commerce Clause claim regarding the AG's imposition of overbroad speech restrictions via civil efforts such as the cease-and-desist letters. *See* SAC at 76-77, ¶¶ 294-303.

- Plaintiffs' Arms Export Control Act claim regarding the AG's preempted imposition of overbroad speech restrictions via civil efforts such as the cease-and-desist letters. *See* SAC at 78-79, ¶¶ 304-310.

- Plaintiffs' Communications Decency Act claim regarding the AG's preempted imposition of overbroad speech restrictions via civil efforts such as the cease-and-desist letters. *See* SAC at 79-80, ¶¶ 311-317.

## II. The AG's briefs cannot narrow his censorship after the fact.

Ever since this lawsuit called out the unconstitutional scope of the AG's censorship, the AG has been trying to half-heartedly walk it back. This retreat is a telling sign of his position's weakness, but not of any real benefit to the AG now.

On the civil side, the AG realizes that the cease-and-desist letter's actual scope—amazingly broad in multiple respects—makes it unconstitutional. So his briefs say that the cease-and-desist letter is not really as broad as its text says.

On the criminal side, the AG realizes too that the speech crime's actual scope makes it unconstitutional. So here too his briefs say that the speech crime is not really as broad as its text says.

Page 12 is an example. The AG's brief about the speech crime says that it "only restricts code that performs the specific function of directing a 3D printer to produce firearms wholly outside of New Jersey's regulatory framework." Doc. 69-1 at 12. But the actual law is *not* limited to code performs any specific function. The actual law applies to any "digital instructions" ("files" or "models") that "may be used" to perform certain functions *regardless of whether or not the code actually performs those functions*. N.J. Stat. § 2C:39-9(*l*)(2).

4

Page 13 is another example.  The AG's brief says that the speech crime "does not restrict any components that express ideas advocating for printable firearms, such as instructional files."  Doc. 69-1 at 13.   But the actual law most certainly *does* cover instructional files by criminalizing "digital instructions" that "may be used to program" a 3D printer (*i.e.*, a "model").  N.J. Stat. § 2C:39-9(*l*)(2).

Page 16 has another example.  The AG's brief about the speech crime says that it "does not restrict Defense Distributed from disseminating text files or any other files that lack the functional capability to directly produce firearms."  Doc. 69-1 at 16-17.  But the actual speech crime has no such "functional" or "directly" limitation.   It criminalizes *any* "model" that "may be used" for programming, regardless of whether the model itself is "functional"; and it criminalizes *any* "model" that "may be used" to program a printer, regardless of whether it "may be used" "directly" versus "indirectly."  N.J. Stat. § 2C:39-9(*l*)(2).

Each and every one of these walkback efforts are legally incorrect and futile. The AG's effort to recast his censorship in constitutionally-nicer lights after the fact is wrong because the die is already cast.  *See Rhode Island Ass'n of Realtors, Inc. v. Whitehouse*, 199 F.3d 26, 31 (1st Cir. 1999) ("the pivotal question reduces to whether the Association faced a credible threat of prosecution when it filed suit"). Plaintiffs' claims regarding the AG's cease-and-desist letter accrued in full at the moment of the letter's delivery.  And their claims regarding the AG's threatened

enforcement of the speech crime accrued in full the moment he delivered those threats. After-the-fact waffling in briefs does not undo the past constitutional harms that the AG's clear censorship messages already inflicted. Nor do late-breaking claims of misunderstood ambiguity lessen the constitutional harms that are ongoing.

No First Amendment inquiry turns on what *the AG thinks* his messages mean. The inquiries look instead to the perception of an objectively reasonable citizen hearing and seeing the AG's threats. *See Benham v. City of Charlotte, N.C.*, 635 F.3d 129, 135 (4th Cir. 2011). The announced *risk* of punishment causes injury even if new lawyers convince the AG to lighten the rhetoric. *See Edgar v. Haines*, 2 F.4th 298, 310 (4th Cir. 2021) ("the risk of punishment could 'chill[ ]' speech"). From the correct perspective, the AG's civil and criminal censorship today is as broad as ever.

If the AG deems it wise to surrender and settle this controversy, he should make the Plaintiffs a real settlement offer backed by enforceable promises. Nothing of any legal relevance occurs due to inconsistent wishy washy statements of retreat.

Besides settlement, voluntary cessation would be the doctrine to evaluate if the AG really were changing his course of conduct. But voluntary cessation has to be "absolutely clear," *DeJohn v. Temple Univ.*, 537 F.3d 301, 309 (3d Cir. 2008), and nothing even close to voluntary cessation has occurred here—be it as to the AG's censorship at large or as to the exact breadth of his civil and criminal enforcement threats.

The AG's briefing forgets that this issue arose once already when Plaintiffs sought a preliminary injunction from this Court in 2019.  Doc. 18.  (Not lost too is this: The AG successfully opposed the 2019 injunction request by arguing that this Court's proceedings "should be stayed" to make Plaintiffs litigate this controversy "in Texas – the jurisdiction where they first filed."  Doc. 20.  *Contra* Docs. 58; 66.)

To confirm that the AG's threats of punishment remained in full force and imminent as to every Plaintiff, the Plaintiffs posed the question directly to the lawyers representing Grewal:

> To avoid a preliminary injunction here, the Attorney General would need to unequivocally disclaim all of his current threats. In particular, he would need to take the position that New Jersey Statute 2C:39-9(*l*)(2) will not be enforced against the Plaintiffs as punishment for publishing the files at issue via the internet or via the mail. Will he do so? Likewise for the civil punishments he threatens (*e.g.*, civil lawsuits and cease-and-desist orders). Will he now unequivocally disclaim these threats?
>
> . . .
>
> If the Attorney General wishes to narrow this dispute by unequivocally disclaiming any or all of his existing threats, we request that it be done no later than February 19 so that we may accurately prepare our next filing. Otherwise, we will proceed on the understanding that the Attorney General stands by the position that he has staked out ever since July 2018: If Defense Distributed, the Second Amendment Foundation, or CodeIsFreeSpeech.com publish the computer files at issue via the mail or via the internet, Attorney General Grewal will respond by enforcing the speech crime of New Jersey Statute 2C:39-9(*l*)(2) against them, by using civil enforcement mechanisms to direct the Plaintiffs to cease and desist publishing the files at issue, and/or by using civil enforcement mechanisms to direct the Plaintiffs' communication service providers to cease and desist publishing the files at issue.

Doc. 18-60 (Feb. 14, 2019 Letter from Plaintiffs' Counsel to Defendant's Counsel).

If ever the AG was going to back down and cease his censorship campaign, this was the time to do so. But the AG refused to yield. The AG's counsel e-mailed Plaintiffs' counsel on February 19, 2019. Doc. 18-61. As to the civil enforcement threats, the AG's response said nothing at all. *Id.* As to the criminal enforcement threats, the AG's response said only this: "We cannot, of course, provide any generalized assurances one way or the other regarding the enforcement of Section 3(*l*)(2) if your clients intend to violate the plain terms of the statute." *Id.*

The complaint, therefore, pleads that the threat posed to the Plaintiffs by the AG's civil and criminal enforcement efforts remains in full force—with the exact same extraordinary breadth now as it has had all along. SAC at 47-49 , ¶¶ 171-183. The cease-and-desist letter the AG issued to Defense Distributed on July 26, 2018 has never been disclaimed. *Id.* The coercive actions the AG took against Defense Distributed's service providers have never been disclaimed. *Id.* The civil lawsuits the AG filed against Defense Distributed, its founder Cody Wilson, SAF, and others engaged in this speech have never been disclaimed. *Id.* The unequivocal threats he issued at the SB 2465 signing ceremony—to "stop" Defense Distributed founder "Cody Wilson" and "his supporters" from "release[ing] these codes online" and to "come after you"—have never been disclaimed. SAC at 42-45, ¶¶ 148-161.

Under Rule 12(b)(6), the complaint is all that matters. The motion's half-hearted walkbacks and efforts at a narrowing construction do not change the pleaded case, which quite clearly states claims upon which relief can be granted.

## III. The First Amendment Claims Succeed.

The complaint pleads multiple First Amendment claims with distinct legal theories. *See* SAC at 70-73, ¶¶ 255-267. Specifically, Plaintiffs invoke actionable legal theories regarding prior restraints, *id.* at 70-73, ¶¶ 255-261, 265-267, content-based restrictions, *id.* at 70-73, ¶¶ 255-260, 262, 265-267, content-neutral restrictions, *id.* at 70-73, ¶¶ 255-260, 263, 265-267, and overbreadth, *id.* at 70-73, ¶¶ 255-260, 264-267. All are claims upon which relief can be granted.

Each First Amendment claim's analysis should begin with the premise that Plaintiffs' distribution of the digital firearms information at issue qualifies as speech for all constitutional purposes. The complaint pleaded this fully,[1] and though the motion alludes to the possibility of challenging this, Doc. 69-1 at 8 & n.2, the motion does not do so. Instead the motion expressly disclaims such a challenge by saying

---

[1]  *Compare* SAC at 10-12, ¶¶ 36-41, *with Sorrell v. IMS Health Inc.*, 564 U.S. 552, 570 (2011) ("[T]he creation and dissemination of information are speech within the meaning of the First Amendment."), *Bartnicki v. Vopper*, 532 U.S. 514, 526-27 (2001) (same); *Junger v. Daley*, 209 F.3d 481, 482 (6th Cir. 2000) ("Because computer source code is an expressive means for the exchange of information and ideas about computer programming, we hold that it is protected by the First Amendment."), *Universal City Studios, Inc. v. Corley*, 273 F.3d 429, 449 (2d Cir. 2001) ("[C]omputer code, and computer programs constructed from code can merit First Amendment protection."), and *Bernstein v. U.S. Dep't of State*, 922 F. Supp. 1426, 1436 (N.D. Cal. 1996) ("source code is speech").

that "this Court 'need not decide this issue.'"   *Id.*   The motion assumes that "protected expression" is at issue.   *Id.*   The Court should do so as well.

## A.   The content-based censorship theory succeeds.

Plaintiffs' primary First Amendment claim asserts that the AG's civil and criminal censorship violates the constitutional doctrine of content-based speech restrictions because it triggers but cannot survive strict scrutiny.   SAC at 70-73, ¶¶ 255-260, 262, 265-267 ("[The AG's] conduct violates the First Amendment doctrine regarding content based speech restrictions.").   To challenge this claim, the motion makes only one argument: strict scrutiny does not apply.   Doc.69-1 at 7-13.   The motion says nothing about whether, if strict scrutiny applies, the AG can satisfy the resulting inquiry (because of course he cannot).   The sole question therefore is whether strict scrutiny applies.   As a matter of law, it does.   So the claim is valid.

The motion denies that the AG's speech crime triggers strict scrutiny by asserting that it is "content-neutral."   Doc. 69-1 at 8-13.   The Court should reject this because controlling precedents show the speech crime to be content based in two respects.   The laws' plain text makes it content based and so does its purpose.

### 1.   The speech crime's plain text makes it content based.

First, the speech crime the AG threatens to enforce against Plaintiffs is content-based because of what the law's text plainly proscribes.   Section (*l*)(2)

criminalizes speech as such and defines the crime in terms of the speech's subject matter, ideas, and message:

> *l*. Manufacturing or facilitating the manufacture of a firearm using a three dimensional printer. In addition to any other criminal penalties provided under law it is a third degree crime for:
>
> . . .
>
>> (2) a person to distribute by any means, including the Internet, to a person in New Jersey who is not registered or licensed as a manufacturer as provided in chapter 58 of Title 2C of the New Jersey Statutes, digital instructions in the form of computer-aided design files or other code or instructions stored and displayed in electronic format as a digital model that may be used to program a three-dimensional printer to manufacture or produce a firearm, firearm receiver, magazine, or firearm component.

*Id.* Under this law, citizens can freely speak to each other with "digital instructions" about any topic *except the topic of 3D-printing firearms*. They can talk about how to program 3D printers to manufacture anything *except firearms*. When speech that is otherwise perfectly legal turns to the subject of firearms, Section (*l*)(2) makes the speaker a criminal. That makes Section (*l*)(2) content-based. *See also supra* at 1.

Reed v. Town of Gilbert, Arizona, 576 U.S. 155 (2015), proves that the AG's speech crime is content-based. *Reed* held that laws trigger strict scrutiny if they "target speech based on its communicative content," meaning targeting the speech's "message" or "ideas" or "subject matter." *Id.* at 163. Section (*l*)(2) does just that by banning instructive speech about a particular topic (3D firearms production), for it is "well established that '[t]he First Amendment's hostility to content-based

regulation extends not only to restrictions on particular viewpoints, but also to prohibition of public discussion of an entire topic.'"  *Id.* at 169.

*NIFLA v. Becerra*, 138 S. Ct. 2361 (2018), proves as well that Section (*l*)(2)'s speech crime is content-based.  Again the Court held that laws trigger strict scrutiny if they "target speech based on its communicative content," specifying this time that the rule covers laws about what citizens can "inform" each other about.  *Id.* at 2371. Since strict scrutiny applies to laws restricting what citizens can "inform" each other about, *id.* strict scrutiny applies to Section (*l*)(2)'s censorship of "instructions."

*City of Austin v. Reagan National Advertising of Austin, LLC*, 142 S. Ct. 1464, 1471 (2022) (cited at Doc. 69-1 at 9-10), does not hold otherwise.  Section (*l*)(2) does not, as was the case in *City of Austin*, "require[] an examination of speech *only in service of drawing neutral, location-based lines*."  *Id.* at 1271 (emphasis added). Section (*l*)(2) requires an examination of speech in service of drawing *content-based* lines—lines defining the criminalized "message" and "ideas" and "subject matter. *See supra* at 1.  *City of Austin* rightly acknowledged that strict scrutiny applies where, as in *Reed* and as here, the speech restriction ends up "singl[ing] out specific subject matter for differential treatment."  *Id.* (quoting *Reed*, 576 U.S. at 169).

It gains the AG  nothing to say that "regulations of computer code are content neutral if they regulate code because of its *functional* capability," Doc. 69-1, because Section (*l*)(2) does not do that. Section (*l*)(2) criminalizes computer code (speech)

because of the *ideas* and *subject* that it pertains to, and *Reed* rightly deems "idea"- and "subject"- based laws to be content-based.  *Id.* at 163.

The "content based" discussion of *Universal City Studios, Inc. v. Corley*, 273 F.3d 429 (2d Cir. 2001) (cited at Doc. 69-1 at 9-10), is not analogous.  The *Corley* restriction was far more neutral than the AG's.  *Corley* might be analogous if and only if New Jersey's speech restriction criminalized *all* digital instructions that may be used to manufacture *anything*.  That Section (*l*)(2) targets just the topic of and ideas about *firearms* makes all the difference in the world.  *Corley* also does not apply here because the exact nature of the computer code at issue differs.  *Compare id.* at 452 ("The functionality of computer code properly affects the scope of its First Amendment protection."), *with* SAC at 10-12, ¶¶ 36-41 ("With respect to 3D-printing processes in particular, CAD files and CAM files do not produce anything automatically. They are not functional software."). [2]

### 2.    The speech crime's purpose makes it content based.

Statutory text is not the only way to establish that a speech restriction is content based.  A speech restriction can also be content-based because of its purpose. *See Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 642 (1994) ("a content-based

---

[2] *Rigby v. Jennings*, No. CV 21-1523 (MN), 2022 WL 4448220 (D. Del. Sept. 23, 2022) (cited at Doc. 69-1 at 12), treats this issue fleetingly on different facts and is wrongly decided, having used the same inapt *Corley* analogy that the AG does.

purpose may be sufficient in certain circumstances to show that a regulation is content based"); *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). The complaint puts this at issue by pleading that "New Jersey's Section (*l*)(2) speech crime was enacted for the purpose of discriminating against and censoring Defense Distributed and SAF's members, in particular," SAC at 42, ¶ 147, with plenty of plausible supporting details, *id.* at 41-42 ¶¶ 148-152. Yet the motion says nothing of it. This independent basis for triggering strict scrutiny is valid and unchallenged.

### B. The content-neutral censorship theory succeeds.

As an alternative to the claim about content-based restriction, Plaintiffs also assert that the AG's censorship violates the doctrine of content-neutral speech restrictions because it triggers but cannot survive intermediate scrutiny. SAC at 70-73, ¶¶ 255-260, 263, 265-267 ("[The AG's] conduct violates the First Amendment doctrine regarding content neutral speech restrictions."). For this claim, the AG tries to show that his censorship automatically satisfies intermediate scrutiny. Doc.69-1 at 13-17. But this flatly contradicts the complaint, which pleads that the AG's wrongdoing violates intermediate scrutiny in all relevant legal and factual senses. *See, e.g.*, SAC at 71, ¶ 263 ("Even if [the AG's] conduct is deemed to impose content-neutral speech restrictions, it is an unconstitutional abridgement of First Amendment's freedoms because it does not serve a significant governmental interest and is not narrowly drawn to serve any such interest."). In addition to several crucial

matter-of-law errors, the AG's supposed Rule 12 argument is really just a veiled summary judgment effort that is procedurally premature and substantively empty.

### 1. The asserted state interest is not legitimate.

Intermediate scrutiny cannot be survived unless the asserted state interest qualifies as legitimate. *See, e.g.*, *McCullen v. Coakley*, 573 U.S. 464, 486 (2014). In this respect, the motion fails because the AG's asserted interests are *not* legitimate.

The interest at issue must be carefully defined, so as to ensure that each step of the inquiry uses the proper scope. *See Hill v. Colorado*, 530 U.S. 703, 749 (2000) (Scalia, J., dissenting) ("This requires us to determine, first, what is the significant interest the State seeks to advance?"). But the AG does not do this properly or consistently. The motion vaguely shifts his claimed interest, especially when trying to show its legitimacy.

The AG first claims as his interest the "interest in preventing the dissemination of code that enables domestic terrorists, felons, and minors to produce untraceable and unregulated firearms." Doc. 69-1. This amounts to a claimed interest not in stopping certain *conduct*, but in stopping *speech about* conduct. Even assuming that the former conduct-focused interest is legitimate (very disputed), federal law certainly does *not* legitimize any such interest in suppressing speech. "The mere tendency of speech to encourage unlawful acts is not a sufficient reason for banning it." *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 253 (2002). "Without a

15

significantly stronger, more direct connection" between the speech and a third party's criminal conduct, "the Government may not prohibit speech on the ground that it may encourage [third-parties] to engage in illegal conduct." *Id*.; *see also Edenfield v. Fane*, 507 U.S. 761, 770-71 (1993) (state cannot impose a "flat ban" on solicitations by public accountants on the ground that solicitations "create[] the dangers of fraud, overreaching, or compromised independence").

Framed properly—as an interest in preventing *speech about* conduct—no compelling authority supports the AG's legitimacy argument. *Lacey v. Cessna Aircraft Co.*, 862 F.2d 38, 48 (3d Cir. 1988) (cited at Doc. 69-1 at 14), does not suffice. It addressed an interest in stopping *conduct*, *id.* ("the manufacture of unsafe products"), not an independent interest in stopping *speech about that conduct*. The same is true of *Defense Distributed v. U.S. Dep't of State*, 121 F. Supp. 3d 680 (W.D. Tex. 2015), *aff'd*, 838 F.3d 451 (5th Cir. 2016), which likewise addressed the legitimacy of an interest in stopping conduct, *id.* at 700 (stopping actual "violent crime"), not an independent interest in stopping speech about that conduct.

*New York State Rifle & Pistol Association, Inc. v. Bruen*, 213 L. Ed. 2d 387 (2022), is somehow cited as supporting the AG. Doc. 69-1. But on this front and many others, *Bruen* is of course a huge point in Plaintiffs' favor and not the AG's. Footnote 9 is about laws governing conduct, *id.* at 2138 n.9 (actual "armed self-defense"), not speech about conduct. And Footnote 9 says only that states *try* to

justify such laws by *asserting* an interest in limiting who can "bear arms"—not that states actually *succeed* in surviving the requisite scrutiny by *actually* meeting the test for interest legitimacy. *Id.*

The AG's other claimed interest is the interest in "preserving the ability of law enforcement to conduct serial number tracing." Doc. 69-1 at 15. But the only case cited in support of this interest's legitimacy is *United States v. Marzzarella*, 614 F.3d 85, 98 (3d Cir. 2010) (cited at Doc. 69-1 at 15), the fundamental tenets of which *Bruen* wholly abrogated.

Even if the Court deems the serialization interest legitimate, the AG fails to stay focused on this particular interest in the test's remaining elements. He cites the serialization interest when he deems it favorable (for a snippet of the legitimacy inquiry), but forgets it and shifts to other interests when arguing about other elements (whether the interest is actually advanced, whether the law is narrowly tailored).

Any successful defense of the AG's censorship must necessarily be unified. Governments cannot use one interest to satisfy element A, a different interest to satisfy element B, and yet another interest to satisfy element C. To be constitutional, the *same* interest must be deemed legitimate, actually advanced by the law at issue, and satisfactory of the narrow tailoring requirement. At best the slender reed of serialization helps as to one element (interest legitimacy). It does not carry the load otherwise, which is why the AG mentions it so little and shifts the focus.

## 2. The asserted state interest is not actually advanced.

Intermediate scrutiny cannot be survived unless the challenged action actually advances the asserted interest. *See, e.g.*, *McCullen v. Coakley*, 573 U.S. 464, 486 (2014). The complaint sufficiently alleges that the AG's speech crime does *not* in fact advance his asserted interests, *see* SAC at 70-73, ¶¶ 255-260, 263, 265-267, and in this posture the complaint is all that matters. The AG's motion's ipse dixit about the speech crime actually advancing his interests is (a) obviously incredible and, in any event, (b) legally irrelevant on a Rule 12(b)(6) motion to dismiss.

Once an actual summary judgment proceeding occurs, the Court will easily reject the AG's fanciful vision of censorship's efficacy as factually wrong. For at that stage, the AG's burden will be very high indeed. Justifications backed by mere "anecdote and supposition" will not suffice, *United States v. Playboy Entertainment Group, Inc.*, 529 U.S. 803, 822 (2000), and neither will "ambiguous proof," *Brown*, 564 U.S. at 800. Real "empirical support" of efficacy will have to be given. *Globe Newspaper Co. v. Sup. Ct. for Norfolk Cty.*, 457 U.S. 596, 609 (1982). The proof must demonstrate that the "restriction will in fact alleviate" its concerns. *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 555 (2001). It is not enough to offer "mere speculation or conjecture." *Id*. For now, the Court can just reject the AG's factual contradictions as procedurally inapposite.

18

### 3.    The speech crime is not narrowly tailored.

Intermediate scrutiny cannot be survived unless the challenged action is a *narrowly tailored* means of advancing the asserted interest.   *See, e.g.*, *McCullen v. Coakley*, 573 U.S. 464, 486 (2014).   In this respect, the motion fails because the AG's speech crime is clearly *not* narrowly tailored.

One reason the statute cannot claim "narrow tailoring" status is substantial underinclusivity.  *See Brown v. Entm't Merchants Ass'n*, 564 U.S. 786, 802 (2011). While it criminalizes speech by normal people, Section (*l*)(2) does nothing about the speech of firearms manufacturers or wholesalers. While it criminalizes speech regarding "firearms," New Jersey's speech crime does nothing about speech regarding other dangerous instrumentalities such as poison or bombs.  And while it criminalizes the "distribution" of digital firearms information, New Jersey's speech crime does nothing about the *possession* or *use* of that same information to, for example, produce an illegal firearm—the evil that New Jersey means to combat.

Another reason that Section (*l*)(2) is not "narrowly tailored" is that very plausible, much less restrictive alternatives exist.  Most obviously, New Jersey could achieve its ends by banning only the harmful conduct at issue—not speech that is merely and only sometimes remotely associated with that conduct.  *See Bartnicki*, 532 U.S. at 529 ("The normal method of deterring unlawful conduct is to impose an appropriate punishment on the person who engages in it.").

### C.    The overbreadth theory succeeds.

Plaintiffs' First Amendment claims assert that the AG's civil and criminal censorship violates the constitutional doctrine regarding overbreadth.  SAC at 70-73, ¶¶ 255-260, 264-267.   The central overbreadth question is whether the AG's censorship reaches a "substantial amount of constitutionally protected conduct," as opposed to just a "single impermissible application."  *City of Houston, Tex. v. Hill*, 482 U.S. 451, 458 (1987).  The motion challenges this claim by arguing that Section (*l*)(2) sweeps in *no unconstitutional conduct* whatsoever.  Doc. 69-1 at 17.  On the contrary, though, Section (*l*)(2) meets the test by sweeping in massive amounts of speech that could not possibly be constitutionally proscribed.

First, Section (*l*)(2) is overbroad because it criminalizes speech regardless of its relationship to illegal conduct.  A state may "suppress speech for advocating the use of force or a violation of law only if such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action."  *Ashcroft*, 535 U.S. at 253 (internal citations omitted).  A "contingent and indirect" relationship to criminal conduct will not suffice, nor will an allegation that there is "some unquantified potential for subsequent criminal acts."  *Id*. at 250.

Section (*l*)(2) does not target speech that is "directed to inciting or producing *imminent lawless action* and is likely to incite or produce such action"—it targets *every instance of distribution*.  *See id.* at 253.  Virtually all the speech it covers falls

squarely on the protected side of the line, either because the expression's recipients commit no illegal act at all or because, if they did, the causal link is merely contingent and indirect.  *Cf. Staples v. United States*, 511 U.S. 600, 610 (1994) ("[T]here is a long tradition of widespread lawful gun ownership by private individuals in this country.").  Yet this law still criminalizes every instance of "distribut[ion]" no matter what.

Second, New Jersey's speech crime is overbroad because it criminalizes sharing information about any "firearm component."  This covers a wide array of generic items—such as fasteners, nuts, bolts, and screws—that have unlimited potential uses and are not unique to firearms.  Even if New Jersey could criminalize certain speech about a completed "firearm," it could not possibly criminalize speech about mundane parts available to anyone in any hardware store.

Third, New Jersey's speech crime is overbroad because it fails to distinguish between information that has, and has not, been committed to the public domain.  As noted, digital firearms information is already freely circulating in the public domain, and "the Government may not . . . restrict individuals from disclosing information that lawfully comes into their hands in the absence of a state interest of the highest order."  *United States v. Aguilar*, 515 U.S. 593, 605 (1995).  Yet this statute draws no distinction between truly novel "instructions" and those that everyone with a smartphone or computer has been able to obtain with simple Google search.

Yet another substantial set of speech that Section (*l*)(2) unconstitutionally criminalizes is speech done without the constitutionally-necessary scienter. States cannot criminalize speech without a stringent requirement of scienter—*i.e.*, knowledge of the fact that truly distinguishes innocent acts from guilty ones. *See, e.g.*, *Holder v. Humanitarian Law Project*, 561 U.S. 1, 16-17 (2010); *New York v. Ferber*, 458 U.S. 747, 765 (1982); *Smith v. California*, 361 U.S. 147, 153-54 (1960).[3] Section (*l*)(2) lacks the needed scienter element because it does not even require the speaker to *know* that instructions will "be used to program a three dimensional printer to manufacture or produce a firearm, firearm receiver, magazine, or firearm component"—let alone know that the recipient would use the information to engage in *illegal* production of a firearm. Hence, the requisite scienter requirement is missing. *See Rice v. Paladin Enters., Inc.*, 128 F.3d 233, 247-48 (4th Cir. 1997). Even if the statute could be constitutionally applied to persons *with* the requisite scienter, the statute is overbroad because it likewise criminalizes the substantial number of persons who speak without the requisite scienter.

Any one of these faults standing alone would meet the overbreadth doctrine's "substantial" threshold. Together they make the case overwhelming.

_____

[3] Footnote 10 of the AG's brief mentions the need for "knowing" action, but never defines what has to be known.  Doc. 69-1 at 34 n.10.

## IV.     The Second Amendment Claims Succeed.

The motion attacks the complaint's Second Amendment claim, *see* SAC at
73-74, ¶¶ 268-275,  with two discrete arguments.  Both are wrong.

### A.     The AG's restrictions implicate the Second Amendment right to "keep and bear Arms."

First, the motion argues that the Second Amendment claims fail because "a
limitation on the distribution of printable gun files does not implicate the plain text
of the Second Amendment."  Doc. 69-1 at 19.  But under a proper understanding of
the Second Amendment's text, *New York State Rifle & Pistol Association, Inc. v.
Bruen*, 213 L. Ed. 2d 387 (2022), and the rights at issue here, the AG's wrongdoing
most certainly implicates the Second Amendment's protections.

At issue here is the right to self-manufacture firearms and to maintain them.
Both are obviously implicated by a law restricting the actual production of a
"firearm, firearm receiver, magazine, or firearm component," and both are likewise
implicated by a law restricting *speech about* "produc[ing] a firearm, firearm
receiver, magazine, or firearm component."  N.J. Stat. § 2C:39-9(*l*)(2).

The Second Amendment's textual guarantee of "the right of the people to keep
and bear Arms" includes the right to self-manufacture firearms and to maintain them.
*See Ezell v. City of Chicago*, 651 F.3d 684, 704 ("[t]he right to possess firearms for
protection implies a corresponding right to acquire and maintain proficiency in their
use; the core right wouldn't mean much without the training and practice that make

23

it effective."); *Ill. Ass'n of Firearms Retailers v. City of Chicago*, 961 F. Supp. 2d 928, 930, 930 (N.D. Ill. 2014) ("the right to keep and bear arms for self-defense under the Second Amendment . . . must also include the right to acquire a firearm"); *Andrews v. State*, 50 Tenn. 165, 178 (1871) (the "right to keep arms, necessarily involves the right to purchase them, to keep them in a state of efficiency for use, and to purchase and provide ammunition suitable for such arms."). Indeed, the textually-expressed right to "keep and bear Arms" would mean nothing if those words did not also protect the corollary the rights to acquire and/or manufacture firearms and to maintain them. *Cf. Frein v. Pennsylvania State Police*, 47 F.4th 247, 256 (3d Cir. 2022) ("We would never say the police may seize and keep printing presses so long as newspapers may replace them, or that they may seize and keep synagogues so long as worshippers may pray elsewhere. Just as those seizures and retentions can violate the First Amendment, seizing and holding on to guns can violate the Second."); *Brandywine-Main Line Radio, Inc. v. F.C.C.*, 473 F.2d 16, 68 (D.C. Cir. 1972) ("The government cannot maintain a monopoly of the airways any more than it can maintain a monopoly of the streets, or of printing presses.").

### B.   The AG's restrictions are inconsistent with the Second Amendment.

Second, the AG argues that, even if the Second Amendment's protections apply here, "Subsection (l)(2) is still consistent with the Second Amendment." Doc. 69-1 at 21.  Not so.  *Bruen*'s sea change clearly spells the AG's defeat.

To justify a firearm regulation, the "government may not simply posit that the regulation promotes an important interest." *Bruen*, 213 L. Ed. 2d at 2126. The AG tries to do that here by touting the supposed virtues of making all citizens "go through a licensed manufacturer." Doc. 69-1 at 21-22.  That does not suffice.

"Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 213 L. Ed. 2d at 2126. A regulation only falls outside the "Second Amendment's 'unqualified command'" if it is "consistent with this Nation's historical tradition." *Id.* at 2126, 2130 (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50 n.10 (1961)).

Although it is the government's burden to carry, a brief review of history and tradition reveals that self-manufactured firearms have a long and, until recently, unregulated history in the United States. *See, e.g.*, Joseph G. S. Greenlee, *The American Tradition of Self-Made Arms*, 54 ST. MARY'S L.J. (forthcoming 2022), *available at* https://bit.ly/3Pz6hkJ. The unregulated self-manufacture of firearms was common in the American colonies, beginning with gunsmiths who made and repaired militia and hunting weapons and were "extremely important and highly valued in their communities." *See id.* at 9.[4]

---

[4] Indeed, colonists had the express right to import firearms and the parts necessary to make them. *Id.* at 9-10 (citing Francis Newton Thorpe, The Federal and State Constitutions, Colonial Charters, and Other Organic Laws of the States, Territories, and Colonies Now or Heretofore Forming the United States of America 3787–88 (Francis Newton Thorpe ed., 1909)). While "[i]n the large

Accordingly, colonial law reflected this understanding that the right to bear arms extended to commerce in firearms, which is necessarily associated with their manufacture. For instance, in Virginia, all persons had "liberty to sell armes and ammunition to any of his majesties loyall subjects inhabiting this colony." Laws of Va., Feb. 1676-77, Va. Stat. at Large, 2 Hening 403 (1823).

During the Revolutionary War, when the British attempted to prevent the Americans from acquiring firearms and ammunition, Americans were forced to manufacture their own firearms and gunpowder to survive. *See Greenlee*, *supra*, at 12–15 (citing M.L. Brown, Firearms in Colonial America: The Impact on History and Technology 1492-1792 127 (1980)). Due to the circumstances of the war, "[n]early every able-bodied male between 16 and 60 . . . [had] to provide his own arms" and some men "built their arms themselves." *Id.* at 25. Further, "[w]hen the colonies faced major arms shortages throughout the war, domestic arms manufacturing filled the void." *Id.* at 16.[5]  Indeed, several colonies solicited firearm

_____

gunsmith shops of the cities it is probable that many minds were given to the making of a gun . . . in the smaller shops which formed the great majority—mere cabins on the outskirts of the wilderness—one man with or without an apprentice did every part of the work." Charles Winthrop Sawyer, Firearms in American History 145 (1910); *see also* James B. Whisker, The Gunsmith's Trade 5 (1992) ("In small shops one tradesman performed all operations required to make a gun . . . There was no division of labor.").

[5] *See also* David B. Kopel, *Does the Second Amendment Protect Firearms Commerce?*, 127 HARV. L. REV. F. 230, 234 (2014) ("the right to engage in firearms commerce . . . is one of the most important reasons why America's political dispute with Great Britain turned into an armed revolution").

manufacturers, including those engaged in private manufacture and others outside of the firearms industry, to increase domestic production. *See* Greenlee, *supra*, at 18–23. Describing the landscape of firearms in early America in 1793, Thomas Jefferson wrote that "[o]ur citizens have always been free to make, vend, and export arms. It is the constant occupation and livelihood of some of them."  Letter from Secretary of State Thomas Jefferson to British Ambassador to the United States George Hammond, May 15, 1793, in 7 The Writings of Thomas Jefferson 325–26 (Paul Ford ed., 1904).

After the Revolutionary War, "[b]ecause gunsmithing was a universal need in early America, many early Americans who were professionals in other occupations engaged in gunsmithing as an additional occupation or hobby." Greenlee, *supra*, at 29. Specifically, "persons occupied as blacksmiths, whitesmiths, tinsmiths, locksmiths, silversmiths, farmers, clock and watchmakers, carpenters, mechanics, cutlers, stonemasons, merchants, and at least one attorney offered gunsmithing services." *Id.* at 29–31.

This tradition extended to pioneers, mountain men, and explorers whose need to make and repair firearms was a necessity to survive.  *Id.* at 32.  Moreover, although some early riflemakers forged their firearm parts from scratch, "there were gunsmiths who did not forge out their barrel blanks, but purchased them in bulk from some factory like that of Eliphalet Remington." John G.W. Dillin, The Kentucky

Rifle 96 (1975).  These riflemakers then fitted their barrels "to hand-made stocks with American factory or English locks."  *Id.*  The "precursor parts" of their day.

This tradition continued into the nineteenth and twentieth centuries, where "[m]any of the most important innovations in firearms technology began not in a federal armory or major firearms manufactory, but in private homes and workshops." Greenlee, *supra*, at 35.  Such innovations include "[t]he most popular rifle in America today . . . the AR-15, owned in the tens of millions . . . [whose] roots are in homebuilding." *Id.* at 39.

This history makes clear that, for essentially all of the relevant time period, anyone with the requisite skill could build firearms for any purpose; "[o]ne need not have had a wealthy patron or sponsor, or work for king and nobility, to make guns." *Id.* at 41 (internal citation omitted); Whisker, *supra*, at 6 ("Even those apprentices who had never completed an apprenticeship might enter the trade. No guild, union or government agency attempted to regulate the gun making business . . . He need not take any examination. He need not present one of his guns to any examining board."); *id.* at 90 ("Gunsmiths considered it to be their right to make guns without regulation or interference.").

In fact, no restrictions were placed on the self-manufacture of firearms for personal use in America during the seventeenth, eighteenth, or nineteenth centuries. *See* Greenlee, *supra*, at 40. Rather, "[a]ll such restrictions have been enacted within

the last decade." *Id.* (emphasis added). The first major federal gun regulation was not enacted until the 1934 National Firearms Act. And it narrowly regulated only "a subset of arms thought particularly suitable for criminal use."[6]  But the federal government has never required a license to build a firearm for personal use. *See Greenlee*, *supra*, at 42.[7]

Despite these laws—all of which were enacted long after the Founding and the passage of the Fourteenth Amendment—it has always been lawful to build arms for personal use under federal law with no special restrictions.  *See* What is ATF Doing in Regards to People Making Their Own Firearms, BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES (May 14, 2015), https://bit.ly/3YyRxX1 (last visited Dec. 18, 2022) ("An individual may generally make a firearm for personal use.").  At the state level, it was not until 2016 that a small minority of states began to regulate the manufacture of arms for personal use. *See* Greenlee, *supra*, at 42.

In sum, there is no historical tradition in the United States of regulating, let alone prohibiting, the self-manufacture of firearms or the communication of methods

---

[6] Jake Charles, *Ghost Guns, History, and the Second Amendment*, DUKE CENTER FOR FIREARMS LAW (Apr. 27, 2022), https://firearmslaw.duke.edu/2022/04/ghost-guns-history-and-thesecond-amendment/.

[7] Instead, restrictions applying to self-manufactured firearms generally apply to all firearms—for instance, "the making of a firearm that falls within the scope of the National Firearms Act requires advanced approval by [ATF], as well as a tax payment. But no federal law uniquely targets arms built for personal use." *Id.* at 42–43.

needed to do so.   By doing just that, New Jersey's newly-enacted, draconian restrictions violate the Second Amendment. *See Bruen*, 142 S. Ct. at 2130.

## V.    The Equal Protection Clause Claims Succeed.

The motion attacks the complaint's Equal Protection Clause claims, *see* SAC at 74-75, ¶¶ 276-283, with arguments about what kind of *proof* is required at that stage.   Every major case cited is about summary judgment or trial *proof*.   But of course, at this Rule 12 motion stage, proof is irrelevant.   It suffices for the complaint to say, shortly and plainly, that the AG "took action against Defense Distributed-but not similarly situated persons engaged in publication of the Defense Distributed I Files because [the AG] disagrees with the content of Defense Distributed's constitutionally protected speech and because [the AG] dislikes the persons involved in the speech; as such, [the AG's] conduct violates Defense Distributed and SAF's right to the equal protection of the laws."   SAC at 74, ¶ 280 (citing *Whren v. United States*, 517 U.S. 806 (1996)).

Substantial plausibility is lent to these allegations by the allegations of what the AG and Section (*l*)(2)'s enactors said when putting the law into effect.   *See* SAC at 42-43 , ¶ 147-153.   They linked the bill to the cease-and-desist letter that the AG issued to Defense Distributed, they said that the bill was to "stop" Defense Distributed founder "Cody Wilson."   *Id.*   No cited case has such allegations of lawmakers targeting the plaintiff and his company *expressly by name*.   Furthermore,

even if a complaint had to give some detail about similarly situated parties that have not been prosecuted, this complaint does. *Id.* at 18, 74 ¶ 68, 280.

## VI.   The Due Process Clause Claims Succeed.

The motion attacks the complaint's Due Process Clause claims, *see* SAC at 75-76, ¶¶ 284-293, with three arguments.  All are wrong.

First, the AG attacks the Due Process Clause claim about deprivation of the Plaintiffs' federal license.  According to the motion, the State Department alone is to blame for this strain of wrongdoing because the AG was not the one "directly depriving the third party of any right whatsoever." Doc. 69-1.  But this idea of total independence (of the AG from the State Department) contradicts one of the complaints most important sets of allegations that the Fifth Circuit rightly recognized in *Bruck* when analyzing this same complaint: "the principal claims against both defendants are temporally and factually intertwined" because the complaint plausibly alleges that the State Department and AG *worked together* to deprive Plaintiffs of their federal rights. *Defense Distributed v. Bruck*, 30 F.4th 414, 430 (5th Cir. 2022) ("The State Department's noncompliance may have been caused by . . . the NJAG's public campaign against the settlement.").

The AG's second argument is that this claim should fail because the State Department is "not before the court." Doc. 69-1 at 31.  But that flies in the face of everything the AG said to obtain the severance order from the Western District of

Texas—the one that separated the Plaintiffs' claims against the AG from the Plaintiffs' claims against the State Department (and was reversed by *Bruck*).  If this point is correct, it is not a reason to dismiss, but is instead a reason to put this case against the AG back with the case against the State Department.

The motion's third argument concerns vagueness.  According to the AG, the vagueness claim cannot be brought because everything the Plaintiffs want to say is "clearly proscribed" by the statute.  Doc. 69-01 at 33.  But while it is true that *some* of what the Plaintiffs spoke in the past and intent to speak in the future is clearly covered, coverage for plenty of the speech at issue is extraordinarily vague.

A crux of the vagueness problem is that New Jersey's law criminalizes code or instructions "*that may be* used to program a three-dimensional printer to manufacture or produce a firearm, firearm receiver, magazine, or firearm component."  N.J. Stat 2C:39-9(*l*)(2) (emphasis added).  But it is impossible for a speaker to know what counts as "code . . . *that may be* used to" engage in such programming.  In the same way that "(w)hat is contemptuous to one man may be a work of art to another," *Smith v. Goguen*, 415 U.S. 566, 575 (1974), what "may be used" by one programmer can be totally useless to another.  Speakers like Defense Distributed cannot tell in advance on which side of the line their speech will fall.

The AG's brief often says that the statute only covers "functional" code, as though that provides the necessary clarity.  *E.g.*, Doc. 69-1 at 34.  But the supposed keystone term "functional" is *nowhere in the statute*.  The whole point of the Due Process Clause's vagueness doctrine is to stop situations like this, where a dramatically ambiguous criminal law is interpreted by government lawyers one way one day and a different way the next—all without real textual anchors.

The scienter mystery fuels the vagueness problem as well.  As Plaintiffs read it, the statute has no meaningful scienter requirement at all and is therefore constitutionally invalid.  *See supra* Part IV.C.  But the AG injects undertainty by saying that only "knowing" violations are covered.  Doc. 69-1 at 34 n.10.  Under that view, what has to be "known" for this crime to occur?  No one can tell with any reasonable certainty, making the crime unconstitutionally vague in yet another way.

## VII.   The Commerce Clause Claims Succeed.

Two modes of judicial review occur in dormant Commerce Clause cases. Apart from the default balancing test of *Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970), strict scrutiny applies to any law that discriminates against out-of-state economic interests on its face, in its purpose, or in its practical effect.  *E.g.*, *Wyoming v. Oklahoma*, 502 U.S. 437, 454-55 (1992).  The motion attacks the complaint's Commerce Clause claims, *see* SAC at 76-78, ¶¶ 294-303, by trying to defeat both modes of analysis.  But neither effort succeeds.

33

First, the motion tries to avoid strict scrutiny by saying that "New Jersey is regulating only conduct involving the State."  Doc. 69-1 at 24-25.  But that flatly contradicts what the law's creators said at inception.  From a public podium they announced to the world that the speech crime would be used to "stop" Defense Distributed founder "Cody Wilson" and "his supporters" from "releas[ing] these codes online."  SAC at 42, ¶ 149.  The pleaded fact of a discriminatory purpose is enough on its own to trigger strict scrutiny.  And it accords with the law's text, which also triggers strict scrutiny because it is *not* limited to conduct inside of New Jersey.

Section (*l*)(2)'s text triggers strict scrutiny because it does indeed discriminate against out-of-state economic interests by "regulat[ing] conduct that takes place exclusively outside the state."  *Backpage.com, LLC v. Hoffman*, No. 13-CV-03952 DMC JAD, 2013 WL 4502097, at *11 (D.N.J. Aug. 20, 2013).   Specifically, discrimination occurs with respect to website publication: even though speakers like Defense Distributed operate their websites in a passive fashion from outside of New Jersey, Section (*l*)(2) expressly projects New Jersey's law about what can and cannot be said on the internet throughout the entire Union.  *See Am. Libraries Ass'n v. Pataki*, 969 F. Supp. 160, 182 (S.D.N.Y. 1997).  Discrimination also occurs with respect to the statute's "offer" and "advertisement" bans.  That conduct will often occur entirely outside of New Jersey—such as at the trade shows that Defense Distributed attends—and still qualify as a crime under Section (*l*)(2).

34

Each of these applications are direct and substantial parts of the statute. Section (*l*)(2) is therefore unconstitutional per se, "regardless of whether the statute's extraterritorial reach was intended by the legislature." *Healy v. Beer Inst.*, 491 U.S. 324, 336 (1989); *see Am. Booksellers Found. v. Dean*, 342 F.3d 96, 104 (2d Cir. 2003); *Pataki*, 969 F. Supp. at 182.

Wholly apart from the issue of strict scrutiny, the AG's motion to dismiss cannot defeat the Commerce Clause claim otherwise. For even if that standard does not apply, the intensly-factual *Pike* balancing inquiry must still occur, and on this complaint the *Pike* balancing theory is completely viable.

The balancing test of *Pike v. Bruce Church, Inc.,* 397 U.S. 137 (1970), applies by default to laws that escape strict scrutiny because they are "directed to legitimate local concerns, with effects upon interstate commerce that are only incidental." *United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 346 (2007). It invalidates laws if the burden on interstate commerce is "clearly excessive in relation to the putative local benefits." *Pike*, 397 U.S. at 142. The complaint cannot be dismissed because it sufficiently pleads that Section (*l*)2 violates *Pike*. *See* SAC at 76-78, ¶¶ 294-303.

Courts cannot render automatic judgments about the *Pike* balancing test without an extensive evidentiary record. This is not a case of rational basis review, where courts are sometimes allowed to utilize "speculation unsupported by evidence

or empirical data." *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993) (emphasis added). The dormant Commerce Clause supplies a more demanding standard.

Even when *Pike* and not strict scrutiny applies, courts employing the balancing test cannot just conjure up supposed "legitimate local concerns" to support restrictive laws and regulations. Nor can courts conducting the *Pike* balancing test simply conjure up the "burden" on one side of the scale and "benefits" on the other. Litigants must establish these matters with evidence. *See Frazier v. Heebe*, 482 U.S. at 646 ("empirical evidence" is needed); *Colon Health Centers of Am., LLC v. Hazel*, 813 F.3d 145 , 159 (4th Cir. 2016) ("speculative" interests do not suffice).  In light of these principles, the AG cannot possibly have defeated the *Pike* balancing strain of Plaintiffs' Dormant Commerce Clause claim by baldly asserting in a motion that the law's practical benefits outweigh its burdens on the interstate market.

## VIII. The Arms Export Control Act Claims Succeed.

New Jersey's use of Section 3(*l*)(2) to stop Plaintiffs' publication of digital firearms information is preempted by the federal government's exclusive authority over foreign affairs. Specifically, Congress charged the executive branch with administering and enforcing pertinent provisions of the Arms Export Control Act of 1976 ("AECA"), 22 U.S.C. ch. 39, and the International Traffic in Arms Regulations

("ITAR"), 22 C.F.R. Parts 120-130.  *See* 28 U.S.C. §§ 516, 519; *see also* 22 U.S.C. § 2778(a)(1); 22 U.S.C. § 2778(g)(6); 22 U.S.C. § (e)(2)(A);  22 C.F.R. § 126.7(a).

By seeking to criminalize Plaintiffs' publication of matters that the State Department has expressly authorized for publication, New Jersey seeks to have its legislature take over the President's job of "control[ling] the import and the export of defense articles." § 2778(a)(1).  States cannot regulate this aspect of foreign policy.  *See Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 375 (2000); *Nat'l Foreign Trade Council, Inc. v. Giannoulias*, 523 F. Supp. 2d 731, 738-742 (N.D. Ill. 2007).  The Supremacy Clause forbids this usurpation of federal power.  *See Armstrong v. Exceptional Child Ctr., Inc.*, 135 S. Ct. 1378, 1384 (2015).

The motion attacks the complaint's Arms Export Control Act claims, *see* SAC at 78-79, ¶¶ 304-310, with one argument.  According to the AG, preemption via the Arms Export Control Act does not occur because federal law regulates only "international" speech and New Jersey's law regulates just speech in New Jersey. Doc. 69-1 at 35.  But that position completely contradicts the AG's decision to sue the State Department in Washington *for the purpose of stopping changes to the federal scheme*.  The AG's scope argument—that the federal scheme does not govern and impact what happens in New Jersey—was rightly rejected in *Washington v. United States Dep't of State*, 318 F. Supp. 3d 1247, 1255 (W.D. Wash. 2018) ("Defendants' argument is so myopic and restrictive as to be unreasonable.

37

Whatever defendants' statutory authority, the fact is that the internet is both domestic and international. The federal defendants' determination that the 3D files at issue are subject to regulation under ITAR . . . ha[s] domestic repercussions as well.").

The motion also attacks this preemption theory by saying that it is "possible to comply with both federal and state law." Doc. 69-1 at 36. But that is clearly not so where, as here, the federal law goes far beyond not forbidding conduct and *affirmatively licenses it*. *See* FAC at 28-29, ¶ 91.

## IX.    The Communications Decency Act Claims Succeed.

Congress immunized the Plaintiffs from prosecution under Section 3(*l*)(2) with the Communications Decency Act of 1996 ("CDA"), "Congress's grant of 'broad immunity' to internet service providers 'for all claims stemming from their publication of information created by third parties.'" *Google, Inc. v. Hood*, 822 F.3d 212, 220 (5th Cir. 2016). CDA Section 230(c)(1) provides that, for interactive computer services such as a website, "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1).[8] Section

---

[8] "The term 'information content provider' means any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service." § 230(f)(3).

230(e)(3), in turn, preempts state laws that are "inconsistent with" subsection (c)(1). 47 U.S.C. § 230(e)(3).

Plaintiffs' case directly implicates CDA Section 230.  Much of the digital firearms information that Defense Distributed published in the past, and desires to publish in the future, is "information provided by another information content provider."  47 U.S.C. § 230(c)(1); *see* SAC at 12-18 , ¶¶ 42-67.  While this action certainly concerns the Plaintiffs' right to publish *new* digital firearms information, for purposes of the CDA, this case also implicates Plaintiffs' right to *republish* digital firearms information that was provided by other people engaged in the open source development process.

Section 3(*l*)(2) criminalizes the distribution of information regardless of whether information was *re*published—*i.e.*, "provided by another information content provider."  As such, Section 3(*l*)(2) is facially "inconsistent with" Section 230(c)(1) and preempted.  This conclusion is not novel.  Courts have consistently invalidated similar state criminal laws because they were preempted by CDA Section 230.  *See Backpage.com, LLC v. Hoffman*, No. 13-CV-03952 DMC JAD, 2013 WL 4502097, at *1 (D.N.J. Aug. 20, 2013); *Backpage.com, LLC v. Cooper*, 939 F. Supp. 2d 805, 823 (M.D. Tenn. 2013); *Backpage.com, LLC v. McKenna*, 881 F. Supp. 2d 1262, 1271 (W.D. Wash. 2012).  This claim is just as viable as those.

## X.      The Tortious Interference Claims Succeed.

The AG attacks the complaint's tortious interference claims, *see* SAC at 80-82, ¶¶ 318-328,  by saying that sovereign immunity bars them, Doc. 69-1 at 38. But regardless of what general rules of immunity might afford states, the AG here waived that immunity by voluntarily proceeding in federal court against the Plaintiffs (in the Washington litigation, *see* SAC at 30-34, 45, ¶¶ 95-109, 159) to accomplish the wrongdoing that gives rise to the tortious interference claims.  Under *Lapides v. Board of Regents of University System of Georgia*, 535 U.S. 613 (2002), and its progeny, the AG has either committed waiver as a matter of law or acted so inequitably with his litigation tactics as to make waiver a fact issue inappropriate for automatic dismissal.  *See id.* at 619 ("It would seem anomalous or inconsistent for a State both (1) to invoke federal jurisdiction, thereby contending that the 'Judicial power of the United States' extends to the case at hand, and (2) to claim Eleventh Amendment immunity, thereby denying that the 'Judicial power of the United States' extends to the case at hand.").  Finally, sovereign immunity is an affirmative defense that must be pleaded to matter, *see Tritchler v. Cnty. of Lake*, 358 F.3d 1150, 1153 (9th Cir. 2004), and it has not been pleaded it here.  So at this point, at least, there is no immunity defense to contend with.

### Conclusion

The motion to dismiss should be denied.

Date: December 20, 2022                    Respectfully submitted,

BECK REDDEN LLP                            HARTMAN & WINNICKI, P.C.
Chad Flores                                s/ Daniel L. Schmutter
cflores@beckredden.com                     Daniel L. Schmutter
1221 McKinney Street, Suite 4500           dschmutter@hartmanwinnicki.com
Houston, Texas 77010                       74 Passaic Street
(713) 951-3700                             Ridgewood, New Jersey 07450
                                           (201) 967-8040

                    Counsel for Plaintiffs